UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------x
                                :

*TLA Claimholders Group*,

                 Appellant,    :

  -against-            :  No. 22-cv-5891-DLC

*LATAM Airlines Group, S.A.*,    :

             Debtor-Appellee.  :

-------------------------------------------------x

*In re LATAM Airlines Group, S.A.*,

             Debtors.

-------------------------------------------------x

On Appeal From The United States Bankruptcy Court
For The Southern District Of New York

Case No. 20-bk-11524

The Honorable James L. Garrity, Jr.

**OPENING BRIEF OF AD HOC GROUP OF TLA CLAIMHOLDERS**

DANIEL A. FLIMAN
CHRISTOPHER M. GUHIN
EMILY L. KUZNICK
MATTHEW GAROFALO
JOHN F. IAFFALDANO
PAUL HASTINGS LLP
200 Park Ave.
New York, NY 10166
Telephone:  212.318.6000
Facsimile:  212.319.4090

MATTHEW D. MCGILL
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone:    202.955.8500
Facsimile:    202.467.0539

*Counsel for the TLA Claimholders Group*

i

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Bankruptcy Procedure 8012, the TLA Claimholders Group states that it is an ad hoc group of institutions or funds. The institutions or funds that are members of the TLA Claimholders Group are as follows:

*Merrill Lynch Credit Products, LLC*. Merrill Lynch Credit Products, LLC, is a wholly owned subsidiary of Bank of America Corporation, which is a publicly held corporation.

*Centerbridge Credit Partners Master, L.P.; Centerbridge Special Credit Partners III-Flex, L.P.* Centerbridge Credit Partners Master, L.P., and Centerbridge Special Credit Partners III-Flex, L.P., are limited partnerships advised by Centerbridge Partners, L.P. None of these entities is publicly traded and no publicly held corporation owns 10% or more of their respective equity interests.

Dated: July 18, 2022

GIBSON, DUNN & CRUTCHER LLP

/s/ Matthew D. McGill
Matthew D. McGill

*Counsel for the TLA Claimholders Group*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................ ii

TABLE OF AUTHORITIES ..........................................................................v

INTRODUCTION ......................................................................................... 1

STATEMENT OF JURISDICTION..............................................................6

STATEMENT OF THE ISSUES...................................................................6

STATUTORY BACKGROUND....................................................................7

STATEMENT OF FACTS ............................................................................9

    I.   TLA Borrowed Money In Exchange For Notes Held By The TLA Claimholders. ...................................................................................9

    II.  The Debtors Crafted A Reorganization Plan That Shifts Value From TLA's Creditors To Its Equity Holder. .................................10

    III. The Bankruptcy Court Overruled The TLA Claimholders' Objection And Confirmed The Plan..............................................13

        A.   The TLA Claimholders Challenged Their Treatment Under The Plan. ...........................................................................13

        B.   The Court Adopted The Debtors' Standard And Overruled The TLA Claimholders' Objection. .........................................15

SUMMARY OF ARGUMENT ....................................................................18

STANDARD OF REVIEW .........................................................................22

ARGUMENT ...............................................................................................22

    I.   The Plan Must Repay The TLA Claimholders In Full, Including Post-Petition Interest, Because The Plan Designates The TLA Claimholders As Holders Of Unimpaired Claims. ...................................22

        A.   Chapter 11 Reorganizations Turn On The Fundamental Distinction Between Impaired And Unimpaired Creditors................22

        B.   The Code's Text Demands Than An Unimpaired Creditor Must Receive Interest That Accrues During The Bankruptcy. ...................24

C.   The Code's Statutory History Reaffirms That Unimpaired Creditors Must Receive Interest That Accrues During The Bankruptcy. ........................................................................29

D.   The Code's Protection Of Unimpaired Creditors Builds On Centuries Of Caselaw Protecting Creditors' Priority Over Shareholders. ...............................................................30

E.   The TLA Claimholders Must Receive Post-Petition Interest Because The Debtors Designated Them Unimpaired. .......................32

F.   The TLA Claimholders' Post-Petition Interest Must Be Paid In Accordance With The Debt Instruments. ...........................................34

II.   The Bankruptcy Court Erred In Confirming A Plan That Paid Zero Post-Petition Interest To Unimpaired Creditors. ......................................35

A.   The Bankruptcy Court's Theory of Code Impairment Contravenes The Text Of Section 1124(1). .........................................38

B.   Section 502(b)(2) Does Not Prohibit Payment Of Post-Petition Interest On An Allowed Claim. .............................................................41

C.   The Bankruptcy Court Compounded Its Error In Holding Post-Petition Interest Is Available Only After A Factual Determination Of Solvency Of The Debtor. .......................................43

D.   If Solvency Were Relevant, The Bankruptcy Court Applied The Wrong Legal Standard Of Valuation. ..................................................46

E.   The Bankruptcy Court Erred By Construing Code Provisions Applicable Only To Impaired Creditors To Reduce The Rate Of Interest Owed. ........................................................................................49

CONCLUSION ..................................................................................................50

CERTIFICATE OF COMPLIANCE ................................................................52

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re 53 Stanhope LLC*,
   625 B.R. 573 (Bankr. S.D.N.Y. 2021)................................................................35

*In re Ahlers*,
   794 F.2d 388 (8th Cir. 1986) ............................................................................23

*Am. Iron & Steel Mfg. Co. v. Seaboard Air Line Ry.*,
   233 U.S. 261 (1914)..........................................................................................31

*In re Amster Yard Assocs.*,
   214 B.R. 122 (Bankr. S.D.N.Y. 1997)..............................................................25

*Assocs. Comm. Corp. v. Rash*,
   520 U.S. 953 (1997)....................................................................................47, 48

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
   526 U.S. 434 (1999)..............................................................................1, 30, 42

*In re Beck*,
   128 B.R. 571 (Bankr. E.D. Okla. 1991) ...........................................................50

*Beecher v. Leavenworth State Bank*,
   192 F.2d 10 (9th Cir. 1951) ..............................................................................31

*Matter of Beverly Hills Bancorp.*,
   752 F.2d 1334 (9th Cir. 1984) ..........................................................................31

*Bromley v. Goodere*,
   1 Atkyns 75 (1743) ...........................................................................................30

*Brown v. Leo*,
   34 F.2d 127 (2d Cir. 1929) ...............................................................................31

*Bullard v. Blue Hills Bank*,
   575 U.S. 496 (2015)............................................................................................6

*In re Charter Commc'ns*,
   419 B.R. 221 (Bankr. S.D.N.Y. 2011)..............................................................32

*Ex parte Clarke*,
  4 Ves. Jr. 677 (1799) ........................................................................................30

*Cohen v. de la Cruz*,
  523 U.S. 213 (1998) ..........................................................................................42

*Colfin Bulls Fundings LLC v. Paloian*,
  547 B.R. 880 (N.D. Ill. 2016) ................................................................32, 34, 50

*Consol. Rock Prods. v. Du Bois*,
  312 U.S. 510 (1941) ........................................................3, 30, 31, 42, 45, 47

*In re DBSD N. Am., Inc.*,
  634 F.3d 79 (2d Cir. 2011) .........................................................................22, 46

*Debentures Protective Comm. of Cont'l Inv. Corp. v. Cont'l Inv. Corp.*,
  679 F.2d 264 (1st Cir. 1982) ......................................................................31, 46

*In re Depietto*,
  2021 WL 3287416 (S.D.N.Y. Aug. 2, 2021) ..................................................27

*In re Dow Corning Corp.*,
  456 F.3d 668 (6th Cir. 2006) .....................................................................23, 50

*In re Dow Corning Corp.*,
  244 B.R. 678 (Bankr. E.D. Mich. 1999) .........................................................42

*In re Energy Future Holdings Corp.*,
  540 B.R. 109 (Bankr. D. Del. 2015) ..........................................................41, 49

*In re Fast*,
  318 B.R. 183 (Bankr. D. Colo. 2004) ..............................................................50

*In re G-I Holdings Inc.*,
  420 B.R. 216 (Bankr. D.N.J. 2009) .................................................................24

*In re Gaston & Snow*,
  1996 WL 694421 (S.D.N.Y. Dec. 4, 1996) .....................................................23

*In re Gen. Growth Props., Inc.*,
  451 B.R. 323 (Bankr. S.D.N.Y. 2011) ............................................................28

*In re L J Anaheim Associates*,
   995 F.2d 940 (9th Cir. 1993) ...............................................................................25

*In re Lafayette Hotel P'ship*,
   227 B.R. 445 (S.D.N.Y. 1998) ..........................................................................22

*Littleton v. Kincaid*,
   179 F.2d 848 (4th Cir. 1950) ...............................................................................31

*Louisville Trust Co. v. Louisville, N.A. & C. Ry. Co.*,
   174 U.S. 674 (1899)............................................................................................45

*In re Manville Forest Prods. Corp.*,
   896 F.2d 1384 (2d Cir. 1990) .............................................................................22

*Miles Corp. v. Lindel*,
   107 F.2d 729 (8th Cir. 1939) ..............................................................................31

*Ex parte Mills*,
   2 Ves. Jr. 296 (1793)..........................................................................................30

*In re Monclova Care Ctr., Inc.*,
   59 F. App'x 660 (6th Cir. 2003).......................................................26, 32, 34, 40

*In re Moshe*,
   567 B.R. 438 (Bankr. E.D.N.Y. 2017) .............................................................28

*In re Mullins*,
   633 B.R. 1 (Bankr. D. Mass. 2021) ..........................................16, 17, 23, 34, 42

*N. Pac. Ry. Co. v. Boyd*,
   228 U.S. 482 (1913)............................................................................................30

*In re New Valley Corp.*,
   168 B.R. 73 (Bankr. D.N.J. 1994) ............................................................3, 16, 29

*Norwest Bank Worthington v. Ahlers*,
   485 U.S. 197 (1988)..................................................................................1, 23, 44

*In re Oneida Ltd.*,
   351 B.R. 79 (Bankr. S.D.N.Y. 2006)..................................................................25

*Pacifica L 51, LLC v. New Invs. Inc.*,
  840 F.3d 1127 (9th Cir. 2016) ..............................................................28

*In re Perez*,
  30 F.3d 1209 (9th Cir. 1994) ..........................................................23, 41

*In re Prud. Energy Co.*,
  58 B.R. 857 (Bankr. S.D.N.Y. 1986)....................................................46

*In re Roblin Indus., Inc.*,
  78 F.3d 30 (2d Cir. 1996) .....................................................................48

*Ruskin v. Griffiths*,
  269 F.2d 827 (2d Cir. 1959) .........................................3, 4, 31, 42, 45

*S.W. Airlines Co. v. Saxon*,
  142 S. Ct. 1783 (2022)...........................................................................39

*Sexton v. Leopold Louis Dreyfus*,
  219 U.S. 339 (1911)................................................................................30

*Solow v. PPI Enters. (U.S.) Inc.*,
  324 F.3d 197 (3d Cir. 2003) ...........................................24, 33, 38, 40

*In re SunEdison, Inc.*,
  556 B.R. 94 (Bankr. S.D.N.Y. 2016)....................................................48

*In re Taddeo*,
  685 F.2d 24 (2d Cir. 1982) ................................ 18, 19, 24, 25, 27, 28, 34, 41, 50

*In re Ultra Petroleum Corp.*,
  943 F.3d 758 (5th Cir. 2019) (*Ultra Petroleum I*)........................35, 38

*Ultra Petroleum Corp. v. Ad Hoc Group of Unsecured Creditors of Ultra Res.*,
  624 B.R. 178 (Bankr. S.D. Tex. 2020) ...........................................17, 33

*Windsor on the River Assocs., Ltd. v. Balcor Real Estate Fin.*,
  7 F.3d 127 (8th Cir. 1993) ...................................................................25

*Wolkowitz v. Am. Rsch. Corp.*,
  170 F.3d 1197 (9th Cir. 1999) .............................................................48

## STATUTES

11 U.S.C. § 101(5) ...................................................................................25, 26, 38, 40

11 U.S.C. § 101(32) ........................................................................................5, 21, 46

11 U.S.C. § 103(b) ....................................................................................................49

11 U.S.C. § 502(b) .............................................. 4, 15, 20, 36, 38, 40, 41, 42, 43, 49

11 U.S.C. § 702 ........................................................................................................39

11 U.S.C. § 724(b) ...................................................................................................39

11 U.S.C. § 726(a) .......................... 4, 5, 9, 17, 20, 21, 24, 36, 37, 39, 41, 44, 49, 50

11 U.S.C. § 1122(a) ...................................................................................................7

11 U.S.C. § 1123(a) ...................................................................................................7

11 U.S.C. § 1123(d) ....................................................................................7, 8, 27, 34

11 U.S.C. § 1124(1) ......................................... 2, 6, 8, 9, 11, 15, 18, 19, 20, 25, 26,
...................................................... 27, 28, 29, 30, 34, 35, 36, 38, 39, 40, 43, 51

11 U.S.C. § 1124(2) ......................................................... 8, 18, 26, 27, 28, 34, 38

11 U.S.C. § 1124(3) (1988) ...................................... 3, 4, 7, 8, 9, 16, 18, 20, 25, 29,
..................................................... 31, 32, 33, 35, 36, 39, 41, 42, 43, 44

11 U.S.C. § 1126(c) ...........................................................................................8, 39, 40

11 U.S.C. § 1126(f) ............................................................................2, 9, 11, 24

11 U.S.C. § 1129(a) .......................... 8, 9, 16, 17, 20, 21, 22, 23, 36, 37, 43, 44, 49

11 U.S.C. § 1129(b) ........................................... 1, 2, 8, 9, 16, 17, 19, 22, 24, 35, 49

28 U.S.C. § 157 ........................................................................................................6

28 U.S.C. § 158(a) ...................................................................................................6

28 U.S.C. § 1334 ......................................................................................................6

28 U.S.C. § 1961 ....................................................................................................50

Bankruptcy Reform Act of 1994,
Pub. L. 103-394, § 213, 108 Stat. 4106 ..........................................................3, 29

**OTHER AUTHORITIES**

2 Collier on Bankruptcy ¶ 101.32[4] (16th ed. 2018).......................................21, 48

H.R. Rep. No. 103-835, *reprinted in* 1994 U.S.C.C.A.N. 3340 (1994) ........3, 29, 32

S. Rep. No. 95-989, reprinted in 1978 U.S.C.C.A.N. 5787 (1978)..................24, 42

## INTRODUCTION

The Appellant, the TLA Claimholders Group, consists of unsecured creditors of TAM Linhas Aéreas ("TLA"), commonly known as LATAM Airlines Brasil, an indirect wholly owned subsidiary of LATAM Airlines Group, S.A. ("LATAM," and together with its affiliate debtors and debtors-in-possession, the "Debtors"). TLA is one of Brazil's two largest airlines and is the largest airline in the LATAM conglomerate. TLA, indisputably, is one of LATAM's most valuable assets, accounting for 50% of its passenger traffic.

The most important fact relating to this appeal is that TLA's plan of reorganization provides that LATAM's 100% equity stake in TLA is fully reinstated. This is important because it implicates bankruptcy's "absolute priority rule," which, as the Supreme Court has explained, commands that "creditors ... be paid before the stockholders could retain [equity interests] for any purpose whatever." *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 444 (1999) (citation omitted; alteration in original). That venerable rule now has "express statutory force," incorporated as part of the confirmation prerequisite that a bankruptcy plan be "fair and equitable." *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988) (citing 11 U.S.C. § 1129(b)(2)(B)(ii)). But, under the Code, that protection applies only to a class that has voted to reject the plan. And the only creditors who get to vote are those whose claims are *impaired* by the plan.

1

The amount of interest that has accrued on the TLA Claimholders' notes since the filing of the petition is substantial—well over $100 million.  While TLA's plan proposed to reinstate all of LATAM's equity in TLA, it proposed to pay none of that accrued interest; it proposed to pay only the amount of the TLA Claimholders' claims as of the petition date.  To forestall a challenge to this plan under the absolute priority rule, the Debtors' Plan designated the TLA Claimholders' class of claims as ***unimpaired***.  Under the Code, an unimpaired class cannot vote on the plan and instead is conclusively presumed to accept it.  *See* 11 U.S.C. § 1126(f).  Unable to vote, the TLA Claimholders could not challenge it under section 1129(b)'s "fair and equitable" requirement.  Through this clever scheme, TLA retains more than $100 million of value for the benefit of its sole equity holder.

That highly anomalous result—a class of unimpaired creditors left worse off under a plan than if they had been impaired and voted against it—is contrary to the text and history of chapter 11, and centuries of bankruptcy practice and precedent.

Start with the text: Under section 1124(1) of the Code, a creditor may be treated as unimpaired and denied a vote on the plan only if the plan "leaves unaltered the legal, equitable, and contractual rights to which [the creditor's] claim … entitles the holder of such claim." 11 U.S.C. § 1124(1).  Here, the TLA Claimholders' "claims" are debt instruments all of which indisputably provide for payment of interest after default.  A plan that eliminates the TLA Claimholders' contractual rights

2

to receive post-default interest quite obviously does not leave those contractual rights "unaltered."

And then there is the history of section 1124. Prior to 1994, section 1124 provided that a creditor would be unimpaired if "the holder of such claim ... receive[s] … cash equal to the allowed amount of such claim" on the effective date of the plan. 11 U.S.C. § 1124(3) (1988). In 1994, a bankruptcy court concluded that, under this provision, a debtor could avoid paying post-petition interest to creditors, and could retain that value for junior classes, by designating creditors as unimpaired and paying them the cash value of their allowed claims, just as the Debtors' plan here does with respect to the TLA Claimholders. *In re New Valley Corp.*, 168 B.R. 73, 75–76 (Bankr. D.N.J. 1994). Declaring this an "unfair result," H.R. Rep. No. 103-835, at 48, *reprinted in* 1994 U.S.C.C.A.N. 3340, 3356, Congress repealed section 1124(3). Bankruptcy Reform Act of 1994, Pub. L. 103-394, § 213, 108 Stat. 4106, 4125. The bankruptcy court's decision here effectively revives it.

The decision below also contradicts decades of bankruptcy caselaw recognizing that, if a creditor was not made whole in a reorganization that reinstated equity holders, "some of [the creditors'] property rights will be appropriated for the benefit of stockholders without compensation." *Consol. Rock Prods. v. Du Bois*, 312 U.S. 510, 529 (1941). That is why the Second Circuit, in *Ruskin v. Griffiths*, 269 F.2d

3

827 (2d Cir. 1959), required the creditors be paid "the expressly-bargained-for" rate of pendency interest when a plan provided an equity recovery. *Id.* at 832.

The bankruptcy court's errors originate in its misreading of section 502(b)(2) of the Code. Section 502(b)(2) prohibits including "unmatured interest"—which is to say, interest not yet accrued—as part of an allowed claim, which is calculated as of the petition date. 11 U.S.C. § 502(b)(2). The bankruptcy court misapprehended this provision as generally prohibiting payment of post-petition interest. But nothing in section 502(b)(2) prohibits payment of interest that actually has accrued on an allowed claim after the petition date but prior to payment. Indeed, the best interest of creditors test contemplates exactly that. *See* 11 U.S.C. § 726(a)(5). Interest that has accrued is not "unmatured interest" at all; section 502(b)(2) is inapplicable.

The bankruptcy court compounded its error when, in an effort to reconcile its flawed reading of section 502(b) with Congress's repeal of section 1124(3) (and its clear implication that Congress intended that unimpaired creditors receive post-petition interest), the court held that post-petition interest could be paid, but only when the debtor is "solvent." A0676. This led to extensive—yet totally unnecessary—factual development as to whether TLA was solvent. The obligation to pay post-petition interest is triggered not by a showing that the debtors' assets exceed its liabilities, but rather by the fact that the plan of reorganization contemplates a recovery for equity. It is that circumstance that invokes the absolute priority rule and its

4

unyielding command that objecting creditors be paid in full, with interest, before value runs to equity. Whatever the value of TLA's assets, the Plan reinstated its equity; that compels payment of post-petition interest.

To the extent the valuation of the debtor's assets is relevant at all, the bankruptcy court erred in disregarding the value of TLA as a going concern. The bankruptcy court suggested that its methodology was compelled by the Code's definition of "insolvent." *See* 11 U.S.C. § 101(32). But that provision requires a "fair valuation" of the assets. And the "fair valuation" of a going concern's assets must look to the valuation of the going concern. After all, the Debtor filed for chapter 11 reorganization—not chapter 7 liquidation.

Finally, the bankruptcy court erred in stating, in an advisory portion of its opinion, that if the TLA Claimholders were owed post-petition interest, it should be paid only at the federal judgment rate. That conclusion is based on an incorrect interpretation of a provision—section 726(a)(5)—that undisputedly is textually limited to impaired creditors. Unimpaired creditors must be paid at their contract rate.

The Plan declared the TLA Claimholders unimpaired and thereby denied them the right to vote on the Plan and the protections afforded to dissenting impaired creditors. What the Code promises in return is that the TLA Claimholders' contractual rights under their notes would remain "unaltered." A straightforward reading of that

text requires that the TLA Claimholders be paid their full principal and all the interest that accrues under their contracts through the reconciliation of their claim.

## STATEMENT OF JURISDICTION

The bankruptcy court had jurisdiction to hear this bankruptcy proceeding under 28 U.S.C. §§ 157 and 1334.  The bankruptcy court's confirmation order was a final appealable order that was timely appealed on June 29, 2022.  *Bullard v. Blue Hills Bank*, 575 U.S. 496, 502 (2015) (confirmation order is a final order that "alters the status quo and fixes the rights and obligations of the parties").  This court has jurisdiction to hear this appeal under 28 U.S.C. § 158(a).

## STATEMENT OF THE ISSUES

When a chapter 11 plan designates a class of claims as unimpaired, section 1124(1) demands that the plan "leave[] unaltered the legal, equitable, and contractual rights" that the creditor was promised.  The Debtors' Plan designates the TLA Claimholders as unimpaired, but nevertheless denies them *any* contractual interest that has accrued since the filing of the petition.  At the same time, the Plan passes substantial value to TLA's sole shareholder by fully reinstating the equity.

The issues on appeal are:

(1)    Whether a plan of reorganization must pay unimpaired creditors the interest that has accrued since the filing of the petition in accordance with their "legal, equitable and contractual rights";

(2)    Whether unimpaired creditors may receive post-petition interest only when they demonstrate that the debtor is solvent;

(3)    If, as the bankruptcy court held, an unimpaired class is entitled to post-petition interest only when the creditors demonstrate that the debtor is "solvent," whether the bankruptcy court erred in holding that solvency should be determined without reference to the debtor's value as a going concern when the plan calls for the debtor to continue as a reorganized company; and

(4)    If the unimpaired TLA Claimholders are entitled to post-petition interest, whether the bankruptcy court erred in invoking a provision applicable only to impaired creditors to conclude that interest would be paid at the federal judgment rate rather than the rates provided in the TLA Claimholders' Debt Instruments.

## STATUTORY BACKGROUND

The concept of impairment is central to the administration of chapter 11 plans of reorganization.  Section 1122 of the Bankruptcy Code requires every plan of reorganization to divide creditor claims into classes of "substantially similar" claims. 11 U.S.C. § 1122(a).  Section 1123 then requires a plan to specify "any class … that is not impaired under the plan" and also to spell out "the treatment of any class of claims … that is impaired under the plan."  *Id*. § 1123(a)(2)–(3).  Section 1123 does not require the plan to specify the treatment of an *unimpaired* class.  Instead, section 1124 provides that a class of claims is unimpaired only if the plan "leaves unaltered

the legal, equitable, and contractual rights to which such claim … entitles the holder of such claim," or otherwise cures a default and reinstates in full the underlying obligation held by the class, with the "amount necessary to cure the default" "determined in accordance with the underlying agreement and applicable nonbankruptcy law." *Id.* § 1124(1); *id.* § 1123(d); *see also id.* § 1124(2) (reinstatement and cure provision). Unless the plan fully cures and reinstates the class's debt obligations in accordance with section 1124(2), or otherwise "leaves unaltered the legal, equitable and contractual rights to which such claim … entitles the holder," *id.* § 1124(1), the "class of claims … is impaired under a plan." *Id.* § 1124.

Section 1123 requires a plan to specify "the treatment" of impaired classes because the Code calls for impaired classes to vote on the plan of reorganization. *See* 11 U.S.C. § 1126(c). The ability to vote on the plan is critical, because section 1129 generally permits a bankruptcy court to confirm a plan of reorganization only if every impaired class votes to accept the plan. *See id.* § 1129(a)(8)(A). When a class votes to reject a plan, the court can "cram down" the plan only if "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims … that is impaired under, and has not accepted, the plan." *Id.* § 1129(b)(1). Moreover, even when an impaired class votes to accept a plan, each dissenting creditor within the class must receive at least the amount it would receive in a chapter 7 liquidation of the debtor. *See id.* § 1129(a)(7). This is known as the "best interests

of creditors" test.  Under the best interests of creditors test, before value can flow to the debtor's equity holders, a dissenting creditor with an allowed claim must be paid the full amount of the allowed claim plus "interest at the legal rate from the date of the filing of the petition, on any claim paid." *Id.* § 726(a)(5).

A class of unimpaired claims, on the other hand, does not get to vote on the plan.  Instead, the unimpaired class, and each holder of a claim of such class, "are conclusively presumed to have accepted the plan."  11 U.S.C. § 1126(f).  Accordingly, an unimpaired class cannot benefit from the "fair and equitable" requirement of section 1129(b); that is limited to "each class of claims … that is impaired under, and has not accepted, the plan." *Id.* § 1129(b)(1).  Nor can holders of unimpaired claims benefit from the best interests of creditors test incorporated in section 1129(a)(7); that test is reserved for a dissenting holder of a claim in an "impaired class." *Id.* § 1129(a)(7).  The holders of claims in a class that is not impaired benefit instead from the treatment required by section 1124—as relevant here, that the plan "leave[] unaltered the legal, equitable, and contractual rights to which such claim … entitles the holder of such claim." *Id.* § 1124(1).

## STATEMENT OF FACTS

## I.   TLA Borrowed Money In Exchange For Notes Held By The TLA Claimholders.

LATAM is a Latin American airline formed out of the merger of Chilean and Brazilian airlines.  The TLA Claimholders hold loans made to the Brazilian entity,

TLA.  LATAM is the ultimate parent of TLA, and holds the equity of TLA through its wholly owned subsidiary, TAM.  TLA is the Debtors' largest passenger airline entity, and in 2019 it carried approximately 50% of the Debtors' passenger traffic.  B.R.Dkt. 483 ¶ 8.[1]

The loans owned by the TLA Claimholders (the "Debt Instruments") arise from four offerings by Brazilian banks dated in 2018 and 2020.[2]  TLA's obligations under the Debt Instruments are unsecured.  The Debt Instruments provide for: (1) interest at a specified rate; (2) post-default rates of interest of 1% per month; (3) a 2% post-default late payment charge; and (4) fees and expenses, including attorneys' fees.  These Debt Instruments, governed by Brazilian law, are consistent with the market in Brazil and are enforceable.  A0644.

## II.     The Debtors Crafted A Reorganization Plan That Shifts Value From TLA's Creditors To Its Equity Holder.

LATAM, the ultimate parent company of TLA, and several of its affiliates (although not TLA) filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in May 2020.  Additional affiliates of LATAM, including TLA, filed petitions for relief in July 2020.  The cases were consolidated for procedural

---

[1]  Citations to "B.R.Dkt." refer to the bankruptcy docket below in the main proceeding, No. 20-11254.

[2]  The loans are listed in the TLA Claimholders' Objection to Confirmation, A103–A104, and are attached to their respective proofs of claims.

purposes only, and no substantive consolidation of the Debtors' estates has been ordered.

Under the confirmed plan of reorganization, A0873 (the "Plan"), the Debtors' various creditors are divided into eleven classes. The TLA Claims are placed in Class 6, which consists exclusively of general unsecured claims against Debtors other than LATAM and its two principal financing affiliates. *Id.* § 3.2(f)(i) at A0804. The Plan classified Class 6 as unimpaired and, accordingly, the Class 6 creditors are "conclusively presumed to have Accepted this Plan … and therefore are not entitled to vote" on the Plan. *Id.*; *see also* 11 U.S.C. § 1126(f).

The Plan provides that Class 6 creditors will receive: "(x) [c]ash equal to the amount of [their] Allowed Class 6 Claim; (y) such other less favorable treatment as to which the Debtors and the Holder of such Allowed Class 6 Claim shall have agreed upon in writing or (z) such other treatment such that the applicable Allowed Class 6 Claim will be rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code." A0804. When the TLA Claimholders argued that their status as unimpaired creditors required post-petition interest, the Debtors responded that the cash value of the allowed claims, and *no interest* for the period following the filing of TLA's bankruptcy petition was sufficient (*i.e.*, the treatment provided in clause (x)).

11

Meanwhile, the Plan provides that TLA's pre-bankruptcy shareholder—LATAM's subsidiary, TAM—retains complete ownership of TLA after the reorganization. Its equity stake is "preserved and Reinstated." A0806 at § 3.2(*l*)(ii). As a result of the reinstatement of TAM's interest in TLA and the Plan's reinstatement of LATAM's equity interests, even the shareholders of the Debtors' ultimate parent entity, LATAM, retain an equity stake in TLA.[3]

To secure confirmation of this Plan that (rather unusually) allowed the Debtors' shareholders to retain equity interests in the reorganized entities, the Debtors needed to entice impaired classes to vote to accept the Plan. To do that, the Debtors entered into backstop agreements offering fees totaling more than $700 million to select impaired creditors, which now are the subject of appeal No. 22-cv-5660. Having been designated unimpaired, Class 6 holders, including the TLA Claimholders, were not permitted to vote and instead were conclusively presumed to have accepted the Plan that paid them the cash value of their allowed claim, but no post-petition interest.

---

[3] The Plan provides that these prior shareholders "shall be retained and reinstated subject to the dilution" caused by the new stock and convertible notes issued to LATAM's creditors under the Plan. A0805 at § 3.2(k)(ii). Many of these pre-bankruptcy shareholders are also offered a preferential ability to reinvest in the reorganized company's common stock on highly favorable terms. A0818 at § 6.1.

### III. The Bankruptcy Court Overruled The TLA Claimholders' Objection And Confirmed The Plan.

#### A. The TLA Claimholders Challenged Their Treatment Under The Plan.

The TLA Claimholders objected to their treatment under the Plan, arguing that, as a disenfranchised, unimpaired class under a Plan that passed substantial value to TLA's equity holder, Class 6 was entitled to post-petition interest at the rates provided in the holders' contracts.  A101; A105; A265; A0626 at n.49, A0667–68; A0275, 164:9–13, A0438, 165:19–23, A0439, 171–74, A0445–48; *see also* B.R.Dkt. 6039, at 3–5 (cataloging argument).  The Debtors responded that the TLA Claimholders were not entitled to post-petition interest at all, A219, that if post-petition interest were available at all, it would be owed only if the TLA Claimholders proved TLA was solvent, and in that case, interest should be paid at the federal judgment rate and not the rates provided for in the Debt Instruments, A237.

To meet the Debtors' argument, the TLA Claimholders and the Debtors offered extensive expert evidence of TLA's solvency (or insolvency) based on entirely different methodologies.  The TLA Claimholders' expert, Santiago Dellepiane, provided models that calculated TLA's value as an operating business.  His calculations used the standard metric for valuation of a business—they looked at the projected future cash flows that TLA will realize in its ongoing operations and determined the present value of that income.  Dellepiane produced a value for TLA between $5.8

13

billion and $7.0 billion.  Using the accounting models that the Debtors used in other parts of the plan, Dellepiane calculated TLA's liabilities as $1.96 billion.  A0657 (citing Am. Dellepiane Decl. ¶¶ 31, 37).  But whether using Dellepiane's calculations of TLA's liabilities, or the Debtors' own higher estimate, subtracting those liabilities from his most conservative estimate of TLA's value, Dellepiane concluded that TLA was solvent, and that billions in residual value would pass to TLA's reinstated equity holder.  A0655 (citing Am. Dellepiane Decl. ¶ 37).

The Debtors offered the expert testimony of Brock Edgar, who gave two estimates based on two entirely different methodologies.  The first was a "liquidation analysis," which "analyzes the funds that would be raised if each item of property (*i.e.*, each asset) of TLA were sold at market value in an orderly sale process."  A0662–63  (citing Debtors' Omnibus Reply, B.R.Dkt. 5373, ¶ 116).  This included a specific disclaimer explaining that it: "DOES NOT PURPORT TO BE A VALUATION OF THE DEBTORS' ASSETS AS A GOING CONCERN."  A0664 (quoting Am. Dellepiane Rebuttal Decl. ¶ 12).  Calculating the value of this asset-by-asset hypothetical forced sale, Edgar estimated the aggregate value of TLA's property to be between $360.1 and $490.8 million.  Under this counterfactual assumption, the sale of TLA's assets would not raise sufficient funds to cover its existing liabilities.

14

Edgar's second method, the "balance sheet test," compared TLA's total liabilities and assets reflected on TLA's 2021 audited financial statements and its March 2022 unaudited monthly balance sheet.  A0663 (citing Edgar Decl. ¶ 11).  Edgar simply calculated TLA's "book value," the "original price paid for an asset less allowable depreciation."  A0664 (citing Am. Dellepiane Rebuttal Decl. ¶ 12).  According to these statements, TLA's liabilities exceeded its assets by approximately $360 million dollars in December 2021, and by approximately $1.3 billion in March 2022.  A0663 (citing Edgar Decl. ¶ 11).

## B. The Court Adopted The Debtors' Standard And Overruled The TLA Claimholders' Objection.

The bankruptcy court overruled the TLA Claimholders' objection and accepted the Debtors' argument that holders of Class 6 claims were not entitled to any post-petition interest.  A0682.  The bankruptcy court found that the TLA Claimholders are "unimpaired under the Plan and that the Plan does not run afoul of section 1124(1) of the Bankruptcy Code."  *Id.*  The bankruptcy court looked to section 502(b)(2), which excludes "unmatured interest" from the amount of a creditor's allowed claim, and then concluded that the TLA Claimholders' loss of their contractual right to post-petition interest resulted from section 502(b)(2) of the Code rather than the Plan.  A0684.  Therefore, the bankruptcy court concluded, "the TLA Claimholders are not impaired and thus have no right to vote to accept or reject the Plan."  A0682.

The bankruptcy court nevertheless concluded that the TLA Claimholders could recover post-petition interest on their claims under section 1129(a)(7) of the Code, which allows recovery of post-petition interest "at the legal rate" for certain *impaired* creditors, but only if TLA was demonstrated to be solvent by the TLA Claimholders.  A0676–67.  The bankruptcy court reasoned that "section 1129(a)(7) must apply to both impaired and unimpaired creditors, notwithstanding that, by its pla[i]n language, it applies only to the former."  A0678.  The bankruptcy court inferred this from "the legislative history of Congress' repeal of" section 1124(3), which abrogated a bankruptcy court decision in *In re New Valley*, 168 B.R. 73 (Bankr. D.N.J. 1994), that " held that unimpaired creditors were not entitled to post-petition interest."  A0677.  "By abrogating this 'unfair result,'" the bankruptcy court continued, "Congress must have intended that both impaired and unimpaired unsecured creditors of solvent debtors who are receiving payment of their claims in cash in full should receive [post-petition interest] 'at the legal rate.'"  *Id*.  An interpretation that "allow[s] impaired creditors to be treated better than unimpaired creditors," the court recognized, was "untenable and illogical," would "offend basic ten[e]ts of fairness," and was "contrary to Congressional intent."  A0678.[4]

---

[4]  Yet, in addressing a recent decision that held that, to satisfy Section 1129(b)'s fair and equitable requirement, a bankruptcy plan that retained value for equity had to pay a dissenting class of impaired creditors post-petition interest at the contract rates, *In re Mullins*, 633 B.R. 1 (Bankr. D. Mass. 2021) , the court found the decision "inapposite."  A0679 n.52.  It reasoned, "here, the Plan treats the TLA Claimholders as unimpaired," and because only a dissenting

*(Cont'd on next page)*

The court then adopted the Debtors' asset-by-asset legal standard for solvency, disregarding any consideration of TLA's actual future as an ongoing business, and concluded that the TLA Claimholders had failed to show TLA was solvent. A0649–58.

Finally, the bankruptcy court issued an advisory opinion as to the interest rate the TLA Claimholders would have obtained had they demonstrated that the liquidation value of TLA's assets exceeded its liabilities.  Acknowledging that other bankruptcy courts had awarded interest at the contract rate, *see* A0670 (citing *In re Mullins*, 633 B.R. 1, 20 (Bankr. D. Mass. 2021); *Ultra Petroleum Corp. v. Ad Hoc Group of Unsecured Creditors of Ultra Res.*, 624 B.R. 178, 199–200 (Bankr. S.D. Tex. 2020) ("*Ultra Petroleum II*")), the bankruptcy court determined that because unimpaired creditors could recover post-petition interest only through section 1129(a)(7)'s best interest of creditors test, the TLA Claimholders could obtain only "the legal rate" available under section 726(a)(5), and, without any further analysis, that the "the legal rate" in section 726(a)(5) refers to the federal judgment rate. A0677.

---

class of impaired creditors has recourse to Section 1129(b), "there is no need to analyze section 1129(b)."

## SUMMARY OF ARGUMENT

The Bankruptcy Code imposes a single simple protection for unimpaired creditors—the plan of reorganization must "leave[] unaltered the legal, equitable, and contractual rights to which [the creditor's] claim or interest entitles the holder of such claim or interest." 11 U.S.C. § 1124(1). According to its plain text, section 1124 demands that the plan give the creditor precisely what it would have received absent the bankruptcy, including interest that accrues during the pendency of the bankruptcy. *In re Taddeo*, 685 F.2d 24, 28 (2d Cir. 1982) (a holder of an unimpaired claim is "restored to his original position").

Section 1124(1)'s context and statutory history confirm this reading. Section 1124(2), which provides an alternate path to unimpairment, similarly requires the plan to leave unaltered the creditor's rights, and that provision is widely interpreted to require the payment of post-petition interest at the contract rates. The Code previously also offered a third path to unimpairment—if a plan offered the cash value of an allowed claim under the former section 1124(3). But when a bankruptcy court relied on section 1124(3) to conclude that a creditor who received no post-petition interest was unimpaired, Congress responded by denouncing the decision and repealing section 1124(3). This confirms that Congress intended unimpaired creditors to receive post-petition interest, and that a debtor cannot unimpair a creditor simply

by paying the allowed amount of the creditor's claim as of the date of the petition, which is precisely what the Plan does to the TLA Claimholders.

Payment of post-petition interest here also is consistent with decades of bankruptcy case law. The absolute priority rule commands that creditors be repaid in full before surplus value may pass to equity holders. Bankruptcy courts accordingly have held that creditors must be paid for interest that accrues during the bankruptcy whenever the equity holders take value.

The Plan's denial of any post-petition interest to the TLA Claimholders does not leave their legal, equitable, and contractual rights unaltered. They are not restored to their "original position," *Taddeo*, 685 F.2d at 28, and they are worse off than if they were impaired and voted against the plan and could invoke section 1129(b)'s fair and equitable test. If the Plan is to be sustained, the Court must order that the Debtors pay the TLA Claimholders the interest that has accrued under the Debt Instruments since the filing of the petition, at the rates specified in those instruments. Any other treatment would be contrary to section 1124(1)'s straightforward directive that the creditor's rights be unaltered.

The bankruptcy court's decision to ratify the Debtors' proposed treatment, which pays *nothing* for the interest that has accrued after the petition date, is flawed at every step. First, the bankruptcy court's reading of section 1124 to protect only rights in claims to the extent claims are "allowed" under section 502 of the Code

disregards the text of section 1124.  Section 1124(1) provides that rights in a "claim," which the Code defines broadly to include an unmatured right to payment, must be unaltered.  Section 1124(1) does not limit its protection to the allowed portion of a claim, fixed as of the date of the petition.

In any event, section 502(b)(2) of the Code does not cut off the TLA Claim-holders' right to post-petition interest, as the bankruptcy court held.  Section 502(b)(2) states that, in fixing the allowed amount of the claim as of the date of the petition, "unmatured interest" is excluded.  But section 502(b)(2) does not address a creditor's right to be paid interest that accrues on the allowed claim during the pendency of the case.  Section 726(a)(5) explicitly provides for payment of such interest.  And both before and after the enactment of the Code, courts have recognized that post-petition interest can be paid.  There is no indication that section 502(b) upended that long settled bankruptcy practice.

The bankruptcy court also erred by concluding that a creditor must prove a debtor is "solvent" (a term not defined in the Bankruptcy Code) on a book value basis before the creditor can assert any right to post-petition interest.  That was incorrect in two ways.  First, the creditor's right to repayment is not tied to "solvency" in an accounting sense—neither section 1124, which protects the rights of unimpaired creditors, nor section 1129, which protects the rights of impaired creditors, nor section 502(b), which supposedly disallows post-petition interest, makes any

reference to the debtor's solvency or insolvency.  Rather, the creditor's right to de-mand post-petition interest arises from its priority over shareholders.  Thus a debtor is "solvent," and must pay post-petition interest, whenever the plan accords value to equity.

Second, even assuming that the TLA Claimholders did have to demonstrate TLA's solvency, the bankruptcy court applied the wrong legal standard.  When a company is undergoing reorganization and will remain an operating enterprise after confirmation, the company's value has to be assessed based on its worth as a unified enterprise because only that accounts for "the additional value element which flows from the combination of the various assets to an economic unit."  2 Collier on Bank-ruptcy ¶ 101.32[4] (16th ed. 2018).  That is the only way to ascertain a "fair valua-tion" of a going concern.  11 U.S.C. § 101(32).

Finally, the bankruptcy court erred in concluding that if any post-petition in-terest were owed, it must be paid at the federal judgment rate.  No provision of the Code supports that result.  The two the bankruptcy court identified, section 1129(a)(7) and section 726(a)(5), apply only to an "impaired class of claims," and the Debtors elected to treat the TLA Claimholders as unimpaired creditors.  Section 726 has no bearing here, and, even if it applied, the court below misinterpreted its term "legal rate."  TLA Claimholders must be paid post-petition interest at the rates provided in their Debt Instruments.

## STANDARD OF REVIEW

In a bankruptcy appeal, the Court reviews the bankruptcy court's conclusions of law de novo and reviews factual findings for clear error. *In re Manville Forest Prods. Corp.*, 896 F.2d 1384, 1388 (2d Cir. 1990); *In re Lafayette Hotel P'ship*, 227 B.R. 445, 449 (S.D.N.Y. 1998) (same).

## ARGUMENT

### I. The Plan Must Repay The TLA Claimholders In Full, Including Post-Petition Interest, Because The Plan Designates The TLA Claimholders As Holders Of Unimpaired Claims.

#### A. Chapter 11 Reorganizations Turn On The Fundamental Distinction Between Impaired And Unimpaired Creditors.

Chapter 11 reorganizations are built around a fundamental separation between impaired creditors, who vote to approve or reject a plan, and unimpaired creditors, who do not. Every class of impaired creditors gets to vote to approve or reject a proposed plan of reorganization. If an impaired class of creditors rejects a plan, a plan may nonetheless be crammed down, but only if the plan meets all of the other requirements of section 1129 and at least one class of impaired claims held by non-insider creditors has accepted the plan. 11 U.S.C. § 1129(a)(10).

A crammed down plan must be "fair and equitable" to each class of impaired creditors who have not accepted the plan. 11 U.S.C. § 1129(b)(1). The Code "does not define the full extent of 'fair and equitable,' but it includes a form of the absolute priority rule as a prerequisite." *In re DBSD N. Am., Inc.*, 634 F.3d 79, 94 (2d Cir.

2011) (reversing confirmation for violation of absolute priority). This means that "a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property [under a reorganization] plan." *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988) (quoting *In re Ahlers*, 794 F.2d 388, 401 (8th Cir. 1986)). A plan in which the pre-bankruptcy owners "retain an equity interest" but a dissenting class of creditors is not paid in full "is contrary to the absolute priority rule" and cannot be confirmed. *Norwest Bank*, 485 U.S. at 202. And for a dissenting class to receive "full present value," "such creditors must be paid interest for the post-confirmation value of their money." *In re Perez*, 30 F.3d 1209, 1214–15 (9th Cir. 1994); *see also In re Dow Corning Corp.*, 456 F.3d 668, 671 (6th Cir. 2006) (fair and equitable test requires post-petition interest at contract rate before value passes to equity); *In re Mullins*, 633 B.R. at 16 (holding that, where judgments were not based on underlying contracts, the fair and equitable requires payment of post-petition interest at the state judgment rate (not the federal judgment rate) before value passes to equity).

Section 1129 provides an additional protection to impaired creditors—if a creditor votes against confirmation, even if that creditor's class accepts confirmation by majority vote, the creditor must receive "no less under the Plan than the creditors would be entitled to under a chapter 7 liquidation." *In re Gaston & Snow*, 1996 WL 694421, at *7 (S.D.N.Y. Dec. 4, 1996); *see* 11 U.S.C. § 1129(a)(7). This sets a floor

for the dissenting creditor's recovery and ensures that the chapter 11 proceeding will not put the creditor in a worse position than if the company had been forced to liquidate its assets.  And the liquidation waterfall provides that before any property of the estate can flow to the debtor, unsecured creditors must be paid "interest … from the date of the filing of the petition" on the amount of their allowed claims.  *Id.* § 726(a)(5).

But these protections apply only to ***impaired*** classes of creditors.  An ***unimpaired*** class, and each of its members, is conclusively presumed to have accepted the plan and cannot vote.  11 U.S.C. § 1126(f).  An unimpaired creditor accordingly has no recourse either to the fair and equitable test of section 1129(b) or the best interests of creditors test of 1129(a)(7).  This is because "[t]he holder of a claim or interest who under the plan is restored to his original position … has no cause to complain."  *In re Taddeo*, 685 F.2d 24, 29 (2d Cir. 1982) (quoting S. Rep. No. 989, 95th Cong., 2d Sess. 120 (1978)); *see also In re G-I Holdings Inc.*, 420 B.R. 216, 255 (Bankr. D.N.J. 2009) (unimpaired creditors are "presumed to have accepted the Plan" because "legal right to repayment … will be satisfied in full").

### B. The Code's Text Demands Than An Unimpaired Creditor Must Receive Interest That Accrues During The Bankruptcy.

The Code "creates a presumption of impairment."  *Solow v. PPI Enters. (U.S.) Inc.*, 324 F.3d 197, 203 (3d Cir. 2003).  The presumption can be overcome, and the claim may be treated as unimpaired, only if the Plan "leaves unaltered the legal,

equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest." 11 U.S.C. § 1124(1). Because the designation of a class as "unimpaired" results in its disenfranchisement, the Bankruptcy Code "define[s] impairment in the broadest possible terms." *Taddeo*, 685 F.2d at 28. The Second Circuit has held that "*any* change in legal, equitable or contractual rights creates impairment." *Id.* (emphasis in original); *see also Windsor on the River Assocs., Ltd. v. Balcor Real Estate Fin.*, 7 F.3d 127, 130 (8th Cir. 1993) ("[A]ny alteration of rights, no matter how minor, constitutes 'impairment.'"); *In re L J Anaheim Associates*, 995 F.2d 940, 942 (9th Cir. 1993) ("any alternation of the rights constitutes impairment even if the value of the rights is enhanced") (citing authorities). The "narrow question that thus arises is whether [the creditor's] 'legal, equitable, [or] contractual rights' were changed by the Plan; if so, its claim was impaired." *Id.* at 943.

Moreover, the scope of the "claim" that is protected by section 1124 is broad: a claim is any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured …." 11 U.S.C. § 101(5). Thus any alteration even of an *unmatured* right to payment under a contract constitutes impairment. *In re Oneida Ltd.*, 351 B.R. 79, 95–96 (Bankr. S.D.N.Y. 2006); *In re Amster Yard Assocs.*, 214 B.R. 122, 123 (Bankr. S.D.N.Y. 1997).

The post-petition interest that is guaranteed in the Debt Instruments is a right to payment that is unmatured at the time of the petition, but which has matured during the proceeding and has now accrued. As a matter of textual construction, therefore, the right to post-petition interest on the debt is a "claim" under section 101(5) that falls within section 1124(1)'s protection. Simply substituting the definition of "claim" given in section 101(5), *i.e.*, "a right to payment, whether or not such right is … unmatured," into the text of section 1124(1) where section 1124(1) refers to a "claim" results in the following:

> A class … is impaired under a plan unless, with respect to each [right to payment, whether or not such right is … unmatured,] of such class, the plan … leaves unaltered the legal, equitable, and contractual rights to which such [right to payment, whether or not such right is … unmatured,] entitles the holder.

Thus a creditor is impaired if it does not receive the post-petition interest (a right to payment that matures during the bankruptcy and has now accrued) that the creditor's contract entitles the creditor to demand. *See In re Monclova Care Ctr., Inc.*, 59 F. App'x 660, 663–64 (6th Cir. 2003) (collecting authorities).

Statutory context confirms this plain meaning of section 1124(1). Section 1124(2) provides an alternate avenue for a plan to treat a claim as unimpaired. To use this method of unimpairment, the plan must cure the default on the claim, restore the claim's priority and maturity, compensate the creditor for any damages, and cannot "otherwise alter the legal, equitable, or contractual rights to which such claim …

entitles the holder of such claim." 11 U.S.C. § 1124(2); *see also Taddeo*, 685 F.2d at 28-29 (characterizing section 1124(2) as a "a small exception … providing that curing a default, even though it inevitably changes a contractual acceleration clause, does not thereby 'impair' a creditor's claim"). The echo of the text of section 1124(1) in section 1124(2)(E) makes clear that cure and reinstatement in accordance with section 1124(2) is the *only* way in which the rights of an unimpaired class may be altered by a plan. And the Code further demands that, when a plan cures and rein-states under section 1124(2), "the amount necessary to cure the default shall be de-termined in accordance with the underlying agreement and applicable nonbank-ruptcy law." *Id.* § 1123(d). This makes clear that the amount needed to unimpair a class is determined by contract and state law, and not any provision of the Bank-ruptcy Code.

Cases under section 1124(2) confirm that an unimpaired creditor *must* receive post-petition interest at the rate provided by the underlying contract. Thus, in *In re Depietto*, the court required the debtor to repay post-petition interest not only at the normal rate under the contract but also had to repay "a two percent late charge on principal and interest" that applied under the contract as a penalty for the default. 2021 WL 3287416, at *7–8 (S.D.N.Y. Aug. 2, 2021). In fact, a "number of courts, including several within the Second Circuit, have concluded that § 1123(d) may re-quire the debtor to pay a default interest rate in order to cure a default." *Id.* at *6

27

(collecting authorities); *see also Pacifica L 51, LLC v. New Invs. Inc.*, 840 F.3d 1127, 1139 (9th Cir. 2016); *In re Moshe*, 567 B.R. 438, 444 (Bankr. E.D.N.Y. 2017); *In re Gen. Growth Props., Inc.*, 451 B.R. 323, 327 (Bankr. S.D.N.Y. 2011).

Section 1124(2) operates as a "small exception" to the general command of section 1124(1) that a plan leave intact an unimpaired class's "legal, equitable, and contractual rights." *Taddeo*, 685 F.2d at 28.  It would be highly anomalous if a plan could place an unimpaired creditor in a less advantageous position under the general rule (section 1124(1)) than could be achieved under its exception (section 1124(2)).

Indeed, if, as the court below held, section 1124(1) permits unimpairment simply through cash payment of the allowed amount of a claim as of the petition date, there would be no need for section 1124(2) to provide for the cure of a default occurring *after* the filing of the petition at all.  *See* 11 U.S.C. § 1124(2)(A).  If the bankruptcy court were correct, unimpairment could be achieved simply by paying the full amount of the claim as of the date of the petition, and then any remaining obligations under the debt contract could be discharged.  The post-petition default would be irrelevant.  But Congress drafted section 1124(2) with precision, and it embraces cures of post-petition defaults precisely because it understood that the debt obligations of unimpaired creditors must otherwise remain unaffected by a reorganization plan.  The unimpaired creditors' legal and contractual rights must be unaltered by the Plan.

### C. The Code's Statutory History Reaffirms That Unimpaired Creditors Must Receive Interest That Accrues During The Bankruptcy.

Section 1124's statutory history powerfully confirms that a creditor who is not paid post-petition interest is impaired.  Prior to 1994, section 1124 contained a third subsection which stated that a claim could be treated as unimpaired if, "on the effective date of the plan, the holder of such claim or interest receives … cash equal to … the allowed amount of such claim." 11 U.S.C. § 1124(3) (1988) (repealed).  A New Jersey bankruptcy court interpreted that provision to allow confirmation of a plan that limited unimpaired creditors to pre-petition interest only and allowed residual value to flow to a junior class of creditors and equity holders.  *In re New Valley Corp.*, 168 B.R. 73, 75–76 (Bankr. D.N.J. 1994).  If this sounds familiar, it should; it is precisely what the Plan does to the TLA Claimholders.

But Congress reacted to *New Valley* by repealing section 1124(3).  Bankruptcy Reform Act of 1994, Pub. L. 103-394, § 213, 108 Stat. 4106, 4125.  The committee report condemned *New Valley*'s conclusion and explained that "[a]s a result of [section 1124(3)'s repeal], if a plan proposed to pay a class of claims in cash in the full allowed amount of the claims, the class would be impaired, entitling creditors to vote for or against the plan." H.R. Rep. No. 103-835, at 48, *reprinted in* 1994 U.S.C.C.A.N. 3340, 3356–57.  Here the Debtors have done precisely what section 1124(3) previously allowed and what Congress in 1994 expressly rejected—it has offered the TLA Claimholders the cash value of their claims on the petition date,

but denied them post-petition interest, and nevertheless treated them as unimpaired. That is irreconcilable with section 1124's statutory history.

### D. The Code's Protection Of Unimpaired Creditors Builds On Centuries Of Caselaw Protecting Creditors' Priority Over Shareholders.

Section 1124's protection of the interest that accrues during the reorganization is not anomalous—it rests on centuries of bankruptcy practice requiring debtors to repay creditors in full before the shareholders take value from a reorganization. This doctrine is an outgrowth of the "absolute priority rule" which demands that "creditors … be paid before the stockholders could retain [equity interests] for any purpose whatever." *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 444 (1999) (quoting *N. Pac. Ry. Co. v. Boyd*, 228 U.S. 482, 508 (1913)).

The requirement to pay post-petition interest before making distributions to the debtor's equity holders stretches back to English common law, *see, e.g.*, *Ex parte Clarke*, 4 Ves. Jr. 677, 349, 350 (1799); *Ex parte Mills*, 2 Ves. Jr. 296, 640, 641 (1793); *Bromley v. Goodere*, 1 Atkyns 75 (1743), and eventually carried over to American practice, *Sexton v. Leopold Louis Dreyfus*, 219 U.S. 339, 344 (1911). The Supreme Court itself has applied the rule. *Consol. Rock Prods. Co. v. Du Bois*, 312 U.S. 510, 527 (1941). In *Consolidated Rock*, though the proposed reorganization retained "the relative priorities" of the creditors and preferred shareholders, the plan still was impermissible because equity received value but "the bondholders ha[d] not been made whole." *Id.* at 527–28. The court held that the creditors' "interest is

30

entitled to the same priority as the principal" and had to be repaid before the share-holders could take value from the estate.  *Id.* at 527; *see also Am. Iron & Steel Mfg. Co. v. Seaboard Air Line Ry.*, 233 U.S. 261, 266 (1914) (same in context of receivership).  Lower courts regularly applied the rule in this Circuit and across the country.  *See, e.g.*, *Ruskin*, 269 F.2d at 832; *Brown v. Leo*, 34 F.2d 127, 128 (2d Cir. 1929); *Matter of Beverly Hills Bancorp.*, 752 F.2d 1334, 1339 (9th Cir. 1984); *Beecher v. Leavenworth State Bank*, 192 F.2d 10, 14 (9th Cir. 1951); *Debentures Protective Comm. of Cont'l Inv. Corp. v. Cont'l Inv. Corp.*, 679 F.2d 264, 270 (1st Cir. 1982); *Littleton v. Kincaid*, 179 F.2d 848, 852 (4th Cir. 1950); *Miles Corp. v. Lindel*, 107 F.2d 729, 732 (8th Cir. 1939).

These cases are clear: before a shareholder could obtain value, equity requires the debtor to pay "the expressly-bargained-for" rate contained in each creditor's contract.  *Ruskin*, 269 F.2d at 832; *Debentures*, 679 F.2d at 270 (reversing confirmation because plan "did not compensate" creditors "for the contractual right" to interest but left value for shareholders).  Thus, the protection section 1124 extends to creditors, requiring that they receive post-petition interest or otherwise receive the expansive protections given to impaired creditors, simply builds on centuries of bankruptcy practice.

31

### E. The TLA Claimholders Must Receive Post-Petition Interest Because The Debtors Designated Them Unimpaired.

The text, context, and history of section 1124 all point toward the same re-sult—a creditor who does not receive post-petition interest and is offered the cash value of its claim on the date of the petition is an impaired creditor.  Thus if a creditor is to be treated as unimpaired, that creditor must receive *exactly* the payments—including accrued post-petition interest at the rate set by contract—that the creditor would have obtained outside the bankruptcy.  *Monclova Care Ctr.*, 59 F. App'x at 664 (collecting authorities); *Colfin Bulls Fundings LLC v. Paloian*, 547 B.R. 880, 891 (N.D. Ill. 2016) (reversing bankruptcy court and requiring full repayment of post-petition interest because "a creditor is impaired under a plan that does not award post-petition interest"); *In re Charter Commc'ns*, 419 B.R. 221, 266 (Bankr. S.D.N.Y. 2011) ("general unsecured claims are legitimately impaired because mem-bers of such classes will not receive post-petition interest"); H.R. Rep. No. 103-835, at 48, *reprinted in* 1994 U.S.C.C.A.N. 3340, 3356–57 (after repeal of section 1124(3), "if a plan proposed to pay a class of claims in cash in the full allowed amount of the claims, the class would be impaired, entitling creditors to vote for or against the plan").

The Plan's treatment of the TLA Claimholders' Debt Instruments does not leave unaltered the legal, contractual, and equitable rights that arise from those claims.  Because of TLA's default, the Debt Instruments provide that the TLA

Claimholders are entitled to repayment of the outstanding principal, ongoing interest on the principal, and additional default interest until the entire balance is repaid. But the Plan pays the TLA Claimholders *only* for the first of these by paying "(x) [c]ash equal to the amount of [their] Allowed Class 6 Claim" as of the petition date. A0804 at § 3.2(f)(ii). This is not full satisfaction of the amount owed under the Debt Instruments. Thus the Plan impairs the TLA Claimholders' rights. *PPI Enters.*, 324 F.3d at 206–07. The Plan also alters the TLA Claimholders' equitable right to priority by transferring value to equity holders. This too impairs their claims. *Ultra Petroleum II*, 624 B.R. 178, 203 (Bankr. S.D. Tex. 2020).

If the Plan is to stand, then, the Court must order the treatment necessary to bring the TLA Claimholders' repayment into alignment with their status as unimpaired creditors. The Plan contemplates just such a payment—it provides that as an alternative to receiving the cash amount of their allowed claims, the TLA Claimholders may receive "(z) such other treatment such that the applicable Allowed Class 6 Claim will be rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code." A0804 at § 3.2(f)(ii). Indeed, the bankruptcy court itself stated that if the TLA Claimholders had demonstrated an entitlement to post-petition interest, "then the Debtors would have to include [post-petition interest] … to satisfy the TLA [Claimholders] under the Plan." A0677. Thus there remains a path under the Plan for the TLA Claimholders to remain unimpaired, and to avoid holding a new vote

on the Plan or otherwise disturbing the Plan's implementation.  But the Debtors cannot do so while at the same time denying the TLA Claimholders the interest that has accrued on their loans since TLA filed its petition for bankruptcy.

### F.  The TLA Claimholders' Post-Petition Interest Must Be Paid In Accordance With The Debt Instruments.

And because, to be unimpaired, the TLA Claimholders' "contractual rights" under its Debt Instruments must be "unaltered," 11 U.S.C. § 1124(1), the amount of interest due must be determined in accordance with the Debt Instruments.  *See Mullins*, 633 B.R. at 20; *Colfin Bulls*, 547 B.R. at 891; *Monclova Care Ctr.*, 59 F. App'x at 664 (creditor designated as unimpaired must receive otherwise applicable interest on its claim).  Imposing any other rate—whether lower or higher—would alter the TLA Claimholders' contractual rights under the Debt Instruments and thus result in impairment, and require Class 6 to vote on the Plan.  *See Taddeo*, 685 F.2d at 28.  It also would put section 1124(1) in misalignment with section 1124(2), which looks only to the creditors' contracts and applicable nonbankruptcy law to determine the amounts necessary to cure a default.  *See* 11 U.S.C. §§ 1123(d), 1124(2).  There is no reason to suppose that Congress wanted a different analysis under section 1124(1).

34

## II. The Bankruptcy Court Erred In Confirming A Plan That Paid Zero Post-Petition Interest To Unimpaired Creditors.

The bankruptcy court held that the Plan could designate TLA Claimholders as unimpaired while refusing payment of any post-petition interest.  This leaves the TLA Claimholders without recourse to section 1129(b)'s "fair and equitable" test, 11 U.S.C.§  1129(b)(1), and therefore worse off than if they had been deemed impaired and voted against the Plan.  The bankruptcy court itself recognized that such an outcome was "untenable and illogical" and "offend[s] basic ten[e]ts of fairness and the purposes of the Bankruptcy Code."  A0678.  And, indeed, the bankruptcy court's conclusion rests on a cascade of mistaken legal premises any one of which is sufficient grounds to reverse the judgment on appeal.

The bankruptcy court first erred in holding that the scope of "a creditor's 'legal, equitable, and contractual rights' under section 1124(1) are subject to 'the Bankruptcy Code's own limitations on claim allowance.'"  A0648 (quoting *In re 53 Stanhope LLC*, 625 B.R. 573, 575 (Bankr. S.D.N.Y. 2021)).  Under this theory of "Code impairment," "where a plan refuses to pay funds disallowed by the Code, the Code—not the Plan—is doing the impairing."  *Id.* (quoting *Ultra Petroleum Corp. v. Ad Hoc Group of Unsecured Creditors of Ultra Res.*, 943 F.3d 758, 765 (5th Cir. 2019) (*Ultra Petroleum I*)).  But section 1124(1) demands non-alteration of all rights arising from a creditor's "claim"—not merely the "allowed" portion of a claim.  Section 1124(3) previously made the allowed claim amount a measuring stick for

35

unimpairment, but Congress repealed that provision.  Under section 1124(1) the claim as it existed outside of bankruptcy is what must be "unaltered."

Second, the bankruptcy court misread section 502(b)(2) as a general prohibition on the payment of post-petition interest.  That is clearly not correct.  Section 502(b) provides that a bankruptcy court, in determining the amount of a disputed claim as of the date of the petition, shall not include "unmatured interest" as part of a creditor's "allow[ed]" amount.  11 U.S.C. § 502(b)(2).  That says nothing about whether or when interest that accrues (*i.e.*, matures) on a claim during the pendency of a bankruptcy case should be paid.  In fact, the Code expressly provides for "the payment of interest … from the date of the filing of the petition, on any claim" that is paid.  11 U.S.C. § 726(a)(5).  And the inescapable lesson of Congress's repeal of section 1124(3) is that it believed the Code did permit the payment of post-petition interest, in accordance with centuries of bankruptcy practice.

The bankruptcy court seemingly recognized that a construction of the Code that permits impaired creditors to be paid post-petition interest under the best interests of creditors test while precluding unimpaired creditors from ever receiving post-petition interest was untenable, particularly in view of the repeal of section 1124(3).  The Court resolved this "quandary" by discerning that unimpaired creditors could recover post-petition interest through section 1129's best interests of creditors test even though that test "on its face applies only to an 'impaired class of claims.'"

36

A0676 (quoting 11 U.S.C. § 1129(a)).  But unimpaired creditors could obtain that relief under this dubious construction of the Code, the bankruptcy court held, only if they demonstrated that the debtor is solvent.

That, too, was error.  There is no basis whatsoever for that requirement in the text of the Code.  The section 726 waterfall—where it is applicable—provides for payment of post-petition interest before any property of the estate can flow to the debtor—no further showing of solvency is required.  *See* 11 U.S.C. § 726(a)(5)–(6).  Under both the Code and decades of caselaw, what is relevant in determining whether post-petition interest should be paid is whether the plan sends value to equity holders.  And even if the Code made solvency of the debtor a relevant consideration in this analysis—and it does not—the bankruptcy court erred in disregarding TLA's value as a going concern.

Finally, the court erred when it opined that, if the TLA Claimholders were to receive post-petition interest, it would be only at the federal post-judgment interest rate.  The court followed a handful of poorly reasoned decisions holding that "the legal rate" provided for in the best interests of creditors test is the federal judgment rate.  But, as the bankruptcy court acknowledged, the best interests of creditors test applies only to impaired creditors.  And the Debtors chose to designate the TLA Claimholders as unimpaired.  While the Court need not reach the issue to afford complete relief to the TLA Claimholders, the better reading of "legal rate" is the rate

under applicable nonbankruptcy law.  That aligns the best interests of creditors test

with the absolute priority rule's command that creditors be made whole before any

value flows to equity.

### A. The Bankruptcy Court's Theory of Code Impairment Contravenes The Text Of Section 1124(1).

The bankruptcy court held that section 1124(1) safeguards unimpaired credi-

tors' contractual rights to payment only to the extent that they are part of an allowed

claim under the Code.  The theory is that if a right to payment is disallowed by

section 502 of the Code, then the Code has impaired the creditor's right to payment

rather than the Plan.  *See* A0648 (citing *Ultra Petroleum I*, 943 F.3d at 763; *PPI*

*Enters.*, 324 F.3d at 204–07).

But the theory is flawed.  Under the claim allowance process of section 502

the court fixes an allowed amount for each claim *as of the date of the petition*.  But

section 1124(1) protects not merely the rights the creditor is entitled to under that

allowed portion of the claim, fixed at the petition date, but all the legal and contrac-

tual rights to which the "claim" entitles the holder, including an "unmatured" right

to payment, which is to say a right to payment that matures *after the petition date*.

11 U.S.C. § 101(5); *see supra* § I.B.  And this is why section 1124(2) provides for

cures of defaults occurring *after the commencement of the case*.  *See* 11 U.S.C.

§ 1124(2).  This is necessary only because an unimpaired creditor's rights to pay-

ment under its contract persists during the pendency of the bankruptcy.  Nothing in

section 1124 suggests that an unimpaired creditor's right to payment is cut off as of the date of the petition.  But that is the necessary implication of the theory of Code impairment.

Any suggestion that Congress meant "allowed claim" in section 1124 where it used the term "claim" is refuted by the repeal of section 1124(3), which previously provided for only "cash equal to the allowed amount of such claim."  11 U.S.C. § 1124(3) (1988) (repealed).  When Congress "has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea."  *S.W. Airlines Co. v. Saxon*, 142 S. Ct. 1783, 1789 (2022) (quoting Antonin Scalia & Bryan A. Garner, Reading Law 170 (2012)).  Nothing rebuts the presumption that Congress intended a different idea in section 1124(1) where it used the term "claim," than in the repealed section 1124(3) where it referred to the allowed claim.

Indeed, numerous other provisions of the Code refer to an "allowed claim" or an "allowable claim."  Section 726, which governs the distribution of the estate in a liquidation, sets the priority for "any allowed unsecured claim" relative to other types of claims.  11 U.S.C. § 726(a)(2)–(4).  Section 702 permits a holder of an "allowable … unsecured claim" to vote on the selection of a trustee.  *Id.* § 702.  Section 724 provides for the distribution of property subject to a lien to repayment of particular "allowed claims."  *Id.* § 724(b)(1)–(5).  Section 1126 sets voting rules based on

the number of holders of "allowed claims" who vote to accept or reject. *Id.* § 1126(c). When Congress intends for a provision to consider only the portion of a creditor's claim allowed, it plainly knows how to do so. But it did not in section 1124(1).

A faithful reading of the text of section 1124(1) compels the conclusion that it protects from alteration all contractual rights arising from a unimpaired creditor's "claim," meaning its "right to payment," "whether matured [or] unmatured." 11 U.S.C. § 101(5). Neither the decision below nor the cases it cited in support of its "Code impairment" theory grappled with section 101(5)'s sweeping definition of "claim." Indeed, *Ultra Petroleum* fails even to cite section 101, and *PPI Enterprises* does so only in passing without engaging with the text. 324 F.3d at 203. Both decisions simply concluded, with little justification, that "a creditor's claim outside of bankruptcy is not the relevant barometer for impairment." *PPI Enters.*, 324 F.3d at 204. That is exactly wrong. Although a "right to post-petition interest is subject to disallowance under 11 U.S.C. § 502(b) in most cases, it remains part of [the] claim[]," and if it is altered, the claim is impaired. *Monclova Care Ctr.*, 59 F. App'x at 663. The reason unimpaired creditors are denied the opportunities to vote and to invoke the Code's substantive protections for dissenting creditors is that unimpaired creditors instead obtain the full benefits (and burdens)—no more and no less—of their pre-bankruptcy bargain. Unimpaired creditors are "restored to [their] original

position." *Taddeo*, 685 F.2d at 28.  Thus the creditor's nonbankruptcy claim is the

**_only_** barometer for impairment.

### B. Section 502(b)(2) Does Not Prohibit Payment Of Post-Petition Interest On An Allowed Claim.

Even if the theory of "Code impairment" were textually or logically sustaina-

ble—and it is not—section 502(b)(2) simply does not prohibit payment of post-pe-

tition interest on an allowed claim, which is what the TLA Claimholders seek here.

When there is an objection to a creditor's claim, section 502(b)(2) mandates

that the court not include "unmatured interest" as part of the amount of an allowed

claim.  11 U.S.C. § 502(b)(2).  But "there is a distinction between the payment of

interest *on an allowed claim* as opposed to *as an allowed claim*."  *In re Energy Fu-*

*ture Holdings Corp.*, 540 B.R. 109, 111 (Bankr. D. Del. 2015).  The provisions gov-

erning confirmation, including the requirement that a creditor receive fair and equi-

table treatment, can require the debtor to pay "the allowed amount of the claim plus

additional consideration, which may include post-petition interest."  *Id.*; *see also In*

*re Perez*, 30 F.3d at 1215 (fair and equitable treatment requires that dissenting class

receive "interest for the post-confirmation time value of their money" before there

is an equity recovery).  Similarly, the best interests of creditors test provides for

"payment of interest … from the date of filing of the petition, *on* any [allowed]

claim." 11 U.S.C. § 726(a)(5) (emphasis added).  And Congress made abundantly

clear when it repealed section 1124(3) that unimpaired creditors also should be paid

41

post-petition interest on their claims. *See supra* § I.C. Bankruptcy courts accordingly have long concluded that "the proposition that such interest must be paid is compatible with § 502(b)(2)." *In re Dow Corning Corp.*, 244 B.R. 678, 685 (Bankr. E.D. Mich. 1999); *see also Mullins*, 633 B.R. 1.

The bankruptcy court's contrary conclusion is sharply at odds not only with the text of the Code and the history of section 1124, but also centuries of bankruptcy practice. Under long-standing and well-established bankruptcy principles, a debtor must repay a creditor in full, including interest that accrues after the petition date, before passing value to equity holders. *See supra* § I.C; *see also Bank of Am. Nat'l Trust & Sav. Ass'n*, 526 U.S. at 444; *Ruskin*, 269 F.2d at 831; *Consol. Rock*, 312 U.S. at 527. The bankruptcy court's interpretation of 502(b)(2) as generally prohibiting payment of post-petition interest would ascribe to Congress an intent to abrogate that deeply-rooted bankruptcy practice. But this Court must "not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure." *Cohen v. de la Cruz,* 523 U.S. 213, 221 (1998). And there is no such indication here. Quite to the contrary, the Senate committee report accompanying section 502 explained that the provision merely restates "principles of [then] present law," S. Rep. No. 95-989, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5849 (1978).

Section 502(b)(2)'s prohibition on including unmatured interest *in* the amount of an allowed claim, therefore, leaves intact a general unsecured creditor's entitlement to be paid post-petition interest *on* an allowed claim.  Section 502(b)(2) thus is no obstacle to the payment of post-petition interest on unimpaired claims.  The bankruptcy court erred in rejecting the TLA Claimholders' contention that they are entitled to post-petition interest in accordance with their Debt Instruments.  The Plan designated the TLA Claimholders' claims as unimpaired and section 1124(1) thus demands that all of their contractual rights arising from the Debt Instruments be unaltered by the Plan.  But here, the Plan—not section 502(b)(2)—deprives the TLA Claimholders of their right to receive contractual interest on their claims.

### C. The Bankruptcy Court Compounded Its Error In Holding Post-Petition Interest Is Available Only After A Factual Determination Of Solvency Of The Debtor.

Yet, at this point, pinioned, on one hand, by its misreading of section 502(b)(2) and, on the other, by the clear import of Congress's repeal of section 1124(3), the bankruptcy court concluded that a creditor could obtain post-petition interest only through the best interests of creditors test of section 1129(a)(7).  But this led the court only to a new problem: how to apply the best interests of creditors test to unimpaired creditors when, "on its face [it] applies only to an 'impaired class of claims' or interests."  A0676 (quoting 11 U.S.C. § 1129(a)(7)).  The court "resolved this quandary" by reference to "equitable principles that seemingly wrangle

43

with the Bankruptcy Code," and concluding that, in repealing section 1124(3), "Congress must have intended that both impaired and unimpaired unsecured creditors" should have the ability to obtain post-petition interest through the best interests of creditors test, notwithstanding its text.  A0677–78.  But the court also held that this anti-textual path to post-petition interest was available only "if TLA was solvent." A0677.  That, too, was error.

Even assuming it could be applied to unimpaired claims, the best interest of creditors test does not turn on the solvency of the debtor.  No variant or synonym of the word "solvent" appears in either section 1129, or section 726.  Instead, the statutory test commands, without any reference to solvency of the debtor, that before any property of the estate can be granted to the debtor, creditors first must be paid post-petition interest on their allowed claims.  *See* 11 U.S.C. § 726(a)(5).  That is because the best interests of creditors test is a corollary to the absolute priority rule which has held for more than a century—again without any reference to solvency of the debtor—that a "dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property [under a reorganization] plan."  *Norwest Bank*, 485 U.S. at 202.

In holding that the TLA Claimholders could not obtain post-petition interest unless they demonstrated that TLA was solvent, the bankruptcy court not only ignored the text of the provision of the Code it was purporting to apply, it also

disregarded the original and ultimate source of the debtor's obligation to pay post-petition interest to impaired creditors, which is the absolute priority rule.  While recent bankruptcy caselaw concerning post-petition interest often speaks of a "solvent debtor exception," those cases generally have not involved a contest over whether the debtor was solvent or insolvent.  Instead, what mattered in those cases was whether the Plan provided a recovery to equity because it is when there is "a contest between a debtor's creditor and its stockholders," *Ruskin*, 269 F.2d at 830, that the absolute priority rule is most clearly implicated.  And the Supreme Court has made clear that the absolute priority rule applies with equal force "[w]hether a company is **solvent or insolvent** in either the equity or bankruptcy sense." *Consol. Rock*, 312 U.S. at 527 (emphasis added).  In either case, "any arrangement of the parties by which the subordinate rights and interest of stockholders are attempted to be secured at the expense of the prior rights of creditors 'comes within judicial denunciation.'" *Id.* (quoting *Louisville Trust Co. v. Louisville, N.A. & C. Ry. Co.*, 174 U.S. 674, 684 (1899)).

To be sure, where a plan fully reinstates the equity, the debtor is often solvent.  But that is not necessarily the case.  An insolvent debtor, too, can propose a reorganization plan whereby equity would obtain a recovery without making objecting creditors whole.  Creditors could agree to accept such a plan.  But when creditors do not accept, it is the absolute priority rule that empowers them to block that outcome. *See*

*DBSD N. Am., Inc.*, 634 F.3d at 94 (reversing confirmation for violation of absolute priority).  It dictates instead that "creditors are entitled to receive post-petition interest before any surplus reverts to the debtor."  *Debentureholders*, 679 F.2d at 269.  And under the Supreme Court's seminal decision in *Consolidated Rock*, the absolute priority rule applies whether or not the debtor is solvent.

### D. If Solvency Were Relevant, The Bankruptcy Court Applied The Wrong Legal Standard Of Valuation.

Even if the bankruptcy court were correct that a showing of solvency is a prerequisite to payment of any post-petition interest—it's not—the bankruptcy court erred by assessing TLA's solvency based on a hypothetical liquidation of its assets and the depreciated book value of its assets.  And the bankruptcy court compounded this error by requiring the TLA Claimholders to prove TLA's solvency, even though "the plan's proponents" "have the burden of proof" to establish that a plan satisfies the requirements of confirmation.  *In re Prud. Energy Co.*, 58 B.R. 857, 862 (Bankr. S.D.N.Y. 1986).  The bankruptcy court justified its solvency analysis by pointing to the Code's definition of "insolvent" as the financial condition "such that the sum of [an] entity's debts is greater than all of such entity's property, at a fair valuation." 11 U.S.C. § 101(32)(A).  But neither the hypothetical liquidation nor the depreciated book value reflect a "fair valuation" of "all of TLA's property."  TLA was and will continue to be an operating business—indeed, one of the two largest airlines in

Brazil.  And because TLA has value as an operating business, any fair valuation of its assets must take into account its worth as a going concern.[5]

Indeed, the Supreme Court itself rejected the approach taken by the bankruptcy court in *Consolidated Rock*.  There, the Court rejected an incomplete asset-based valuation that looked simply to recorded book values.  The Court condemned that approach because it was "apparent that little, if any, effort was made to value the whole enterprise by a capitalization of prospective earnings." *Consol. Rock*, 312 U.S. at 525.  "A sum of values based on physical factors and assigned to separate units of the property without regard to the earning capacity of the whole enterprise is plainly inadequate." *Id.* at 526.  "Unless meticulous regard for earning capacity be had, indefensible participation of junior securities in plans of reorganization may result." *Id.* at 525–26.

The Supreme Court *again* rejected resort to a foreclosure valuation when it held, in *Associates Commercial Corp. v. Rash*, that secured creditors in a cramdown are entitled to demand compensation based on the *replacement value* of an asset that the debtor retains—not the lower value that the asset would realize in a foreclosure sale.  520 U.S. 953, 965 (1997).  A court conducting a valuation of assets retained by the debtor must do so based on "the price a willing buyer in the debtor's trade,

---

[5]  And, at the very least, a fair valuation must take into account *all* of the entity's assets, including its valuable frequent flyer program.  A267.

business, or situation would pay to obtain like property from a willing seller." *Id.* at 960.  In *Rash*, the property retained by the debtor was a single tractor, but here TLA has retained its continued existence as one of Brazil's largest airlines, and TLA's owner has retained complete and exclusive ownership of that business.

It defies *Rash* and common sense for the bankruptcy court to rely on a hypothetical forced sale or book value of TLA's individual assets.  Instead the analysis should look to what a willing buyer would pay to acquire the entire business.  As a leading bankruptcy treatise explains, valuation "must take into account the additional value element which flows from the combination of the various assets to an economic unit."  2 Collier ¶ 101.32[4].  "[F]air value" in cases such as this thus necessarily means "'fair *market* price of the debtor's assets'" when viewed as an entire enterprise.  *In re SunEdison, Inc.*, 556 B.R. 94, 104 (Bankr. S.D.N.Y. 2016) (emphasis added) (quoting *In re Roblin Indus., Inc.*, 78 F.3d 30, 35 (2d Cir. 1996)) *see also Wolkowitz v. Am. Rsch. Corp.*, 170 F.3d 1197, 1199 n.3 (9th Cir. 1999) ("If the debtor was a going concern, the court will determine the fair market price of the debtor's assets as if they had been *sold as a unit*, in a prudent manner, and within a reasonable time. If the company was on its deathbed, i.e., only nominally extant, then the court will determine the liquidation value of the assets, such as a price expected at a foreclosure sale." (emphasis added)).  And here, the TLA Claimholders introduced unrebutted expert testimony based on the present value of TLA's future

cash flows—the very method endorsed in *Consolidated Rock*—proving that TLA's value as an operating business far exceeds its liabilities.

### E. The Bankruptcy Court Erred By Construing Code Provisions Applicable Only To Impaired Creditors To Reduce The Rate Of Interest Owed.

Finally, the bankruptcy court also erred in its advisory opinion concluding that post-petition interest, if it were owed, should be paid at the federal judgment rate and not the rate set by contract. A0672. The bankruptcy court based its holding on section 726(a)(5) of the Code, which sets a waterfall for distribution of assets in a chapter 7 liquidation. The problem with this argument is that section 726's liquidation waterfall applies in a chapter 11 proceeding only to *impaired* creditors. *See* 11 U.S.C. § 1129(a)(7); *Energy Future Holdings*, 540 B.R. at 123 ("[N]either sections 1129(b) nor 1129(a)(7) apply to unimpaired creditors."). Section 103(b) of the Code otherwise prohibits application of Section 726 outside of a chapter 7 case. 11 U.S.C. § 103(b) ("Subchapters I and II of chapter 7 of this title apply only in a case under such chapter").

The Plan classifies the TLA Claimholders' claims as unimpaired. As a result, section 1129(a)(7) cannot validly apply to them, and neither can section 726's liquidation waterfall. The bankruptcy court below erred in suggesting that section 726(a)(5) governs the post-petition interest to be paid to a class designated as unimpaired. There is no provision of the Code—not section 502(b) and certainly not

section 726(a)(5)—that limits the amount of post-petition interest that a plan can pay on the allowed claims of a class of unimpaired creditors.  Instead, unimpaired creditors are supposed to be restored to their "original position."  *Taddeo*, 685 F.2d at 29.

Even assuming that section 726(a)(5) could govern the TLA Claimholders' post-petition interest—and it cannot—the bankruptcy court erred by holding that section 726(a)(5)'s reference to "the legal rate" refers to the federal judgment rate set by 28 U.S.C. § 1961.  The better reading of the statutory text is that it requires repayment of interest at the rate that would otherwise legally apply—the nonbankruptcy rate, in other words.[6]  Under this interpretation, section 726 operates to "restor[e] the creditor to as near a position as the creditor would have occupied absent bankruptcy."  *In re Beck*, 128 B.R. 571, 573 (Bankr. E.D. Okla. 1991); *Colfin Bulls*, 547 B.R. at 893 (applying contract rate); *In re Fast*, 318 B.R. 183, 191–92 (Bankr. D. Colo. 2004) (same); *see also Dow Corning*, 456 F.3d at 671 (applying contract rate under the fair and equitable test).

## CONCLUSION

The Court should reverse the bankruptcy court's rejection of the objection of the TLA Claimholders.  The Court need not reverse the confirmation of the Plan.

---

[6]  Reading "the legal rate" to refer exclusively to the federal judgment rate would create further anomalies—for example, by allowing a state judgment debtor to convert from a high state law interest rate to the lower federal rate simply by filing for bankruptcy protection.

Instead, the Court should remand with instructions for the bankruptcy court to direct the Debtors to pay the TLA Claimholders amounts "such that the applicable Allowed Class 6 Claim will be rendered Unimpaired pursuant to Section 1124 of the Bankruptcy Code," A0804, § 3.2(f)(ii), *viz.*, the full amount owed under the Debt Instruments, including post-petition interest at the contract rates.

Dated: July 18, 2022                    Respectfully submitted,

                                        /s/ Matthew D. McGill
DANIEL A. FLIMAN                          MATTHEW D. MCGILL
CHRISTOPHER M. GUHIN                       GIBSON, DUNN & CRUTCHER LLP
EMILY L. KUZNICK                          1050 Connecticut Avenue, N.W.
JOHN F. IAFFALDANO                        Washington, DC  20036
PAUL HASTINGS LLP                         Telephone:  202.955.8500
200 Park Ave.                             Facsimile:   202.467.0539
New York, NY 10166
Telephone:  212.318.6000
Facsimile:   212.319.4090

*Counsel for the TLA Claimholders Group*

51

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i) and Fed. R. Bankr. P. 8015(a)(7)(B)(i), and 8015(h) because, excluding parts of the document exempted by Fed. R. App. P. 32(f) and Fed. R. Bankr. P. 8015(g), it contains 12,468 words.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document is prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14 point Times New Roman.

Dated: July 18, 2022                    */s/ Matthew D. McGill*
                                         Matthew D. McGill

                                         *Counsel for TLA Claimholders Group*