**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: LATAM Airlines Group S.A., *et al.*, | Case No. 22-cv-5891 (DLC) |
| TLA Claimholders Group,<br>                    *Appellant*,<br><br>v.<br><br>LATAM Airlines Group S.A., *et al.*,<br>                    *Appellees*. | On Appeal From The United States<br>Bankruptcy Court For The<br>Southern District Of New York<br><br>Case No. 20-bk-11524<br><br>The Honorable James L. Garrity Jr. |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR STAY PENDING APPEAL**

DANIEL A. FLIMAN
CHRISTOPHER M. GUHIN
EMILY L. KUZNICK
JOHN F. IAFFALDANO
PAUL HASTINGS LLP
200 Park Ave.
New York, NY 10166
Telephone:     212.318.6000
Facsimile:     212.319.4090

MATTHEW D. MCGILL
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
Telephone:     202.955.8500
Facsimile:     202.467.0539
E-mail: mmcgill@gibsondunn.com

*Counsel for the TLA Claimholders Group*

## Table Of Contents

TABLE OF AUTHORITIES ........................................................................................ i

PRELIMINARY STATEMENT ................................................................................. 1

JURISDICTION .......................................................................................................... 4

BACKGROUND .......................................................................................................... 4

    A.    THE BANKRUPTCY CASES ...................................................... 4

    B.    THE TLA CLAIMS ....................................................................... 4

    C.    THE PLAN ..................................................................................... 5

    D.    THE DIP FACILITIES, BACKSTOP AGREEMENTS, AND EXIT FACILITY COMMITMENTS ...................................................... 6

    E.    THE TLA CLAIMHOLDERS GROUP'S APPEAL ......................... 7

    F.    THE DEBTORS' STEPS TOWARD SUBSTANTIAL CONSUMMATION OF THE PLAN .................................................. 8

RELIEF REQUESTED................................................................................................. 9

LEGAL STANDARD.................................................................................................... 9

ARGUMENT .............................................................................................................. 10

    A.    THE FOUR-FACTOR BALANCING TEST FAVORS GRANTING A STAY ......................................................................................... 10

        i.    The TLA Claimholders Group Will Suffer Irreparable Harm Absent a Stay Pending Appeal.................................................. 10

        ii.    The Risk of Injury to Non-Moving Parties is Minimal and Outweighed by the Irreparable Harm to the TLA Claimholders Group Absent a Stay .................................................................. 14

        iii.    The TLA Claimholders Group Has a Substantial Possibility of Success on the Merits of its Appeal........................................ 16

        iv.    The Public Interest Favors Allowing Meaningful Appellate Review...... 23

    B.    NO BOND SHOULD BE REQUIRED............................................. 24

CONCLUSION.......................................................................................................... 25

# Table of Authorities

**Page(s)**

**Cases**

*In re 473 W. End Realty Corp.*,
  507 B.R. 496 (Bankr. S.D.N.Y. 2014) ......................................................................16

*In re 53 Stanhope LLC*,
  625 B.R. 573 (Bankr. S.D.N.Y. 2021) ......................................................................23

*In re Adelphia Commc'ns Corp.*,
  361 B.R. 337 (S.D.N.Y. 2007) ...............................................................9, 11, 13, 24, 25

*Ahuja v. LightSquared Inc.*,
  644 F. App'x 24 (2d Cir. 2016) ................................................................................10

*In re Amster Yard Assocs.*,
  214 B.R. 122 (Bankr. S.D.N.Y. 1997) ......................................................................21

*In re Anderson*,
  560 B.R. 84 (S.D.N.Y. 2016) ....................................................................................16

*In re Atl. Terrace Apartment Corp.*,
  226 B.R. 535 (Bankr. E.D.N.Y. 1998) ......................................................................20

*Bell & Howell: Mamiya Co. v. Masel Supply Co.*,
  719 F.2d 42 (2d Cir. 1983) ........................................................................................10

*In re Brown*,
  2020 WL 3264057 (Bankr. S.D.N.Y. June 10, 2020) ................................................9

*Buccellati Holding Italia Spa v. Laura Buccellati LLC*,
  2014 WL 1325748 (S.D.N.Y. Mar. 17, 2014) .....................................................17, 18

*In re Chateaugay Corp.*,
  988 F.2d 322 (2d Cir. 1993) ......................................................................................10

*Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmbH*,
  2015 WL 5051769 (S.D.N.Y. Aug. 26, 2015) ......................................................9, 10

*In re Country Squire Assocs. of Carle Place, L.P.*,
  203 B.R. 182 (B.A.P. 2d Cir. 1996) .....................................................................11, 16

*CWCapital Asset Mgmt., LLC v. Burcam Cap. II, LLC*,
  2013 WL 3288092 (E.D.N.C. June 28, 2013) ..........................................................24

i

*In re DAEBO Int'l Shipping Co. Ltd.*,
  2016 WL 447655 (Bankr. S.D.N.Y. Feb. 4, 2016) ..................................................12

*In re DAK Indus., Inc.*,
  170 F.3d 1197 (9th Cir. 1999) ...............................................................................22

*In re Degennaro*,
  2020 WL 6827936 (S.D.N.Y. Oct. 2, 2020) ...........................................................11

*Di Pierro v. Taddeo*,
  685 F.2d 24 (2d Cir. 1982)......................................................................................20

*In re Empire Generating Co.*,
  No. 19-23007-RDD (Bankr. S.D.N.Y. June 20, 2019), Dkt. 175 ...........................21

*In re Gen. Motors Corp.*,
  409 B.R. 24 (Bankr. S.D.N.Y. 2009) ...................................................................9, 11

*Giaimo v. DeTrano (In re DeTrano)*,
  326 F.3d 319 (2d Cir. 2003)....................................................................................17

*In re Hertz*,
  637 B.R. 781 (D. Del. 2021)................................................................................6, 22

*Hirschfeld v. Bd. of Elections in the City of N.Y.*,
  984 F.2d 35 (2d Cir. 1993)........................................................................................9

*In re L&N Twins Place LLC*,
  2019 WL 5258096 (Bankr. S.D.N.Y. Oct. 15, 2019) .............................................23

*In re Lehman Bros. Holdings, Inc.*,
  2010 WL 11713067 (S.D.N.Y. June 21, 2010) ........................................................9

*In re Loral Space and Commc'ns Ltd.*,
  Bench Ruling at Tr. 22:19-23:2 ..............................................................................23

*In re Metromedia Fiber Network, Inc.*,
  416 F.3d 136 (2d Cir. 2005)....................................................2, 3, 10, 12, 14

*Mohammed v. Reno*,
  309 F.3d 95 (2d Cir. 2002)................................................................................10, 23

*In re Motors Liquidation Co.*,
  2010 WL 4449425 (S.D.N.Y. Oct. 29, 2010) .........................................................10

*In re Mullins*,
  633 B.R. 1 (Bankr. D. Mass. 2021) ...........................................................6, 7, 8, 22

*Nat. Res. Def. Council v. EPA*,
  19 F.4th 177 (2d Cir. 2021) ....................................................................3, 17

*In re New Valley Corp.*,
  168 B.R. 73 (Bankr. D.N.J. 1994) .................................................................20

*Nken v. Holder*,
  556 U.S. 418 (2009).........................................................................................10

*In re Oneida Ltd.*,
  351 B.R. 95 (Bankr. S.D.N.Y. 2009) ............................................................21

*In re PG&E Corp.*
  610 B.R. 308 (Bankr. N.D. Cal. 2019) ...........................................................6

*Ruskin v. Griffiths*,
  269 F.2d 827 (2d Cir. 1959)...........................................................................23

*Stanbury v. Mukasey*,
  271 F. App'x 14 (2d Cir. 2008) .....................................................................17

*In re Suprema Specialties, Inc.*,
  330 B.R. 93 (S.D.N.Y. 2005).........................................................................24

*Thapa v. Gonzales*,
  460 F.3d 323 (2d Cir. 2006)....................................................................10, 23

*Tolbert v. Queens*,
  242 F.3d 58 (2d Cir. 2001).............................................................................17

*In re Ultra Petroleum Corp.*,
  624 B.R. 178 (Bankr. S.D. Tex. 2020) .......................................................6, 22

*United States v. Harrell*,
  268 F.3d 141 (2d Cir. 2001)...........................................................................17

*United States v. Williams*,
  504 U.S. 36 (1992)...........................................................................................17

*Weber v. United States Tr.*,
  484 F.3d 154 (2d Cir. 2007)...........................................................................24

*In re Windstream Holdings, Inc.*,
  838 F. App'x 634 (2d Cir. 2021) ...................................................................12

**Statutes**

11 U.S.C. § 502(b) ...........................................................................14, 18, 20, 21

11 U.S.C. § 1124(1) ...................................................................1, 5, 13, 14, 17, 18, 19, 20

11 U.S.C. § 1124(3) ...................................................................................................3, 20, 21

28 U.S.C. § 157 ...................................................................................................................4

28 U.S.C. § 1334 .................................................................................................................4

Bankruptcy Reform Act of 1994,
   Pub. L. 103-394, § 213, 108 Stat. 4106 ...................................................................21

**Rules**

Fed. Bankr. R. 8006(b) .....................................................................................................16

Fed. R. Bankr. P. 8007(a) ...................................................................................................9

Fed. R. Bankr. P. 8007(b) ...............................................................................................1, 9

Fed. R. Bankr. P. 8007(c) .................................................................................................24

**Other Authorities**

H.R. Rep. No. 103-835, *reprinted in* 1994 U.S.C.C.A.N. 3340 ....................................21

LATAM Airlines Group S.A. Form 6-K, July 6, 2022
   *available at* https://www.sec.gov/Archives/edgar/data/0001047716/
   000121390022037-460/ea162491ex99-1_latamair.htm .............................................8

Appellants, the ad hoc group of holders (collectively, the "TLA Claimholders" or "Appellants") of certain claims (the "TLA Claims") against TAM Linhas Aéreas S.A. ("TLA," together with its affiliated debtors and debtors-in-possession, the "Debtors"), hereby submit this motion (this "Motion") pursuant to Rule 8007(b) of the Federal Rules of Bankruptcy Procedure seeking a stay of the bankruptcy court's Order Confirming the Joint Plan of Reorganization, A0873, (the "Confirmation Order") pending the resolution of Appellants' appeal.

## PRELIMINARY STATEMENT[1]

This appeal arises from the Confirmation Order and Confirmation Opinion issued by the bankruptcy court that confirmed the Debtors' Plan that classified Appellants as unimpaired without providing for the payment of *any* post-petition interest owed under the terms of their contracts. As Appellants have argued in their opening brief in this appeal, that treatment plainly contravenes section 1124 of the Bankruptcy Code, which demands that a plan must "leave[] unaltered the legal, equitable, and contractual rights" of any claims that the plan treats as unimpaired. 11 U.S.C. § 1124(1). The Plan's designation of Appellants' claims as unimpaired requires that Appellants receive exactly what they would have received outside of bankruptcy, including interest for the period after the filing of the petition, paid at the contractual rates.

The Debtors have indicated that as soon as the Plan has been substantially consummated, they will seek to dismiss Appellants' appeal as equitably moot. The Debtors have further indicated their view that the Plan may be substantially consummated as soon as September, once a rights offering is initiated. July 5 Hr'g. Tr. at 28:6-9.

Even full consummation of the Plan should not render this appeal equitably moot because

---

1   Capitalized terms used but not defined in this Motion shall have the meanings ascribed to such terms in the Confirmation Order or Confirmation Opinion, as applicable. Capitalized terms used but not defined in this Preliminary Statement shall have the meanings ascribed to them elsewhere in the Motion.

the appeal, if successful, would require only the payment of money the reorganized Debtors will have capacity to pay.  Yet, the Second Circuit has stated that a "chief consideration" in determining whether an appeal from an order confirming a bankruptcy plan is equitably moot "is whether the appellant sought a stay of confirmation."  *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 144 (2d Cir. 2005).  Where such a stay is sought, the court "will provide relief if it is at all feasible." *Id.*  Appellants accordingly sought from the bankruptcy court a stay of confirmation pending an expedited appeal, B.R.Dkt. 5787,[2] which the bankruptcy court denied, B.R.Dkt. 5918, and Appellants now are seeking the same relief from this Court.  But this is not merely a box-checking exercise to satisfy the Second Circuit's "chief consideration" in the equitable mootness analysis. The stay of confirmation pending this expedited appeal, and, if necessary, expedited review in the Second Circuit, is warranted under the well-established standard.

The Debtors very soon will maintain that the Plan has been substantially consummated and that this appeal has become equitably moot.  They will maintain this even though Appellants sought a stay pending appeal from the bankruptcy court and now are seeking a stay from this Court. They will argue (baselessly) that because the Plan has been substantially consummated a payment of post-petition interest to Appellants is inequitable.  And although Appellants believe that they will sustain their burden of demonstrating that post-consummation relief would be equitable and feasible, there can be no assurance as to how this Court, or the Second Circuit, would weigh the facts and the relevant factors.  The fact that the Debtors in just weeks' time will argue that Appellants' appeal is equitably moot establishes an imminent and concrete risk of harm to Appellants' statutory right to appeal and to vindicate their rights under the Bankruptcy Code as unimpaired

---

[2]   References to "B.R.Dkt." refer to the bankruptcy docket in the main proceeding, No. 20-11254.  "Dkt." refers to this Court's docket.

creditors to receive the full benefit of their pre-bankruptcy bargain.

Equitable mootness would be an uniquely inequitable end to Appellants' appeal because Appellants are very likely to succeed on the merits.  *See* Dkt. 14.  The Debtors treated Appellants as unimpaired creditors to prevent them from voting on the Plan.  The Code allows debtors to disenfranchise creditors, but only when their legal, equitable, and contractual rights are left unaltered; the unimpaired creditors must get the benefit of their pre-Bankruptcy bargain.  The Plan, which echoes the Plan in the *New Valley* case that caused Congress to repeal Section 1124(3) of the Code, flouts this obligation.  If their appeal is adjudicated on the merits, Appellants are very likely to prevail.  The bankruptcy court, in denying certification of the appeal, admitted that the Appellants actually raised these issues, B.R.Dkt. 6130, at 14, and that the bankruptcy court passed upon them in the Confirmation Order, B.R.Dkt. 6130, at 21.  That is sufficient to preserve each of these issues for appeal, despite the bankruptcy court's erroneous forfeiture conclusion.  *See Nat. Res. Def. Council v. EPA*, 19 F.4th 177, 183 n.2 (2d Cir. 2021).

A stay pending resolution of an expedited appeal should not unduly prejudice the Debtors. In any event, any prejudice the Debtors might suffer from a stay pending appeal is wholly within their control.  Because equitable mootness is a prudential doctrine, it does not go to the jurisdiction of the Court and accordingly is waivable by the parties.  *See Metromedia*, 416 F.3d at 144 ("equitable mootness bears only upon the proper remedy, and does not raise a threshold question of our power to rule").  Here, a stay pending appeal is necessary only because the Debtors intend to press an equitable mootness argument to prematurely terminate Appellants' appellate rights and thereby obtain a substantive result that is contrary to the plain text of the Bankruptcy Code and that unlawfully enriches their shareholders at the expense of Appellants.  The Debtors can eliminate the need for a stay—and any potential harm flowing from it—simply by waiving their equitable mootness

argument.  That an otherwise appropriate stay pending appeal deprives the Debtors of the ability to claim equitable mootness is not a cognizable harm.

Finally, a stay pending an expedited appeal would be in the public interest.  The public has a strong interest in the orderly operation of the appellate process because it permits the development of the law and ensures that it is correctly and uniformly applied.  A stay pending an expedited appeal, entered to forestall a claim of equitable mootness, advances that important public interest.

## JURISDICTION

This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 158 and 1334.

## BACKGROUND

### A.    The Bankruptcy Cases

On May 26, 2020, LATAM Airlines Group S.A., the ultimate parent company of TLA, and certain of its affiliates sought relief under chapter 11 of the Bankruptcy Code, and on July 7 and 9, 2020, certain additional affiliates also filed for bankruptcy.

TLA, commonly referred to as LATAM Airlines Brazil, was among the entities that filed its petition on July 9 ("TLA Petition Date").  TLA is the Debtors' largest passenger airline entity, and in 2019 it carried approximately 50% of the Debtors' passenger traffic.  B.R.Dkt. 483, ¶ 8.

### B.    The TLA Claims

The TLA Claims consist of loans made to TLA, governed by and enforceable under Brazilian law ("the Debt Instruments").  The Debt Instruments each provide for the payment of (1) interest at specified pre-default rates, (2) post-default rates of interest of 1% per month, (3) a 2% post-default late payment charge, and (4) certain fees and expenses, including attorneys' fees. There is no dispute that the agreements are enforceable and that a default has occurred.[3]

---

[3]    The loans are listed in the TLA Claimholders Group's Objection, A103–04, and are attached to their respective proofs of claims.

C.    **The Plan**

On November 26, 2021, the Debtors filed their Joint Plan of Reorganization.  B.R.Dkt. 3666 (as amended, modified, or revised, the "Plan").  Appellants objected.  A95; A265. After holding confirmation hearings, the bankruptcy court issued the Confirmation Opinion and entered the Confirmation Order.

The approved Plan provides that Appellants will receive:

> (x) Cash equal to the amount of such Allowed Class 6 Claim; (y) such other less favorable treatment as to which the Debtors and the Holder of such Allowed Class 6 Claim shall have agreed upon in writing or (z) such other treatment such that the applicable Allowed Class 6 Claim will be rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code.

(*See* Plan at Section 3.2(f).)  The Plan also provides that TLA's pre-petition shareholder will retain its equity interests in TLA and that shareholders of TLA's ultimate parent, LATAM Airlines Group S.A., will retain an equity stake in the business and receive the ability to reinvest under the Plan on favorable terms.  (*See* Plan at Section 3.2(k); 3.2(l).)

In confirming the Plan, the bankruptcy court treated Appellants as unimpaired under section 1124(1) of the Bankruptcy Code, and thus deprived of the right to vote.  But the court also allowed the Debtors to pay Appellants only the cash value of the obligations owed under the Debt Instruments as of the TLA Petition Date under clause (x)—avoiding *any* post-petition interest. A0649, A0682.  The court held that the TLA Claimholders Group "are treated as unimpaired under the Plan and that the Plan does not run afoul of section 1124(1) of the Bankruptcy Code."  A0682.

The bankruptcy court then concluded that post-petition interest would be owed on the TLA Claims only if TLA were solvent.  A0650.  The court accepted the Debtors' liquidation analysis and the values reflected in the Debtors' monthly balance sheets as appropriate methodologies to determine solvency, and found TLA was insolvent.  A0667.

Finally, the bankruptcy court addressed the rate the Appellants would have obtained had they shown an entitlement to post-petition interest.  Resting largely on two out-of-circuit bankruptcy courts, the bankruptcy court settled on the federal judgment rate.  A0675, A0677 (citing *In re Hertz*, 637 B.R. 781, 796 (D. Del. 2021); *In re PG&E Corp*. 610 B.R. 308, 315–16 (Bankr. N.D. Cal. 2019)).  The bankruptcy court acknowledged that other bankruptcy courts had instead awarded interest at the contract rate, *see, e.g.*, *In re Mullins*, 633 B.R. 1, 20 (Bankr. D. Mass. 2021); *In re Ultra Petroleum Corp.*, 624 B.R. 178, 199–200 (Bankr. S.D. Tex. 2020), but declined to follow those decisions, A0679 n.52.  The bankruptcy court confirmed the Plan.  A0873.

### D.    The DIP Facilities, Backstop Agreements, and Exit Facility Commitments

The Debtors currently have access to financing in the form of a debtor-in-possession financing facility (the "A&R DIP Facility") approved by the bankruptcy court on March 18, 2022.  *See* B.R.Dkt. 4704.  The A&R DIP Facility originally matured on August 8, 2022, but it has been extended to October 14, 2022.  B.R.Dkt. 4660-3 (the "A&R DIP Credit Agreement").

Upon emergence, the Debtors will have two primary sources of new liquidity: (i) cash to be generated through rights offerings backstopped by certain creditors and shareholders (the "Backstop Parties" and, together with the parties to the restructuring support agreement and the A&R DIP Facility, the "Plan Support Parties") and (ii) DIP-to-exit financing facilities (the "DTE Facility").  The bankruptcy court approved the Debtors' entry into backstop agreements (the "Backstop Agreements").  B.R.Dkt. 4732.  The original outside date in the Backstop Agreements was September 30, 2022.  This date has since been extended to October 31, 2022, with the option for the Debtors to extend further to November 30, 2022.  B.R.Dkt. 5372-1, at 52, 70 (the "Third Amended Backstop Agreements").

The Debtors' authority to enter into the DTE Facility was approved by the bankruptcy court on June 24, 2022.  B.R.Dkt. 5791.  The bankruptcy court also authorized the Debtors' entry into a

"junior" DIP facility (the "Junior DIP"), the proceeds of which may be used to repay the existing A&R DIP Facility in full prior to the Debtors' emergence from bankruptcy and provide liquidity through the remainder of the chapter 11 cases.  The Junior DIP has a scheduled maturity date of December 1, 2023, and the DTE Facilities also mature on such date if, among other things, the Effective Date (i.e., the date of the Debtors' emergence from bankruptcy) of the Plan has not occurred.  The Debtors have noted that the commitment parties under the DTE Facilities and Junior DIP have the right to terminate their commitments as early as September 5, 2022 in the event of a stay (*see* B.R.Dkt. 5807, at 5-6), and have also stated on the record that they plan to close on the DTE Facilities "by the end of September 2022."  *Id.* at 10.  In total, the Debtors project to have "access to substantial liquidity," B.R.Dkt. 4777 at 59, at emergence including an estimated $2.2 billion in the second half of 2022 and $2.08 billion in 2023, B.R.Dkt. 4777-3 at 8.

**E.**     **The TLA Claimholders Group's Appeal**

On June 23, 2022, five calendar days after entry of the Confirmation Order, Appellants sought a stay of the order pending appeal from the bankruptcy court.  B.R.Dkt. 5787.  The Debtors and several other parties objected.  B.R.Dkts. 5807, 5809, 5817.  On July 7, 2022, the bankruptcy court denied the Appellants' motion.  B.R.Dkt. 5918.

The bankruptcy court concluded: (i) although the "loss of appellate rights is a quintessential form of prejudice" and that "the threat of equitable mootness is enough to satisfy the requirement of showing some irreparable injury," here, the threat of equitable mootness was remote and premature because the Plan would not be substantially consummated before September (*see id.* at 9-13) (quotation marks omitted); (ii) imposition of a stay would cause harm to the Debtors and other Plan Support Parties because it would "prevent [the] consummation of the Debtors' DTE/DIP Facilities and would jeopardize their access to other critical financing facilities." (*id.* at 13-19); (iii) Appellant did not have a "substantial possibility of success on appeal," as the success of such

appeal depended on a threshold factual issue of solvency that would require demonstration of clear error by the bankruptcy court (*id.* at 19-24) (heading altered); (iv) the public interest of "efficient administration of the estates and the Debtors' emergence" outweighed the public interest in "pre-serving appellate rights" and "correcting legal errors in the bankruptcy court," (*id.* at 24-25) (quotation marks omitted).  This appeal followed.

**F.**      **The Debtors' Steps Toward Substantial Consummation of the Plan**

The Debtors have represented that they do not expect to emerge from bankruptcy before October of 2022.  July 5, 2022 Hr'g. Tr. at 28:6-9.  They have asserted (and the bankruptcy court acknowledged) that, prior to emergence, they need to "(1) obtain the necessary shareholders' ap-provals to issue the Plan Securities; (2) register such new securities with the applicable Chilean regulator … ; and (3) comply with preemptive rights under applicable Chilean corporate law." B.R.Dkt. 5918 at 12 (internal citations and quotation marks omitted).  They have been actively taking steps to meet such goals since the entry of the Confirmation Order.  On July 5, 2022, Debtors held a shareholders' meeting, during which shareholders approved the issuance of the new securi-ties outlined in the Plan and modifications of the company bylaws prohibiting the issuance of new shares of convertible securities without voting rights until the Effective Date.  (*See* **Exhibit A**, LATAM Airlines Group S.A. Form 6-K, July 6, 2022, at Exhibit 99.1 https://www.sec.gov/Ar-chives/edgar/data/0001047716/000121390022037-460/ea162491ex99-1_latamair.htm.)

Now that the Debtors have completed the first step towards the issuance of the plan secu-rities, the Debtors will proceed with registration of the securities with the Chilean regulators.  Once approved, the Debtors can begin the Chilean preemptive rights offering, at which point, the Debt-ors have asserted that the "steps leading up to consummation may become irreversible."  B.R.Dkt. 5807, at 7; July 5 Hr'g. Tr. at 28:6-9 (Debtors acknowledging same).

## RELIEF REQUESTED

Pursuant to Bankruptcy Rule 8007(b), Appellants request an entry of an order staying the Confirmation Order pending an expedited appeal in this Court, and, if necessary, an expedited appeal in the U.S. Court of Appeals for the Second Circuit.

## LEGAL STANDARD

After a motion for "a stay of a judgment, order, or decree of the bankruptcy court pending appeal" is made to the bankruptcy court, a motion for a stay "may be made in the court where the appeal is pending."  Bankruptcy Rule 8007(a)(1)(A); (b)(1).  Courts in the Second Circuit consider four factors in deciding such a motion: "(1) whether the movant will suffer irreparable injury absent a stay, (2) whether a party will suffer substantial injury if a stay is issued, (3) whether the movant has demonstrated a substantial possibility, although less than a likelihood, of success on appeal, and (4) the public interests that may be affected."  *Hirschfeld v. Bd. of Elections in the City of N.Y.*, 984 F.2d 35, 39 (2d Cir. 1993) (quotation marks omitted); *In re Lehman Bros. Holdings, Inc.*, 2010 WL 11713067, at * 1 (S.D.N.Y. June 21, 2010).

"[T]he Second Circuit has consistently treated the inquiry of whether to grant a stay pending appeal as a balancing of factors that must be weighed."  *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 347, 368 (S.D.N.Y. 2007) (determining that the "balancing of equities tips in favor of granting a stay . . ."); *In re Brown*, 2020 WL 3264057, at *5 (Bankr. S.D.N.Y. June 10, 2020) (applying the "balancing test" approach); *In re Gen. Motors Corp.*, 409 B.R. 24, 30 (Bankr. S.D.N.Y. 2009) (engaging in a "balancing process with respect to the four factors, as opposed to adopting a rigid rule").  Among the four factors, "irreparable injury and likelihood of success on the merits 'are the most critical.'"  *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmbH*, 2015 WL 5051769, at *2 (S.D.N.Y. Aug. 26, 2015) (Nathan, J.) (quoting *Nken v. Holder*,

556 U.S. 418, 434 (2009)).  "[T]he factors are evaluated on a 'sliding scale' where '[t]he proba-

bility of success that must be demonstrated is inversely proportional to the amount of irreparable

injury plaintiff will suffer absent the stay.'"  *Id.* (quoting *Thapa v. Gonzales*, 460 F.3d 323, 334

(2d Cir. 2006)).  "Simply stated, more of one excuses less of the other."  *Mohammed v. Reno*, 309

F.3d 95, 101 (2d Cir. 2002) (quotation marks omitted); *see also In re Motors Liquidation Co.*,

2010 WL 4449425, at *3 (S.D.N.Y. Oct. 29, 2010) ("The lack of any one factor is not dispositive

to the success of the motion, rather the inquiry represents a balancing of the four factors.").

## ARGUMENT

### A.  The Four-Factor Balancing Test Favors Granting a Stay

The Second Circuit has expressed a strong preference that objecting parties seek stays

pending appeal in bankruptcy cases because they permit the court to "provide relief" at any stage

of appellate review "if it is at all feasible."  *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136,

144 (2d Cir. 2005).[4]  Here, the TLA Claimholders Group amply satisfies the four-factor balancing

test for a stay pending appeal.  Critically, if their appeal is dismissed as equitably moot, they would

suffer irreparable harm—an irreversible loss of appellate rights—and "irreparable harm is 'perhaps

the single most important prerequisite'" for a stay pending appeal.  *Church & Dwight Co.*, 2015

WL 5051769, at *2 (quoting *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45

(2d Cir. 1983)).  The other three factors likewise favor a stay.

### i.  The TLA Claimholders Group Will Suffer Irreparable Harm Absent a Stay Pending Appeal

The Debtors very soon will maintain that their Plan has been substantially consummated;

---

[4] In this Circuit, courts dismiss bankruptcy appeals as "equitably moot" even if the appellant would otherwise be entitled to relief following a successful appeal.  *See Ahuja v. LightSquared Inc.*, 644 F. App'x 24, 26 (2d Cir. 2016) (citing *In re Chateaugay Corp.*, 988 F.2d 322, 325 (2d Cir. 1993)).  Equitable mootness is a prudential doctrine that is not linked to "real" or "constitutional" mootness.  *Metromedia*, 416 F.3d at 144.

they have already stated that the Chilean rights offering beginning in September, in their view, will render the steps towards consummation irreversible.  *See* B.R.Dkt. 5807, at 7; July 5 Hr'g. Tr. at 28:6-9.  Appellants will maintain that post-consummation relief remains available—especially because the Plan itself, in clause 3.2(f)(ii)(z), expressly provides for all "treatment" required to render the Appellants "Unimpaired," meaning full payment of post-petition interest would be entirely consistent with the Plan as written.  *See* Dkt. 14, at 22–30.  Still there can be no assurances that this Court or the Second Circuit will disagree with the Debtors.  A holding that the case is equitably moot would deprive the TLA Claimholders Group of its statutory right to seek appellate review of the Confirmation Order, bringing an abrupt and inequitable end—not based on the merits—to a dispute over nearly $150 million that raises serious questions of statutory interpretation currently being considered in appellate courts across the country.

Courts in this District have held that the "loss of appellate rights is a 'quintessential form of prejudice.'"  *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 348 (S.D.N.Y. 2007).  Indeed, the bankruptcy court noted that "the *threat* of equitable mootness is enough to satisfy the requirement of showing some irreparable injury—enough to get on the scoreboard with respect to this issue." B.R.Dkt. 5918 at 11 (emphasis added) (quoting *Gen. Motors Corp.*, 409 B.R. at 31).  "Thus, where the denial of a stay pending appeal risks mooting *any* appeal of *significant* claims of error, the irreparable harm requirement is satisfied."  *Adelphia Commc'ns Corp.*, 361 B.R. at 347-48 (emphasis in original) (quoting *In re Country Squire Assocs. of Carle Place, L.P.*, 203 B.R. 182, 183 (B.A.P. 2d Cir. 1996)); *see also In re Degennaro*, 2020 WL 6827936, at *1 (S.D.N.Y. Oct. 2, 2020) (granting stay where "failure to grant the stay would moot the appeal").  Courts have even found the *potential loss* of appellate rights due to equitable mootness so prejudicial—and the preservation of the appellate court's ability to review the decision below so paramount—as to warrant a stay

even where appellant could not show the likelihood of success on the merits.  *See In re DAEBO Int'l Shipping Co.*, 2016 WL 447655, at *2 (Bankr. S.D.N.Y. Feb. 4, 2016).

The bankruptcy court, in concluding that the TLA Claimholders Group had not met its burden of demonstrating that it may suffer irreparable harm, reasoned that the threat of equitable mootness was speculative and premature until at least September of 2022, because that is when the Debtors have asserted that the steps leading to consummation of the Plan become irreversible. *See* B.R.Dkt. 5918 at 11-12.  But it is *precisely because* consummation will become irreversible in September, a matter of weeks from now, that it is appropriate and necessary to grant a stay *before* September.  By the time the risk is no longer premature, it will be too late.  As the Second Circuit has observed, the "[m]ost notabl[e]" and favorable way to avoid this catch-22 is to seek a stay.  *In re Windstream Holdings*, *Inc.*, 838 F. App'x 634, 637 (2d Cir. 2021).  Indeed, the court "insist[s]" upon an objecting party's promptly seeking a stay because it is the best way to ensure that affording relief remains feasible throughout the appeal.  *Metromedia*, 416 F.3d at 144.

The Debtors have refused to commit that they will not assert equitable mootness on the grounds of their upcoming steps towards consummation—which would obviate the need for a stay and any potential harm arising from a stay.  Indeed, just days following entry of the Confirmation Order, the Debtors began to take steps towards effectuating the Plan, including calling for an extraordinary shareholders' meeting at which certain issues concerning new securities issuances contemplated by the Plan were voted on and approved.  *See* June 21, 2022 Form 6-K; July 6, 2022 Form 6-K.  While the TLA Claimholders Group is prepared to oppose such dismissal and, indeed, believes that even occurrence of the Effective Date would not render its appeal equitably moot, there is at least the potential that the Debtors would prevail.

Notwithstanding the Debtors' assertions that they would have to go back to square one if

an appellate court ordered the payment of post-petition interest (*see* B.R.Dkt. 5807, ¶ 45), such an order would not require changes to the Plan.  *See* B.R.Dkt. 5824, at 4.  The approved Plan provides for Class 6 treatment that includes "(x) Cash equal to the amount of such Allowed Class 6 Claim; … or (z) *such other treatment such that the applicable Allowed Class 6 Claim will be rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code*."  (Plan § 3.2(f)) (emphasis added).  Accordingly, clause (z) would permit the payment of post-petition interest at the rate required to unimpair the TLA Claims without any revisions to the Plan, and thus the substantial consummation of the Plan would not render the TLA Claimholders Group's appeal moot in any sense.

For the same reason, if this Court were to determine that payment of post-petition interest at the contract rate to the TLA Claimholders Group is, as a legal matter, necessary to render the TLA Claims unimpaired pursuant to section 1124 of the Bankruptcy Code, such payment would fall *squarely* within the treatment of Class 6 claims that has already been confirmed by the bankruptcy court.  The fact that the bankruptcy court disagreed with this analysis only further supports the need for a stay pending appeal to prevent the risk of equitable mootness and a deprivation of an appeal of the merits below.

The issues the TLA Claimholders Group has presented on appeal are "significant" and worthy of full appellate consideration before arguments in support of Appellants' position are wrested from them on procedural grounds.  *Adelphia Commc'ns Corp.*, 361 B.R. at 347–48 (emphasis omitted).  Recognizing the importance of these questions, the Fifth Circuit has twice accepted certification of direct appeals raising materially identical issues.  *See* Order Granting Permission To Appeal, *In re Ultra Petroleum Corp.*, No. 17-20793 (5th Cir. Dec. 19, 2017); Order Granting Permission To Appeal, *In re Ultra Petroleum Corp.*, No. 21-20008 (5th Cir. Jan. 5, 2021).  Currently pending before the Ninth Circuit is yet another appeal that raises questions regarding the

interplay of sections 1124(1) and 502(b)(2).  *See Ad Hoc. Comm. of Holders of Trade Claims v. Pac. Gas & Elec. Corp.*, No. 21-16043 (9th Cir. 2021).  And there can be no dispute that Appellants loss of their ability to even *argue* that they are entitled to nearly $150 million is a "substantial" deprivation of their statutory rights to appeal a bankruptcy court's errors.

Accordingly, the first factor weighs in favor of granting a stay pending appeal.

### ii.   The Risk of Injury to Non-Moving Parties is Minimal and Outweighed by the Irreparable Harm to the TLA Claimholders Group Absent a Stay

Any potential harm to the Debtors and other parties is minimal, of their own creation, and cannot outweigh the irreparable risk of a possible loss of appellate rights.  By opposing a stay while simultaneously pressing to have the appeal rendered equitably moot, the Debtors seek to deprive Appellants of their statutory right to appeal an erroneous order through devices entirely of their own creation.  Because equitable mootness is a prudential doctrine, it does not go to the jurisdiction of the Court and accordingly is waivable.  *See Metromedia*, 416 F.3d at 144.  In this case, a stay is only necessary because the Debtors intend to obtain a substantive result that is contrary to both the Plan and the plain text of the Bankruptcy Code, unlawfully enriching shareholders at the expense of creditors.  The risk posed to the Debtors by the prospect of a stay, by contrast, is of their own creation, because a stay would stop the Debtors from prematurely terminating Appellants' substantial claims of error before they can even be heard on the merits.

Rather than eliminate the risk of a stay by committing not to argue equitable mootness, the Debtors have pressed forward, even while arguing that a stay would throw the financing agreements into disarray.  If the risk of injury from a stay is as great as the Debtors purport, they could easily eliminate that risk by agreeing not to assert equitable mootness based on the steps they intend to take as early as September.  The Debtors' unwillingness to forego this argument—which is unlikely to succeed in any event—speaks volumes about their true concerns of injury from the

14

imposition of a stay.  The Debtors could eliminate any harm flowing from the imposition of a stay simply by waiving their equitable mootness argument.

Nor do the Debtors' arguments about the risk of a stay hold water even if taken on their own terms.  The Debtors and Plan Support Parties have argued that any further delay to the Plan becoming effective will cause injury to the Debtors' estates and their creditors by threatening the settlements achieved in the case.  (*See* B.R.Dkt. 5807, at 8-13.)  However, once parties have expended significant time and resources in an effort to reach settlements, they are highly unlikely to abandon those deals because of implementation delays.  Indeed, the Debtors and the Plan Support Parties proceeded with confirmation of the Plan in the face of substantial opposition, fully aware that those parties likely would appeal and seek a stay.

The Debtors have ample time under their agreements to discuss any modifications.  The A&R DIP Credit Agreement was recently modified to extend the scheduled maturity date.  (*See* B.R.Dkt. 4660-3, A&R DIP Credit Agreement.)  Moreover, under the DTE/DIP Facilities, there will be no scheduled maturity on the DTE/DIP Facilities until December 1, 2023.  (*See* B.R.Dkt. 5666, DTE Motion ¶ 18.)  Additionally, prior to the Confirmation Hearing, the Backstop Parties granted the Debtors the option to extend the outside date under their respective backstop commitment agreements from October 31, 2022 to November 30, 2022 in exchange for additional payment.  (*See* B.R.Dkt. 5372-1, at 39, Third Amended Backstop Agreements.)  These are not charitable extensions.  These lenders have demonstrated that they are willing to accommodate such extensions because they *want* to consummate these favorable transactions—it is doubtful they will simply walk away from those deals because of an additional delay.

Further, the Debtors can continue to operate as they have been during the pendency of a stay.  There are no signs that the Debtors will run out of liquidity if their emergence is delayed, in

particular given that the bankruptcy court has now approved the DTE/DIP Facilities.

To ameliorate any concerns that the Debtors may have with delays in emergence caused by a stay, the TLA Claimholders Group and the Debtors have agreed upon an expedited briefing schedule for the appeal in this Court, Dkt. 9, under which the Appellants have already filed their opening brief, Dkt. 14.  Moreover, the TLA Claimholders Group requested that the bankruptcy court certify its appeal for direct review by the Second Circuit to further shorten the overall period for its appeal; although that request was denied, B.R.Dkt. 6130, Appellants may elect to renew that motion in this Court, *see* Fed. Bankr. R. 8006(b).  Thus, any purported harm resulting from delays caused by a stay can be substantially curtailed.

The irreparable harm to the TLA Claimholders Group—potential loss of appellate rights—outweighs the minimal risk to the Debtors, and favors granting a stay pending appeal.

### iii.   The TLA Claimholders Group Has a Substantial Possibility of Success on the Merits of its Appeal[5]

Equitable mootness would be an especially inequitable outcome in this case, where Appellants are very likely to succeed on the merits.  To obtain a stay, moving parties are required to show a "substantial possibility of success," but are not required to show a "probability" of success or that success is more likely than not.  *See In re Anderson*, 560 B.R. 84, 90 (S.D.N.Y. 2016).  This is a lower bar than a full adjudication of the ultimate merits of the appeal.  *See In re 473 W. End Realty Corp.*, 507 B.R. 496, 501 (Bankr. S.D.N.Y. 2014) ("The 'substantial possibility of success' test is considered an intermediate level between 'possible' and 'probable' and is 'intended to eliminate frivolous appeals.'") (quoting *In re Country Squire Assocs. of Carle Place, L.P.*, 203 B.R. at 184).  Importantly, in an appeal of an order of a bankruptcy court, the appellate court applies a "*de*

---

[5]   The following is not intended to be an exhaustive list of issues on appeal.  The TLA Claimholders Group's Opening Brief in this case has already been filed.  Dkt. 14.

*novo*" standard of review to questions of law and a "clear error" standard of review to factual findings. *Giaimo v. DeTrano (In re DeTrano)*, 326 F.3d 319, 321 (2d Cir. 2003). As demonstrated in the Opening Brief, the text and history of section 1124 weigh strongly in Appellants' favor.

Appellants make four arguments on appeal, including arguments that they are entitled to post-petition interest given their status as unimpaired creditors regardless of TLA's solvency. In denying Appellants' motion to certify a direct appeal to the Second Circuit, the bankruptcy court concluded that these arguments were not preserved below, or were dependent on a preliminary showing of TLA's solvency—both conclusions were mistaken. B.R.Dkt. 6130.

The bankruptcy court's waiver conclusion in the certification denial is inexplicable given that Court's recognition, in the very same opinion, that the Appellants made these legal arguments before that Court, *id.* at 14, and that the bankruptcy court rejected them in its Confirmation Opinion, *id.* at 21. That is all that is required—an issue is preserved "if it was 'pressed *or* passed upon below.'" *United States v. Harrell*, 268 F.3d 141, 146 (2d Cir. 2001) (quoting *United States v. Williams*, 504 U.S. 36, 41 (1992)) (emphasis added); *Nat. Def. Res. Council v. EPA*, 19 F.4th 177, 183 n.2 (2d Cir. 2021) (an issue is preserved if the party makes the argument to the court "before the court issue[s] the judgment that is being appealed"). The bankruptcy court acknowledged this rule but instead mistakenly rested its waiver conclusion on a stray statement in *Stanbury v. Mukasey*, 271 F. App'x 14, 15 (2d Cir. 2008), that an issue is waived if raised in "'a perfunctory manner.'" That is both irrelevant and wrong. As the Second Circuit has made clear, the "perfunctory" standard weighs against an ***appellate*** court's consideration of issues that are not pressed in a party's ***appellate*** briefing; it has no bearing on whether an issue was preserved in the Court below. *Tolbert v. Queens*, 242 F.3d 58, 75 (2d Cir. 2001); *see also Buccellati Holding Italia Spa v. Laura Buccellati LLC*, 2014 WL 1325748, at *4 (S.D.N.Y. Mar. 17, 2014).

Here, as in *Buccellati*, the arguments were included "in the headings" and addressed "in several paragraphs" of pleadings and opinions and were raised in the confirmation hearing—these are not waived.  2014 WL 1325748, at *4.  Indeed, Appellants repeatedly argued below, just as they do here, that their status as unimpaired creditors *required* payment of post-petition interest.  B.R.Dkt. 5175, ¶¶ 1, 23, 24; B.R. Dkt. 6039 at 21, 23, 25.  And, contrary to the bankruptcy court's claim that solvency is the "lynchpin" of the Appellants' objection, the Confirmation Opinion opened its discussion of the Appellants' objection with a section titled "Whether the TLA GUCs Are Impaired Under the Plan" assessing whether the denial of post-petition interest causes impairment with *no mention* of solvency.  B.R.Dkt. 5752 at 21–23.  Indeed, the core legal conclusion at the heart of the Confirmation Opinion is its holding that section 502(b)(2) limits the otherwise plain text of section 1124. The court below held, and the appellants now appeal, the holding that "[b]ecause the Plan provides for payment of the TLA GUCs in full (i.e., principal and pre-petition interest) and the Bankruptcy Code itself disallows payment of PPI under section 502(b)(2), the claims are not impaired within the meaning of section 1124(1) the Bankruptcy Code." *Id.* at 19. This issue was unquestionably pressed and passed upon, and is now appropriately appealed.  So too each of the other issues the Appellants raise were argued and addressed below.[6]  *See generally* B.R.Dkt. 6039, at 3–5 (collecting issues).

Setting aside its demonstrably inappropriate findings as to waiver, the bankruptcy court also erred in the stay decision after concluding that "the lynchpin of [the TLA Claimholders

---

[6] *See* On the Appellants' right to priority over shareholders, Dkt. 5175, ¶ 46 (TLA's shareholders "are not entitled to a cent of recovery on the TLA equity until the TLA GUCs are paid in full"); Dkt. 6039 at 18–20 (slides from confirmation hearing titled "Equity's Recovery Under Plan Triggers Solvent Debtor Precedent"); Dkt. 5752, at 52–56 (considering and distinguishing Second Circuit precedents applying the absolute priority rule to require repayment of creditors' post-petition interest before value passes to shareholders); on whether solvency must be assessed based on enterprise value or asset-by-asset in liquidation, Dkt. 5175 at 10, 11 (insisting on valuation as "a going concern"); Dkt. 6039, at 37, 38, 44 ("Liquidation Value Is Not An Appropriate Metric"); Dkt. 5752, at 25–42 (rejecting entity valuation and instead adopting book value and hypothetical liquidation test).

Group's] claim" was the factual issue of solvency.  *See* B.R.Dkt. at 21.  That misunderstands the TLA Claimholders Group's appeal.  The bankruptcy court erred in concluding, both on the merits and in denying the stay, that a showing of solvency was a necessary predicate to any right to post-petition interest.  This appeal challenges critical *legal* premises concluding *no* post-petition interest was owed.  The Appellants can prevail without addressing or disturbing the bankruptcy court's solvency analysis.  The TLA Claimholders Group argues that: (1) a holder of an unimpaired claim must receive contractually mandated post-default interest because of the Code's guarantee that the creditors' rights will be "unaltered," 11 U.S.C. § 1124(1); (2) a reorganization that passes value to holders of equity interests (in their capacity as such) must first repay creditors in full, including post-petition interest; (3) a debtor's solvency should be determined based on its value as a going concern; and, (4) assuming an entitlement to post-default interest, the interest should be paid at the rates provided in the Debt Instruments.  Each involves a pure question of law, which will be reviewed *de novo*, and each was decided by the Confirmation Opinion.  None depend on any factual finding of solvency.  If Appellants prevail on *any* of these issues, that would fatally undermine the bankruptcy court's rejection of post-petition interest on the TLA Claims *without* requiring any reassessment of the bankruptcy court's factual conclusion on solvency.

Appellants have at least a substantial possibility of success of succeeding on one or more of these issues.  As discussed in the TLA Claimholders Opening Brief, the bankruptcy court's conclusions were contrary to the text and statutory history of section 1124 and the basic scheme of the Bankruptcy Code's absolute priority rule, which requires that creditors be paid in full before *any* residual value may flow to equity holders.  Dkt. 14, at 22–24.

The Confirmation Opinion provides that the Plan may (a) strip creditors of material contractual rights, while depriving them of any right to vote on the Plan and (b) divert the value owed

to those creditors to fund distributions to the Debtors' pre-petition shareholders and Plan Sponsors. This outcome runs afoul of the Bankruptcy Code and the case law.

The Confirmation Opinion reaches its outcome by first finding that the TLA Claims are unimpaired because section 502(b) of the Bankruptcy Code permits a debtor to treat creditors as unimpaired without paying them post-petition interest. This was incorrect. Under section 1124(1), a plan may only treat a class of claims as unimpaired if the plan "leaves unaltered the legal, equitable, and contractual rights" to which the claims entitle the holders. Section 1124 "define[s] impairment in the broadest possible terms." *Di Pierro v. Taddeo*, 685 F.2d 24, 28 (2d Cir. 1982). Any alteration of a creditor's rights is impairment. *In re Atl. Terrace Apartment Corp.*, 226 B.R. 535, 538 (Bankr. E.D.N.Y. 1998) (any change in rights constitutes impairment). The denial of post-petition interest required in the Appellants' contracts alters their legal, equitable, and contractual rights and leaves their claims impaired.

There are additional statutory indications that the denial of post-petition interest constitutes impairment under section 1124(1). Prior to 1994, section 1124 contained a third subsection which stated that a claim could be treated as unimpaired if "on the effective date of the plan, the holder of such claim or interest receives … cash equal to … the allowed amount of such claim." 11 U.S.C. § 1124(3) (repealed). That year, a New Jersey bankruptcy court confirmed a plan that limited one class of creditors to pre-petition interest and allowed residual value to flow to a junior class of creditors and equity holders. *In re New Valley Corp.*, 168 B.R. 73, 75–76 (Bankr. D.N.J. 1994). The court reviewed section 502(b) and section 1124(3), which provided that a creditor was unimpaired if it "receive[d] … cash equal to … the allowed amount of [its] claim," 11 U.S.C. § 1124(3) (repealed), and concluded that a creditor unimpaired under section 1124(3) was not entitled any post-petition interest. *New Valley*, 168 B.R. at 80.

20

Congress reacted by repealing section 1124(3).  Bankruptcy Reform Act of 1994, Pub. L. 103-394, § 213, 108 Stat. 4106, 4125–26.  The committee report expressly referenced the *New Valley* decision and made clear that "if a plan proposed to pay a class of claims in cash in the full allowed amount of the claims, the class would be impaired, entitling creditors to vote for or against the plan."  H.R. Rep. No. 103-835, at 48, *reprinted in* 1994 U.S.C.C.A.N. 3340, 3356–57.  The Confirmation Opinion permits the Debtors to do precisely what section 1124(3) previously allowed—designate the TLA Claimholders Group as unimpaired but only provide them with payment of the cash value of its claims as of petition date.  Congress has rejected that approach.

While this question has not yet been addressed by the Second Circuit Court of Appeals or the Supreme Court of the United States, it has been addressed by bankruptcy courts in this District. In *In re Empire Generating Co.*, No. 19-23007-RDD (Bankr. S.D.N.Y. June 20, 2019), Dkt. 175, the court noted that the denial of post-petition interest to unimpaired claims was a "contradiction" and that counsel "ought to fix it now."  *Id.* at 27:15–20.  The same conclusion was reached in *In re Oneida Ltd.*, 351 B.R. 95, 96 (Bankr. S.D.N.Y. 2009) ("[I]f a creditor has a right to interest on its claim under applicable non-bankruptcy law, it must be paid interest for the post-petition … period. … Once paid that interest, it returns to the position it previously occupied and is unimpaired.").  Neither depended on the debtors' solvency.  When counsel in *Empire* stated that creditors do not have a right to post-petition interest if the debtor is insolvent, the court dismissed the objection, stating, "[t]his is unimpairment … not 1129(a)(7)."  *Empire*, Dkt. 175, at 28:2–4.  When another party argued that the claims were not impaired because post-petition interest was not allowed by operation of section 502(b)—precisely the interpretation the bankruptcy court adopted in its Confirmation Opinion, A0648—the court emphatically rejected that argument:  "Congress meant 1124 to provide for post-petition interest."  *Empire*, Dkt. 175, at 29:10–12; *see also In re*

*Amster Yard Assocs.*, 214 B.R. 122, 123 (Bankr. S.D.N.Y. 1997) ("The unsecured creditors are also impaired because they will receive 100% of their claims without postpetition interest.")

After erroneously finding that the Debtors did not need to pay unsecured creditors being treated as unimpaired post-petition interest, the bankruptcy court proceeded to analyze whether other doctrines require the payment of post-petition interest.  In doing so, the bankruptcy court improperly relieved the Debtors—the plan proponents—of the burden of proof to demonstrate that the Plan complies with all confirmation standards, instead shifting to the TLA Claimholders Group the burden to show that TLA is solvent.  The bankruptcy court then concluded that burden was not met because, while the TLA Claimholders Group provided proof of solvency using TLA's value as a going concern entity, as it exists under the Plan and the Debtors' projections (and as established by the Debtors' own professionals), the bankruptcy court instead accepted the Debtors' proposed asset-by-asset valuation methods, looking to book value and a hypothetical liquidation that will never happen.  This, too, was error.  *In re DAK Indus., Inc.*, 170 F.3d 1197, 1199 n.3 (9th Cir. 1999) (asset-by-asset values should be used only when debtor is "'on its deathbed'" and a debtor that is a going concern needs to be valued "as if [it] had been sold as a unit, in a prudent manner, and within a reasonable time").

And finally, with respect to the rate of interest that unimpaired creditors are to receive, the Confirmation Opinion looked to out-of-circuit decisions.  Resting largely on two decisions of bankruptcy courts in Delaware and California, the Court concluded that the federal judgment rate was the appropriate interest rate.  A0675–77 (citing *Hertz*, 637 B.R. at 796; *PG&E Corp.*, 610 B.R. at 315–16).  The Court acknowledged that other bankruptcy courts disagreed and had awarded interest at the contract rate, *see, e.g.*, *In re Mullins*, 633 B.R. 1, 20 (Bankr. D. Mass. 2021); *In re Ultra Petroleum Corp.*, 624 B.R. 178, 199–200 (Bankr. S.D. Tex. 2020), but declined to follow

those decisions, Dkt. 5752, at 54 n.52.  The fact that there is this dispute amongst the courts is a clear indicator of a possibility of success on the merits.

Moreover, there is sufficient authority in this Circuit to show the Appellant's substantial possibility of success on the merits.  Indeed, the Second Circuit provided guidance to courts in this Circuit decades ago in *Ruskin v. Griffiths*, when it recognized a creditor's right to full repayment before permitting value to flow to equity holders and indicated that payment of post-petition interest at the contract default rate is appropriate in such circumstance.  269 F.2d 827, 835 (2d Cir. 1959).  In holding that it is the "opposite of equity to allow the debtor to escape the expressly-bargained-for result of its act" in filing for bankruptcy, *Ruskin* recognized that courts should honor contract rates of interest before allowing value to pass to equity holders.  *Id.* at 831-32.

Thus, courts in this circuit have found that unsecured creditors are entitled to receive payment of post-petition interest at the contract rate.  *In re L&N Twins Place LLC*, 2019 WL 5258096 at *6-7 (Bankr. S.D.N.Y. Oct. 15, 2019); *In re Loral Space and Commc'ns Ltd.*, Bench Ruling at Tr. 22:19-23:2 ("improper for shareholders to recover before the debtors' unsecured creditors receive postpetition interest."); *In re 53 Stanhope LLC*, 625 B.R. 573, 580 (Bankr. S.D.N.Y. 2021) ("[I]f the debtor is solvent . . . courts will allow the claim at the default rate.").

The Appellants have shown a substantial possibility of success on appeal.  Nevertheless, "the probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury [petitioner] will suffer absent the stay." *Thapa*, 460 F.3d at 334 (quotation marks and brackets omitted).  Given the significant irreparable injury that the TLA Claimholders Group faces, the TLA Claimholders Group's showing of its potential success on the merits is more than sufficient to satisfy this stay factor.  *Mohammed v. Reno*, 309 F.3d 95, 101 (2d Cir. 2002).

### iv.   **The Public Interest Favors Allowing Meaningful Appellate Review**

Granting a stay pending any potential appeal, ensuring the preservation of parties' rights

to a meaningful review on appeal and thereby permitting the development of correct and uniform bankruptcy precedent substantially advances the public interest. *Adelphia Commc'ns Corp.*, 361 B.R. at 342 (describing the ability to appeal the bankruptcy court's order as a "substantial and important right").  This is especially so where, as here, Debtors unabashedly are moving towards consummation of the Plan beginning in September, partly in order to force the Court's hand toward a finding of equitable mootness.  A stay pending appeal entered to forestall such a claim, by contrast, advances the public interest because it provides this Court and the Second Circuit an opportunity to develop the law and remedy the "paucity of settled bankruptcy-law precedent." *Weber v. United States Tr.*, 484 F.3d 154, 158 (2d Cir. 2007).

Courts have also recognized that "the public interest in correcting legal errors in the bankruptcy court outweighs the interest in the efficient administration of the estate." *CWCapital Asset Mgmt., LLC v. Burcam Cap. II, LLC*, 2013 WL 3288092, at *9 (E.D.N.C. June 28, 2013).  A public interest in the efficient administration of bankruptcy cases does not outweigh the interest in preserving appellate rights, especially where the questions presented are substantial and unsettled.

Accordingly, the fourth factor weighs in favor of granting a stay pending appeal.

## B.   <u>No Bond Should Be Required</u>

A bond is not a requirement to obtain a stay pending appeal.  Bankruptcy Rule 8007(c) provides, in relevant part, that "[t]he district court . . . *may* condition the relief it grants on filing a bond or other security with the bankruptcy court." Fed. R. Bankr. P. 8007(c) (emphasis added). Rather than a requirement, courts have discretion in deciding whether to condition a stay upon the posting of a bond.  *See In re Suprema Specialties, Inc.*, 330 B.R. 93, 96 (S.D.N.Y. 2005) ("The posting of a bond … is discretionary and is not a prerequisite to obtain a stay pending appeal.").

The posting of a bond is neither necessary nor warranted here.  The purpose of posting a bond is to protect appellees against losses that may occur as a result of the appeal.  *See* 330 B.R.

at 96; *Adelphia Commc'ns Corp.*, 361 B.R. at 350 ("In determining whether a bond should be ordered, the court looks to whether the bond would be necessary to protect against diminution in the value of property pending appeal and to secure the prevailing party against any loss that might be sustained as a result of an ineffectual appeal.") (quotation marks omitted).  As described above, here the potential harm to the Debtors resulting from a stay pending appeal is dubious, in particular given their liquidity position and the extended runway they obtained with the DTE/DIP Facilities and the fact that a favorable result for the TLA Claimholders on appeal will not require vacating confirmation of the Plan itself.  *Supra*; Dkt. 14, at 50–51.[7]

## CONCLUSION

The TLA Claimholders Group respectfully requests that this Court enter an order, substantially in the form attached hereto, staying the bankruptcy court's Confirmation Order while the TLA Claimholders Group's appeal is pending.

---

[7]  If the Court does decide to condition granting a stay pending appeal on the TLA Claimholders Group posting a supersedeas bond, the second factor (injury to non-moving party) of the balancing test should weigh completely in favor of the TLA Claimholders Group.  *See Adelphia Commc'ns Corp.*, 361 B.R. at 368 (noting that an appellant posting bond would eliminate any potential harm to non-moving parties).

Date: August 1, 2022                              Respectfully submitted,

                                                  */s/ Matthew D. McGill*

DANIEL A. FLIMAN                                  MATTHEW D. MCGILL
CHRISTOPHER M. GUHIN                              GIBSON, DUNN & CRUTCHER LLP
EMILY L. KUZNICK                                  1050 Connecticut Avenue, N.W.
JOHN F. IAFFALDANO                                Washington, DC  20036
PAUL HASTINGS LLP                                 Telephone:     202.955.8500
200 Park Ave.                                     Facsimile:      202.467.0539
New York, NY 10166                                E-mail: mmcgill@gibsondunn.com
Telephone:     212.318.6000
Facsimile:      212.319.4090

*Counsel for the TLA Claimholders Group*