No. 22-CV-05891

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

LATAM AIRLINES GROUP S.A., ET AL.,

*Debtors,*

TLA CLAIMHOLDERS GROUP,

*Appellant,*

– v. –

LATAM AIRLINES GROUP S.A., ET AL.,

*Appellees.*

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK (GARRITY, J.)

IN RE LATAM AIRLINES GROUP, S.A., ET AL., CASE NO. 20-11254-JLG

BRIEF FOR INTERVENOR-APPELLEES

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Rachael L. Ringer
David E. Blabey Jr.
Natan Hamerman
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
*Attorneys for the Parent Ad Hoc Claimant
Group*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 7.1 of the Federal Rules of Civil Procedure and Rule 8012 of the Federal Rules of Bankruptcy Procedure, the Parent Ad Hoc Claimant Group, through its undersigned counsel, states that it is an ad hoc group of institutions. The institutions which are members of the Parent Ad Hoc Claimant Group are as follows:

***Aurelius Capital Management, LP.*** Aurelius Capital Management, LP does not have a parent corporation and no publicly held corporation owns 10% or more of its stock.

***Barclays Bank PLC***. Barclays Bank PLC's ultimate parent is Barclays PLC, which is a publicly traded company, and to the best of Barclays Bank PLC's knowledge, no publicly held corporation owns 10% or more of Barclays PLC's stock.

***Citigroup Financial Products, Inc. (Distressed Trading Desk)***. Citigroup Financial Products, Inc. ("CFPI") is a wholly owned subsidiary of Citigroup Global Markets Holdings Inc., which, in turn, is a wholly owned subsidiary of Citigroup Inc., a publicly held company.  Citigroup Inc. has no parent company and, to the best of CFPI's knowledge, no publicly held corporation owns 10% or more of Citigroup Inc.'s stock.

***Cross Ocean Partners Management LP***. Cross Ocean Partners Management LP does not have a parent corporation and no publicly held corporation owns 10% or more of its stock.

***Deutsche Bank Securities Inc.*** Deutsche Bank Securities Inc. is wholly owned by DB U.S. Financial Markets Holding Corporation, which is wholly owned by DB USA Corporation, which is wholly owned by Deutsche Bank AG, which is a publicly held company. No public company holds 10% or more of Deutsche Bank AG's stock, and Deutsche Bank AG has no parent corporation.

***Grosvenor Capital Management, L.P.*** Grosvenor Capital Management, L.P.'s ("GCMLP") principal owner is Grosvenor Capital Management Holdings, LLLP ("GCM Holdings"), a Delaware (USA) limited liability limited partnership.

***Monarch Alternative Capital LP***. Monarch Alternative Capital LP does not have a parent corporation and no publicly held corporation owns 10% or more of its stock.

***Olympus Peak Asset Management LP.*** Olympus Peak Asset Management LP does not have a parent corporation and no publicly held corporation owns 10% or more of its stock.

***P. Schoenfeld Asset Management L.P.*** P. Schoenfeld Asset Management L.P. does not have a parent corporation and no publicly held corporation owns 10% or more of its stock.

***Sculptor Capital LP***. Sculptor Capital LP does not have a parent corporation and no publicly held corporation owns 10% or more of its stock.

***Silver Point Capital, L.P.***  Silver Point Capital, L.P. does not have a parent corporation and no publicly held corporation owns 10% or more of its stock.

***Sixth Street Partners, LLC.*** Sixth Street Partners, LLC is wholly owned by Sixth Street Partners Management Company, L.P., and no publicly held corporation owns 10% or more of Sixth Street Partners Management Company, L.P.'s stock.

***Strategic Value Partners***. Strategic Value Partners, LLC does not have a parent corporation and no publicly held corporation owns 10% or more of its stock.

***Third Point LLC.*** Third Point LLC does not have a parent corporation and no publicly held corporation owns 10% or more of its stock.

***Värde Partners, Inc.*** Värde Partners, Inc. does not have a parent corporation and no publicly held corporation owns 10% or more of its stock.

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................ ii

INTRODUCTION ................................................................................1

ARGUMENT ....................................................................................4

I.  Section 1129(b) of the Bankruptcy Code Does Not Require Payment
    of Postpetition Interest in This Case..............................................4

    A.  The Plain Language of the Code Does Not Require Payment of
        PPI .....................................................................................4

    B.  Changes to the Code in 1994 Did Nothing to Alter 1129(b) ...............6

II. Payment of Postpetition Interest in this Case Would Be Inequitable ............7

III. The TLA Claimholders' Requested Relief is Unavailable..........................10

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bank of America Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St.*
  *P'Ship*,
  526 U.S. 434 (1999)...........................................................................5

*In re Energy Future Holdings Corp.*,
  540 B.R. 109 (Bankr. D. Del. 2015)...................................................9

*In re New Valley Corp.*,
  168 B.R. 73 (Bankr. D. N.J. 1994) ....................................................6

*United States v. Price*,
  361 U.S. 304 (1960).............................................................................7

**Statutes**

11 U.S.C. § 502(b)(2)........................................................................2, 4

11 U.S.C. § 1124(1) ..........................................................................2, 8

11 U.S.C. § 1124(3) ..............................................................................7

11 U.S.C. § 1129(a)(11).......................................................................11

11 U.S.C. § 1129(b) ....................................................................2, 4, 6, 7

11 U.S.C. § 1129(b)(2).......................................................................2, 6

11 U.S.C. § 1129(b)(2)(A) ...................................................................5

11 U.S.C. § 1129(b)(2)(B) ...................................................................5

11 U.S.C. § 1129(b)(2)(B)(i) .............................................................2, 4

Bankruptcy Reform Act of 1994, Pub. L. 103-394, 108 Stat. 4106 .........7

**Other Authorities**

H.R. Rep. No. 95-595 (1977)............................................................5, 6

H.R. Rep. No. 103-835 (1994).....................................................................................7

## INTRODUCTION

Creditors of TAM Linhas Aéreas (or "TLA"), in stark contrast to the creditors of LATAM Parent, are receiving a 100 cent recovery on their claims. As part of a comprehensive series of settlements to facilitate a smooth and efficient emergence from bankruptcy, creditors of LATAM Parent have agreed to take significant haircuts on their claim recoveries under the Plan. Unsatisfied with their preferential treatment, the TLA Claimholders Group seeks more: payment of over $100 million in postpetition interest. If paid such a windfall, these amounts would not only reduce other creditors' recoveries even more, but upend the Plan and the Debtors' ability to emerge from bankruptcy.

This outcome, in addition to being profoundly inequitable, is also impermissible under the Bankruptcy Code. The TLA Claimholders Group has tried a variety of approaches to crack that Code, pivoting from arguments rejected below to newly crafted theories on appeal. The Debtors will comprehensively address and refute these arguments, new and old. Suffice it to say, the arguments on which the TLA Claimholders Group's confirmation objection was based fail as they were entirely grounded in facts that the Bankruptcy Court found were unsupported by the evidence; the new arguments the TLA Claimholders Group improperly raises for the first time on appeal suffer a similar fate, and do not mandate a different result.

To avoid duplication, the Parent Ad Hoc Claimant Group focuses on three points. The first is the absolute priority rule. The TLA Claimholders Group contends that the rule requires payment of postpetition interest before value may flow to "shareholders." But residual value could flow to the corporate parent of TLA (i.e., LATAM Parent) only if TLA was solvent – and the Bankruptcy Court found that it is not. Moreover, the plain language of section 1129(b)(2)(B)(i) of the Bankruptcy Code requires only that unsecured creditors be paid the "allowed amount" of their claims before money flows to junior stakeholders. It is common ground that the "allowed amount" of a claim does not include postpetition interest, *see* 11 U.S.C. § 502(b)(2), so section 1129(b) cannot be invoked to require it. Changes to the Code in 1994 did nothing to alter this result.

The second key point is the equities of the case. Under the circumstances of the case, the Debtors should prevail in their contentions that sections 502(b)(2), 1124(1), and/or 1129(b)(2) preclude the payment of postpetition interest entirely. But to the extent that sections 1124(1) or 1129(b)(2), with their references to what is "equitable," might arguably permit the payment of postpetition interest in the right case, *that case is not this one*. Not where other creditors are receiving fractional recoveries, and not where the TLA Claimholders Group's very chance at a 100 percent recovery is attributable *only to the compromises and sacrifices of the many*

*other parties in the case* (including the very creditors from whom the TLA Claimholders Group seeks additional recoveries).

Finally, and relatedly, the Plan was not written to provide the TLA Claimholders Group with a free option – to take their 100 cents or litigate consequence-free for far more.  A plan that provides for postpetition interest to the TLA Claimholders Group is a vastly different Plan than the one that the Bankruptcy Court confirmed.  Not only have the Debtors not proven the feasibility of such a plan, the creditors have not agreed to it.  If the Appellant prevails on this appeal, it will be a pyrrhic victory indeed, upsetting over two-and-a-half years of progress towards emergence and requiring negotiation and confirmation of a brand new plan in a down market to the severe detriment of all.

The Court need not, and should not, permit such an outcome.  The Bankruptcy Court's confirmation order and opinion should be affirmed.[1]

---

[1] For sake of concision, the Parent Ad Hoc Claimant Group omits sections of the brief covered by the Debtors, and concurs with the Debtors' position that the TLA Claimholders Group's new arguments are not properly considered on appeal.  Terms used but not defined herein have the meanings ascribed to them by the Debtors.  In filing this brief the members of the Parent Ad Hoc Claimant Group do not assume any fiduciary or other duties to any other entity or individual.

## ARGUMENT

I. **Section 1129(b) of the Bankruptcy Code Does Not Require Payment of Postpetition Interest in This Case**

### A. The Plain Language of the Code Does Not Require Payment of PPI

One of the TLA Claimholders Group's central arguments on appeal is that its constituents' claims were classified as unimpaired so as to avoid application of the "fair and equitable" test of section 1129(b) of the Bankruptcy Code – i.e., the absolute priority rule. That rule, they say, requires payment of postpetition interest before value runs to equity holders. *See* App. Br. at 1-2, 19, 22-23. This is nothing but misdirection. Since the Bankruptcy Court found that TLA is insolvent, the absolute priority rule does not apply; no residual value flows to shareholders of an insolvent debtor. But even if the fair and equitable test did apply, the TLA Claimholders Group would be entitled to no postpetition interest in this case.

"Start with the text." App. Br at 2. Section 1129(b) provides that "the condition that a plan be fair and equitable with respect to a class includes the following requirements:"

> (B) With respect to a class of unsecured claims—
>
> (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the ***allowed amount*** of such claim…

11 U.S.C. § 1129(b)(2)(B)(i). There is no dispute – and no disputing – that the "allowed amount" of a claim does not include postpetition interest. *See* 11 U.S.C.

§ 502(b)(2); *see also* App. Br. at 36. Accordingly, section 1129(b)(2)(B)(i), the statutory codification of the absolute priority rule, by its plain terms does not require the payment of postpetition interest.

The TLA Claimholders Group nevertheless contends that the absolute priority rule reflects an "unyielding command that objecting creditors be paid in full, with interest." App. Br. at 4-5. In support, it invokes a series of pre-Code cases dealing principally with the rights of secured creditors. *See* App. Br. at 30-31 (citing, inter alia, *Consol. Rock Prods. Co. v. Du Bois*, 312 U.S. 510 (1941) and *Ruskin v. Griffiths*, 269 F.2d 827 (2d Cir. 1959)). But the Bankruptcy Code's version of the absolute priority rule contains separate requirements for the treatment of secured and unsecured creditors, *compare* 11 U.S.C. §§ 1129(b)(2)(A) *and* 1129(b)(2)(B) (the former addressing secured claims), so these cases are of no help to them.[2]

Reliance on pre-Code case law in this context is questionable in any event (even if it were relevant). Pre-Code practice is often a guide, but in the case of the absolute priority rule, the Supreme Court has held that "the Code does not codify any authoritative pre-Code version of the absolute priority rule." *Bank of America Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434, 448-49 (1999); *see also* H.R. Rep. No. 95-595, at 414 (1977) (noting that the section is a "partial

---

[2] The "fair and equitable" test for secured creditors calls, inter alia, for the realization by such creditors of "the indubitable equivalent of such *claims*." 11 U.S.C. § 1129(b)(2)(A) (emphasis added). Unlike the test for *un*secured creditors, its reach is not limited to "*allowed* claims."

codification of the absolute priority rule," and that the "elements of the test are new[,] departing from both the absolute priority rule and the best interests of creditors tests found in the Bankruptcy Act").

It is fair to observe that the Code's examples of "fair and equitable" treatment may not be exhaustive. *See* 11 U.S.C. § 1129(b) (noting what the rule "includes"). But if payment of postpetition interest were a *requirement* of the as-codified rule, then surely that would have been said, not left to speculation. In fact, the legislative history of section 1129(b) helps to confirm that the payment of postpetition interest to unsecured claims was not specifically envisioned. The House Report explains that "the holder of an unsecured claim is *not permitted* to receive property of a value as of the effective date of the plan on account of such claim that is greater than the *allowed amount* of such claim." H.R. Rep. No. 95-595, at 415-16 (1977) (emphases added).

In sum, the plain language of section 1129(b)(2) of the Bankruptcy Code requires only that an unsecured creditor be paid its "allowed claim," and the legislative history confirms that this is exactly what Congress meant. Ambiguous pre-Code practice is therefore irrelevant.

### B. Changes to the Code in 1994 Did Nothing to Alter 1129(b)

The TLA Claimholders Group makes much of certain limited changes to the Bankruptcy Code in 1994 in the wake of *In re New Valley Corp.*, 168 B.R. 73 (Bankr.

D. N.J. 1994).  *See, e.g.*, App. Br. at 29-30.  Those changes were limited (as relevant) to the repeal of former section 1124(3) of the Code.  *See* Bankruptcy Reform Act of 1994, Pub. L. 103-394, 108 Stat. 4106.  The 1994 amendments did not touch section 1129(b) of the Code, which continued to require only that an unsecured creditor be paid the "allowed amount" of its claim in priority to shareholders.

Legislative history to the 1994 amendments purported to describe what was meant by the "fair and equitable" test of section 1129(b), suggesting that it might require the payment of postpetition interest in a solvent debtor case.  H.R. Rep. No. 103-835, at 48 (1994).  Since this is not a solvent debtor case, that legislative history is irrelevant.  But in any event, Congressional statements accompanying the repeal of section *1124(3)* in 1994 provide no guidance as to the meaning of section *1129(b)* – a different statute enacted by a different Congress 16 years earlier, in 1978.  *See United States v. Price*, 361 U.S. 304, 332 (1960) (noting that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one").  If section 1129(b) of the Code did not require the payment of postpetition interest when it was enacted in 1978 (as its language and contemporaneous legislative history make clear), it does not require such payment today.

## II.   Payment of Postpetition Interest in this Case Would Be Inequitable

Since the Code *requires* no postpetition interest, that leaves only the equities.  *See* 11 U.S.C. § 1129(b) (cramdown requirement that a plan be "fair and equitable");

11 U.S.C. § 1124(1) (unimpairment requirement that a plan not alter the "equitable" rights of a claimant). The Bankruptcy Court held that "it would not be equitable to allow the TLA Claimholders to receive approximately $150 million more." Confirmation Op. at 56 [A0681]. Observing that the Plan is a "delicate, intricate, and integrated compromise of myriad claims," the Court found that "providing the TLA Claimholders with an additional recovery would reduce the recoveries to impaired creditors under the Plan and risk disrupting the delicate balance set forth in it." *Id*.

The TLA Claimholders Group has not challenged this finding on appeal. In any event, the Bankruptcy Court was right. The Plan is a heavily negotiated compromise, reflecting sacrifices on the part of nearly all major creditor groups. It is the compromises in the Plan that allowed the Debtors to reach resolution with their creditors after two long years in bankruptcy and it is only through those compromises that the Debtors will be able to reorganize. *See, e.g.*, Confirmation Op. at 84 [A0709]. It would be inequitable to permit the TLA Claimholders Group to benefit from those compromises to the tune of a 100 percent recovery – and then take even more. To be sure, a creditor cannot be compelled to settle. But when a creditor invokes equity, such behavior is surely relevant.

The TLA Claimholders Group's position as creditors of subsidiary Debtor TLA does not alter this result. They rely on this position to suggest that when excess

- 8 -

value is retained by them, it is diverted only from shareholders (i.e., TLA's ultimate owner, LATAM Parent), not from other creditors.  To begin with, the entire premise of this argument is flawed, as the Bankruptcy Court expressly found that TLA is not solvent.  *See, e.g.*, Confirmation Op. at 21 [A0646].  But it is wrong in any event to treat creditors of LATAM Parent as shareholders for purposes of this equitable analysis.  Yes, the various Debtors have not been substantively consolidated, but equitable, not legal, rights are at stake, and holders of claims against LATAM Parent are every bit the *creditors* that holders of claims against TLA are.

The Delaware Bankruptcy Court confronted this issue in *Energy Future Holdings*, and was dismissive of similar arguments:

> [I]t is not necessarily the case that equitable considerations require the payment of post-petition interest to unsecured creditors any time equity holders are receiving a distribution.  For example, in a case such as this, the ultimate equity holders of the enterprise are not receiving a distribution.  Rather, the equity is held by another debtor entity in an integrated capital structure. <u>To require the payment of post-petition interest in a case such as this would reduce the consideration available to pay other creditors of the enterprise not the ultimate equity holders.</u>  It is not clear to the Court that it would be equitable in this situation to require the payment of post-petition interest.

*In re Energy Future Holdings Corp.*, 540 B.R. 109, 117-18 (Bankr. D. Del. 2015) (emphasis added).

As in *Energy Future Holdings*, the Debtors here are highly integrated.  A diversion of value to the TLA Claimholders Group could imperil LATAM Parent's

ability to reorganize, which, in turn, would cloud TLA's own prospects for reorganization.  Importantly, no evidence was offered below concerning TLA's ability to raise exit financing, replace back office operations, and secure a fleet, in the absence of a LATAM Parent reorganization.  What's more, the TLA Claimholders Group did not establish below (and cannot establish now on appeal) what the currently integrated businesses, which have operated together for a decade, would look like if separated – if, for example, one Debtor were to emerge while the other languished in restructuring or, worse, liquidated.

In sum, it is not the mere fact that holders of claims against LATAM Parent are creditors (not shareholders) in this case, it is that any "equitable" considerations under the Bankruptcy Code should accommodate the overarching economic realities of the case.  The rights claimed by the TLA Claimholders Group should not be honored in service of equity if doing so would frustrate the Debtors' (both LATAM Parent's and TLA's) efforts to restructure.

For these reasons, the Bankruptcy Court's (unchallenged) holding that equitable considerations militate against payment of postpetition interest in the circumstances of this case should be affirmed.

## III.   The TLA Claimholders' Requested Relief is Unavailable

No doubt recognizing the benefits of the current Plan, the TLA Claimholders Group does not seek reversal of confirmation, but rather an order instructing the

Bankruptcy Court to direct payment of postpetition interest.  App. Br. at 50-51.  But the TLA Claimholders Group cannot have it both ways.  If the Debtors are required to pay postpetition interest to the TLA Claimholders, the Plan will fail.

First, the Debtors have not proven the feasibility of a plan that pays the TLA Claimholders Group the postpetition interest they demand.  Feasibility is a statutory requirement for confirmation.  11 U.S.C. § 1129(a)(11).  Thus, as the Bankruptcy Court found, a holding that the TLA Claimholders Group must be paid postpetition interest to be rendered unimpaired would require additional proceedings below:

> Among other things, the Plan, as modified, will have to be feasible in order to go effective.  The Plan is a product of a series of interrelated compromises, settlements, and other agreements among the Debtors and certain of its principal unsecured creditors and certain of its equity holders.  It is undisputed that if the TLA Claimholders were to succeed on their claim, the sole impact would not necessarily be payment of $145 million of PPI.  Instead, the Debtors and their stakeholders would need to consider how and whether to develop and incorporate a new plan and a new set of underlying agreements that account for such an obligation. . . .  The Debtors have demonstrated that if they are required to pay PPI to the TLA Claimholders, they will be required, among other things, to attempt to formulate, negotiate and execute a new restructuring support agreement, a new set of backstop agreements, a new set of financing agreements, and a new plan, and then seek Court approval of the new agreements and plan and obtain voting approval by the various constituents of the Debtors' estates.

Bench Memorandum and Order Denying the TLA Claimholders' Motion for (I) A Stay of the Confirmation Order Pending Appeal and (II) Certain Injunctive Relief Pursuant to Rule 8007 [Bankr. Dkt. No. 5918] ("**Stay Opinion**"), at 30.

Second, a plan that paid postpetition interest to the TLA Claimholders Group, but to no other creditor of TLA, would also face challenges, including equality of treatment.  The Appellants have not proposed how they would address them.

Third, the Parent Ad Hoc Claimant Group, which holds consent rights over the substance of the Plan (and all plan- and plan-funding-related documentation and means for implementation),[3] has not agreed, and will not agree, to fund a plan that pays postpetition interest to the TLA Claimholders Group.  And without the Parent Ad Hoc Claimant Group's billions of dollars in funding, the Plan as structured could not succeed.  *See, e.g.*, Stay Opinion at 31 (noting that "the Debtors' Business Plan on which the Plan is premised provides that, following the capital raise of approximately $5.442 billion, the Debtors will have minimum levels of liquidity to ensure that they can navigate the substantial volatility and uncertainty of the market"); *see also id*. at 19 (describing necessary capital).

The TLA Claimholders Group has previously argued that the Parent Ad Hoc Claimant Group is unlikely to walk away from the Plan (implicitly acknowledging that they can).  But the Bankruptcy Court rejected this argument as well, finding that "even if the Backstop Parties were willing to renegotiate the agreements, market conditions have deteriorated significantly since the Backstop Agreements were

---

[3] *See, e.g.,* Plan § 10.1, Conditions to Confirmation (providing that the Plan and Confirmation Order must be "in form and substance" acceptable to the "Requisite Commitment Creditors," a defined term that includes the Parent Ad Hoc Claimant Group) [A0838].

executed in January, meaning that the Debtors would be highly unlikely to obtain

backstop commitments on equally favorable terms." Stay Opinion at 19.

*   *   *

For these and the reasons set forth in the Debtors' brief, the Parent Ad Hoc

Claimant Group urges the Court to affirm the Bankruptcy Court's decision and order

confirming the Plan and to reject the TLA Claimholders Group's unwarranted and

unworkable request for a remand with instructions for the Bankruptcy Court to direct

the Debtors to pay the TLA Claimholders Group postpetition interest.


Dated: August 8, 2022
    New York, New York

                  KRAMER LEVIN NAFTALIS &
                  FRANKEL LLP


                  */s/ Rachael L. Ringer*
                  Kenneth H. Eckstein
                  Rachael L. Ringer
                  David E. Blabey Jr.
                  Natan Hamerman
                  Kramer Levin Naftalis & Frankel LLP
                  1177 Avenue of the Americas
                  New York, New York 10036
                  Telephone: (212) 715-9100
                  Facsimile:  (212) 715-8000
                  Email: keckstein@kramerlevin.com
                         rringer@kramerlevin.com
                         dblabey@kramerlevin.com
                         nhamerman@kramerlevin.com

                  *Attorneys for the Parent Ad Hoc Claimant Group*

- 13 -

<u>**CERTIFICATE OF COMPLIANCE**</u>

1.      This brief complies with the type-volume limitation of Federal Rule of Bankruptcy Procedure 8015(a)(7)(B)(i), because it contains 3,155 words, excluding the parts of the brief exempted by Federal Rule of Bankruptcy Procedure 8015(g).

2.      This brief complies with the typeface requirements of Federal Rule of Bankruptcy Procedure 8015(a)(5) and the type style requirements of Federal Rule of Bankruptcy Procedure 8015(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated:          August 8, 2022
                New York, New York

                                        By: <u>/s/ *Rachael L. Ringer*</u>
                                            Rachael L. Ringer