**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: LATAM Airlines Group S.A., | Case No. 22-cv-5891 (DLC) |
| TLA Claimholders Group,<br>*Appellant*,<br><br>v.<br><br>LATAM Airlines Group S.A., *et al.*,<br>*Appellees*. | On Appeal From The United States Bankruptcy Court For The Southern District Of New York<br><br>Case No. 20-bk-11524<br><br>The Honorable James L. Garrity Jr. |

**APPELLEES' OPPOSITION TO THE TLA**
**CLAIMHOLDERS GROUP'S MOTION FOR STAY PENDING APPEAL**

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Jeffrey A. Rosenthal
Lisa M. Schweitzer
David H. Herrington
Abena A. Mainoo
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Attorneys for Appellees LATAM Airlines Group S.A.,* et al.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................... 1

BACKGROUND ................................................................................ 3

I.   The LATAM Bankruptcy and Key Exit
     Financing Agreements ................................................................. 3

II.  The Bankruptcy Court Rulings ......................................................... 5

ARGUMENT ................................................................................... 6

I.   The TLA Claimholders Cannot Satisfy the Four Factors
     Needed to Warrant a Stay .............................................................. 7

     A.   The TLA Claimholders Cannot Establish
          Irreparable Harm Based on a Purported Risk of
          Equitable Mootness that is Not Imminent or
          Actual and at Best is Self-Induced ............................................ 7

     B.   A Stay Would Harm The Debtors and Their
          Stakeholders ................................................................ 10

          i.    A Stay Would Prevent Consummation Of
                The DTE/DIP Facilities and Jeopardize
                Other Critical Facilities ............................................ 11

          ii.   A Stay Could Lead to a Loss Of Backstop
                Commitments .......................................................... 13

     C.   The TLA Claimholders Cannot Establish a
          Substantial Possibility of Success on Appeal ............................... 15

     D.   A Stay Would Be Contrary to the Public Interest .......................... 23

II.  If a Stay is Imposed, a Bond Should be Required to
     Protect the Debtors Against the Massive Harm that a
     Stay Would Cause ..................................................................... 24

CONCLUSION ............................................................................... 25

i

# TABLE OF AUTHORITIES

**Page(s)**

*Buccellati Holding Italia Spa v. Laura Buccellati LLC*,
    No. 11 Civ. 7268(PGG), 2014 WL 1325748
    (S.D.N.Y. Mar. 17, 2014) .......................................................................... 18

*Caiola v. Citibank, N.A.*,
    295 F.3d 312 (2d Cir. 2002) ....................................................................... 19

*In re 53 Stanhope LLC*,
    625 B.R. 573 (Bankr. S.D.N.Y. 2021)................................................... 17, 21

*In re Adelphia Commc'ns Corp.*,
    333 B.R. 649 (S.D.N.Y. 2005) .................................................................... 6

*In re Adelphia Commc'ns Corp. (Adelphia II)*,
    361 B.R. 337 (Bankr. S.D.N.Y. 2007)................................................ 7, 24, 25

*In re Amster Yard Assocs.*,
    214 B.R. 122 (Bankr. S.D.N.Y. 1997)........................................................ 21

*In re Best Prods. Co.*,
    177 B.R. 791 (S.D.N.Y. 1995), *aff'd on other grounds*,
    68 F.3d 26 (2d Cir. 1995) .......................................................................... 8

*In re BGI, Inc.*,
    504 B.R. 754 (S.D.N.Y. 2014) ............................................................ 6, 7, 9

*In re Brown*,
    No. 18-10617 (JLG), 2020 WL 3264057
    (Bankr. S.D.N.Y. June 10, 2020)................................................................ 6

*In re Calpine Corp.*,
    No. 05-60200, 2008 WL 207841
    (Bankr. S.D.N.Y. Jan. 24, 2008)................................................................ *passim*

*In re Cujas*,
376 B.R. 480 (Bankr. E.D. Pa. 2007) ........................................................ 10

*In re DJK Residential, LLC*,
No. 08–10375, 2008 WL 650389
(S.D.N.Y. Mar. 7, 2008) ............................................................................ 24

*In re Francis*,
15 B.R. 998 (Bankr. E.D.N.Y. 1981) ........................................................ 9

*In re Gen. Motors Corp.*,
409 B.R. 24 (Bankr. S.D.N.Y. 2009) .................................................... 8, 25

*In re Markus*,
620 B.R. 31 (S.D.N.Y.2020) .................................................................... 17

*In re Motors Liquidation Co.*,
539 B.R. 676 (Bankr. S.D.N.Y. 2015) ...................................................... 24

*In re Nortel Networks Corp. Secs. Litig.*,
539 F.3d 129 (2d Cir. 2008) ...................................................................... 16

*In re Oneida Ltd.*,
351 B.R. 95 (Bankr. S.D.N.Y. 2009) ........................................................ 21

*In re Sabine Oil & Gas Corp*,
548 B.R. 674 (Bankr. S.D.N.Y. 2016) .................................................... 7, 10

*In re TerreStar Corp.*,
No. 13 Civ. 562(GBD), 2013 WL 4477037
(S.D.N.Y. Aug. 16, 2013) .......................................................................... 16

*In re Trib. Co.*,
477 B.R. 465 (Bankr. D. Del. 2012) .......................................................... 25

*In re Ultra Petroleum Corp.*,
943 F.3d 758 (5th Cir. 2019) ................................................................ 15, 20

*In re Worldcom, Inc.*,
    No. 07 Civ. 3408 DLC, 2007 WL 2682882
    (S.D.N.Y. Sept. 14, 2007) (Cote, J.)............................................................ 16

*Natural Defense Res. Council v. EPA*,
    19 F.4th 177 (2d Cir. 2021) ......................................................................... 19

*Paese v. Hartford Life and Acc. Ins. Co.*,
    449 F.3d 435 (2d Cir. 2006) ......................................................................... 19

*Stanbury v. Mukasey*,
    271 F. App'x 14 (2d Cir. 2008) .................................................................... 17

*Tolbert v. Queens Coll.*,
    242 F.3d 58 (2d Cir. 2001) ........................................................... 16, 17, 18, 19

*United States v. All Right, Title and Int. in Prop., Appurtenances, and*
    *Improvements Known as 479 Tamarind Drive, Hallendale, Fla.*,
    No. 98 Civ. 2279(DLC), 2012 WL 3886698
    (S.D.N.Y. Sept. 7, 2012) (J. Cote) ............................................................... 18

*United States. v. Griffiths*,
    47 F.3d 74 (2d Cir. 1995) ............................................................................. 17

*United States v. Harrell*,
    268 F.3d 141 (2d Cir. 2001) ......................................................................... 17

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005) ........................................................................... 19

## **Rules and Statutes**

28 U.S.C. § 1961 ............................................................................................. 22

Fed. R. Bankr. P. 8007(c) ................................................................................ 24

iv

Appellees LATAM Airlines Group S.A. ("LATAM Parent"), TAM Linhas Aéreas S.A., and certain affiliated debtors and debtors-in-possession (collectively, "Appellees" or the "Debtors")[1] respectfully submit this brief in opposition to the memorandum of law ("Br.") in support of the motion for stay pending appeal submitted by the TLA Claimholders Group ("TLA Claimholders") in support of their claim against TAM Linhas Aéreas S.A. ("TLA"), ECF Nos. 29, 30.

## PRELIMINARY STATEMENT

Over the course of nearly two years, the Debtors and their stakeholders have worked to formulate a Plan that, as the Bankruptcy Court observed, "represents a delicate, intricate, and integrated compromise of myriad claims, arguments, and rights." A1366 ("Confirmation Decision"). The Bankruptcy Court has now confirmed the Plan and time is of the essence in implementing it. The Debtors' successful implementation and emergence from Chapter 11 for the benefit of all of

---

[1]    The Appellees and Debtors also include Lan Cargo S.A., Transporte Aéreo S.A., Inversiones Lan S.A., Technical Training LATAM S.A., LATAM Travel Chile II S.A., Lan Pax Group S.A., Fast Air Almacenes De Carga S.A., Línea Aérea Carguera De Colombia S.A., Aerovías De Integración Regional S.A., LATAM Finance Ltd., LATAM Airlines Ecuador S.A., Professional Airline Cargo Services, LLC, Cargo Handling Airport Services, LLC, Maintenance Service Experts, LLC, Lan Cargo Repair Station LLC, Prime Airport Services Inc., Professional Airline Maintenance Services, LLC, Connecta Corporation, Peuco Finance Ltd., Latam Airlines Perú S.A., Inversiones Aéreas S.A., Holdco Colombia II Spa, Holdco Colombia I Spa, Holdco Ecuador S.A., Lan Cargo Inversiones S.A., Lan Cargo Overseas Ltd, Mas Investment Ltd., Professional Airline Services Inc., TAM S.A., Aerolinhas Brasileiras S.A., Prismah Fidelidade Ltda., Fidelidade Viagens E Turismo S.A., TP Franchising Ltda., Holdco I S.A., Multiplus Corredora De Seguros Ltda., and Piquero Leasing Limited.

their stakeholders depends on critical agreements to provide financing and to backstop the Plan's rights offerings that will expire soon if not consummated.

In the face of this, the TLA Claimholders demand that the Court halt the implementation of the Plan indefinitely so that they can pursue their meritless appeal. After the Bankruptcy Court rejected their stay motion on July 8, they waited nearly a month to renew their motion here. But they cannot possibly demonstrate that the Bankruptcy Court erred. The TLA Claimholders' appeal rests on new arguments that, as the Bankruptcy Court has ruled, were not presented below and therefore cannot serve as the basis for appeal. And even if not barred, their new arguments would fail because they are contrary to what a court has aptly described as "a monolithic mountain of authority." Moreover, their proffered theory of irreparable harm – that their appeal could become equitably moot – fails: The parties' agreed schedule was adopted to enable the Court to issue a decision before the implementation of the Plan may become irreversible and therefore give rise to equitable mootness. Indeed, the Debtors proposed an even faster schedule, but the TLA Claimholders opted for a slower one. Their proffered harm is thus neither imminent nor actual – and if anything it is self-induced.

On the other side of the ledger, to halt the implementation of the Plan would cause the Debtors' and their stakeholders severe harm and threaten the consummation of more than $10 billion in financing and backstop agreements with

a corresponding destruction of value.  For the same reasons, a stay would be contrary to the public interest.  And if a stay nevertheless were to be issued, the TLA Claimholders would need to post a bond to protect the Debtors against the billions of dollars in harm that would ensue.

For all these reasons, the TLA Claimholders' motion should be denied.

## BACKGROUND

### I.    The LATAM Bankruptcy And Key Exit Financing Agreements

The Debtors collectively operate as LATAM Airlines, a multi-entity enterprise operating as a unified platform that, before the advent of COVID-19, had been Latin America's leading airline group and one of the largest airlines in the world.  But the devastating impact of the pandemic forced the Debtors to initiate Chapter 11 proceedings in May and July of 2020.

Now that a Plan has been formulated and confirmed, the Debtors' ability to bridge the period leading to emergence and to obtain necessary financing and capital raising for their successful exit depends upon a number of important financing agreements that the Debtors need to effectuate the Plan and which would be jeopardized by a stay.  *See* A1772-A1773, A1776 ("Stay Decision").  These include the DIP-To-Exit ("DTE")/DIP Facilities, a set of key financing agreements that are

the result of multiple rounds of bidding and negotiation. *See* Herlihy Decl. ¶ 10.[2]
DTE Facilities of $2.75 billion are intended to enable the Debtors' emergence from
bankruptcy in the second half of 2022. *See* A1770 (Stay Decision); Herlihy Decl. ¶
7. A $1.173 billion Junior DIP Facility is intended, together with the four DTE
Facilities, to refinance the existing Amended and Restated DIP Facility (the "<u>A&R</u>
<u>DIP Facility</u>") and provide additional capital and a longer maturity date. *See* A1770
(Stay Decision); *Motion to Approve Debtor in Possession Financing*, BR ECF No.
5666 ¶ 18. Together, the DTE/DIP Facilities remain the best financing for the
Debtors and enable them to achieve a timely emergence from bankruptcy and
execute their business plan. *See* A1772 (Stay Decision); Herlihy Decl. ¶ 7.

In addition, the Debtors have executed backstop agreements with certain
creditors and shareholders, respectively, that provide necessary backstop
commitments to enable the Debtors to conduct offerings to raise $3.7 and $1.8
billion of new capital, respectively, that is needed to implement the Plan and
successfully emerge. *See* Herlihy Decl. ¶ 16; *Statement / Notice of Filing of Third
Amended Backstop Commitment Agreements,* BR ECF No. 5372-1 at 39.

---

[2]     *Declaration of Brent Herlihy in Support of the Debtors' Opposition to the Motion of the
TLA Claimholders for a Stay*, BR ECF No. 5808 ("<u>Herlihy Declaration</u>"). This Opposition refers
to docket entries on the bankruptcy docket as "BR ECF No."

## II.     The Bankruptcy Court Rulings

As the Bankruptcy Court observed, the "lynchpin" of the TLA Claimholders' Objection to the Plan was their assertion that TLA is solvent and accordingly, they could overcome section 502(b)(2)'s express ban on post-petition interest ("PPI") through the so-called "solvent debtor exception."  A1335 (Confirmation Decision); ECF No. 55 ("Appellees' Br.") at 13.  On this threshold factual question of TLA's solvency, the Bankruptcy Court carefully considered the extensive evidence and ruled against the TLA Claimholders across the board:  They failed to satisfy their burden to establish TLA's solvency and also failed to address the proper valuation standard; their evidence was insufficient even on its own terms to establish TLA's current financial condition and ignored TLA's liabilities; and while it was not their burden, the Debtors affirmatively established that TLA is insolvent according to the applicable standard.  A1343-A1344, A1347-A1352.

After filing their notice of appeal, the TLA Claimholders requested that the Bankruptcy Court certify their appeal to the Second Circuit.  *See generally* A1436-A1757.  In a thorough 34-page decision, the Bankruptcy Court rejected the request based principally on its finding that the proposed appellate arguments had not been presented in that court so as to make them proper grounds for appeal.  *See* A1799-A1804.

5

The TLA Claimholders also moved for a stay of the Bankruptcy Court's confirmation of the Plan.  BR ECF No. 5787.  The Bankruptcy Court determined that the TLA Claimholders had not satisfied any of the four factors for obtaining a stay:  They failed to establish any purported threat of irreparable harm that was actual and imminent (*id*. at 9-13); a stay would cause substantial harm to the Debtors (*id*. at 13-19); the TLA Claimholders had not demonstrated a substantial possibility of success on appeal (*id*. at 20-24); and staying the Plan would be contrary to the public interest (*id*. at 24-25).

## **ARGUMENT**

Stays pending appeal under Bankruptcy Rule 8007 "are the exception, not the rule, and are granted only in limited circumstances."  *In re Brown*, No. 18-10617 (JLG), 2020 WL 3264057, at *5 (Bankr. S.D.N.Y. June 10, 2020) (internal citation omitted).  The party seeking a stay therefore "carries a heavy burden."  *In re Adelphia Commc'ns Corp.*, 333 B.R. 649, 659 (S.D.N.Y. 2005).  And where, as here, the Bankruptcy Court has denied a stay, "it is the burden of the appellant to convince the district court or appellate panel that the bankruptcy judge was incorrect."  *In re BGI, Inc.*, 504 B.R. 754, 761 (S.D.N.Y. 2014).  The TLA Claimholders cannot satisfy their heavy burden because they cannot establish any of the four factors for a stay:  (1) that they will suffer irreparable injury absent a stay, (2) that a stay would not cause any other party substantial injury, (3) that they have a substantial

6

possibility of success on appeal, and (4) that the public interest supports a stay.  *In re BGI, Inc.*, 504 B.R. at 762; *In re Calpine Corp.*, No. 05-60200, 2008 WL 207841, at *4 (Bankr. S.D.N.Y. Jan. 24, 2008).

I.    **The TLA Claimholders Cannot Satisfy The Four Factors Needed To Warrant A Stay**

A.    **The TLA Claimholders Cannot Establish Irreparable Harm Based On A Purported Risk Of Equitable Mootness That Is Not Imminent Or Actual And At Best Is Self-Induced**

The TLA Claimholders cannot satisfy the requirement to demonstrate that, without a stay, they will suffer irreparable harm that is "'neither remote nor speculative, but actual and imminent.'"  *See In re Sabine Oil & Gas Corp*, 548 B.R. 674, 681 (Bankr. S.D.N.Y. 2016) (quoting *In re Adelphia Commc'ns Corp.* ("*Adelphia II*"), 361 B.R. 337, 347 (Bankr. S.D.N.Y. 2007)).  Because irreparable harm is "the single most important prerequisite" for the relief they seek, the TLA Claimholders "must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered."  *In re Calpine Corp.*, 2008 WL207841, at *4 (internal citations omitted).  They have failed to do so.

The TLA Claimholders attempt to satisfy this requirement by citing a purported risk that their appeal will become equitably moot before it is decided.  Br. at 12.  "[A] risk of mootness, standing alone, does not constitute irreparable harm."  *In re Sabine*, 548 B.R. at 682 (noting that a majority of courts have adopted this

rule).[3]  This is particularly true here, where the TLA Claimholders insist their appeal will not become equitably moot at any point.  Br. at 12-13.  Beyond this point, the TLA Claimholders cannot establish that there is an "imminent and actual risk" that their appeal would become equitably moot before this Court can issue a decision. As the TLA Claimholders acknowledge, while the steps to implement the Plan may become irreversible – and therefore any challenge to the Plan would become equitably moot – when the preemptive rights offering called for under the Plan commences, that step is not likely to occur until September.  *See* Br. at 11; *Opposition to the TLA Claimholders' Motion*, BR ECF No. 5807 at 7.  The expedited briefing schedule – under which briefing will be complete on August 15 – was agreed to by the parties with this timing in mind in order to facilitate the Court's issuance of a timely decision on the appeal.[4]  In fact, the Debtors proposed an even faster schedule, in which briefing would have been completed by August 2.[5]  But the

---

[3]     *See also In re Calpine Corp.*, 2008 WL 207841, at \*13-14 ("[M]erely invoking equitable mootness . . . —a risk that is present in any post-confirmation appeal of a chapter 11 plan—is not sufficient to demonstrate irreparable harm."); *In re Gen. Motors Corp.*, 409 B.R. 24, 31 (Bankr. S.D.N.Y. 2009) (A "majority of courts have held that a risk of mootness, standing alone, does not constitute irreparable harm."); *In re Best Prods. Co.*, 177 B.R. 791, 808 (S.D.N.Y. 1995), *aff'd on other grounds*, 68 F.3d 26 (2d Cir. 1995) (same).

[4]     In response to a request by the Ad Hoc Group of Unsecured Claimants for the scheduling of oral argument for their related appeal before August 29, *Letter*, Case No. 22-cv-5660 (S.D.N.Y. Aug. 5, 2022), ECF No. 78, argument has now been scheduled in both appeals on August 26.  *See Order*, ECF No. 46.

[5]     The Debtors proposed the following schedule: opening brief due July 8, opposition brief due July 28, and reply due August 2.  *Letter*, Case No. 22-cv-5660 (S.D.N.Y. July 5, 2022), ECF No. 3 at 2 n. 2; *Letter*, ECF No. 4.

8

TLA Claimholders opted for a slower schedule.  Still further, after the Bankruptcy Court denied their stay motion on July 8, the TLA Claimholders waited nearly a month – until August 1 – to file this renewed stay motion.

Having agreed to the appeal schedule – and declined a faster one – with full awareness of the estimated timetable for implementation of the Plan, the TLA Claimholders cannot satisfy the requirement to establish "imminent and actual" irreparable harm by claiming they may not receive an appellate decision fast enough. Such manufactured and self-induced claims of harm cannot satisfy the irreparable harm requirement or establish the equitable basis needed to justify the equitable relief of a stay.  *In re Calpine Corp.*, 2008 WL 207841, at *5 (rejecting claim of irreparable harm where it resulted from movant's "own procrastination") (citation omitted); *In re Francis,* 15 B.R. 998, 1004 (Bankr. E.D.N.Y. 1981) (rejecting claims of irreparable harm because movant found "itself in that position either by choice or neglect"); *In re BGI, Inc.*, 504 B.R. at 767 n. 99 (same).

Further, if the TLA Claimholders are suggesting that this Court should issue a stay of indefinite duration, that would extend to another round of appeals in the Second Circuit, they have provided no authority or justification for such a drastic result.  Any stay order would cause the Debtors and their stakeholders devastating harm, and a stay that would extend indefinitely, for multiple weeks or months, would imperil the Plan and threaten the destruction of billions of dollars in value.  As

discussed below, that harm would vastly outweigh the purported harm that the TLA

Claimholders claim.  *See In re Sabine Oil & Gas Corp.*, 548 B.R. at 682 ("Even if

the risk of mootness were sufficient to satisfy the requirement of some showing of

irreparable injury, however, the Court finds that any threat of harm here is

insignificant when weighed against the injury that the Debtors would suffer if the

stay sought by the Committee were granted."); *In re Cujas*, 376 B.R. 480, 487 (Bankr.

E.D. Pa. 2007) (The alleged harm caused by the risk of equitable mootness argument

must be weighed against "the potential harm other parties [such as the Debtors] may

suffer if the stay is granted.").

### B.   A Stay Would Harm The Debtors And Their Stakeholders

The TLA Claimholders cannot possibly satisfy their burden as to the second

requirement for a stay:  "that the non-moving party or other parties will not suffer

substantial harm if the stay is granted."  *See In re Sabine Oil & Gas Corp.*, 548 B.R.

at 682.  To the contrary, the issuance of a stay threatens to cause the Debtors and

their estates harm on the order of billions of dollars by derailing their years-long

work with a complex population of creditor parties toward restructuring and

emergence.  As the Bankruptcy Court correctly observed, "[t]he Plan represents a

delicate, intricate, and integrated compromise of myriad claims, arguments, and

rights."  A1366 (Confirmation Decision).  A stay threatens to disrupt and destroy

these critical agreements and arrangements.

To begin, the imposition of a stay would prevent the consummation of the Debtors' DTE/DIP Facilities and in turn would jeopardize the Debtors' other important financing agreements.  *See* A1772-A1775 (Stay Decision); Herlihy Decl. ¶¶ 6-24.   Further, as to the Backstop Agreements necessary to the Plan's implementation, a stay would at minimum require payment of $73 million to extend the Agreements by one month, from October 31 to November 30; and beyond that date, a stay would cause the commitment parties to the Backstop Agreements (the "<u>Backstop Parties</u>") to be released from their obligations with no guarantee that they would agree to new ones, let alone on favorable terms.  *See* Herlihy Decl. ¶¶ 16-19.

### i.    A Stay Would Prevent Consummation Of The DTE/DIP Facilities And Jeopardize Other Critical Facilities

As noted, the DTE/DIP Facilities are needed "to provide [the Debtors] with the financing and certainty essential to achieve a timely emergence from bankruptcy and execute their business plan."  A1772 (Stay Decision).  A stay would "prevent the Debtors from satisfying a condition precedent to closing the DTE/DIP Facilities."  A1772-A1773 (Stay Decision); *see also* Ex. B to DTE/DIP Motion, Omnibus Commitment Letter, at Exhibit E, § (s).  In fact, if the Confirmation Order is subject to a stay order, the lenders have the right to terminate their commitments as soon as September 5, 2022.  *See* A1773 (Stay Decision); Ex. B to DTE/DIP Motion, Omnibus Commitment Letter, at Exhibit E, § 12; Herlihy Decl. ¶ 8.

It is highly uncertain whether the lenders – who include financial institutions that are not current creditors of the Debtors – would agree to a waiver. Even if they were willing to negotiate an amendment, it would be extremely challenging and time-consuming to seek to negotiate new agreements, especially with a stay in place, given worsening market conditions, current capital market volatility, and challenges facing the airline industry. As a result, a stay would cause significant risk that the Debtors could not raise the exit financing needed to implement the Plan and emerge from Chapter 11. *See* A1773 (Stay Decision); Herlihy Decl. ¶¶ 9-10.

In addition, the inability to close on the DTE/DIP Facilities would interfere with the Debtors' ability to pay off the existing A&R DIP Facility that is scheduled to mature on October 14, 2022. The Debtors currently plan to close the DTE/DIP Facilities by the end of September 2022 in order to obtain funds in time to pay the A&R DIP Facility. If the Debtors cannot close in time, they would face the challenge of attempting to extend the A&R DIP Facility or raise the necessary debtor-in-possession financing to refinance it. "[T]here is a significant risk that replacement commitments could only be obtained on significantly worse terms or not at all in light of the current conditions in the capital markets." *See* A1774 (Stay Decision); Herlihy Decl. ¶¶ 11-12.

The harm a stay would cause would extend to the Debtors' efforts to enter into a new revolving credit facility. The Debtors have obtained a commitment for a

new $500 million revolving credit facility to provide necessary liquidity and to enable them to meet the "Minimum Liquidity Condition Precedent" in the Backstop Agreements.  For the reasons outlined above, "a stay would prevent the Debtors from closing the revolving credit facility…. and there is no guarantee that [they could] obtain a new facility to replace it.  *See* A1774 (Stay Decision); Herlihy Decl. ¶¶ 13-14.

Still further, and for the same reasons described above, a stay would place at risk the arrangements for the refinancing of the $600 million existing Revolving Credit Facility with an extended $600 million facility and the replacement of the $273 million Spare Engine Facility with an extended $273 million facility, both of which are important in allowing the Debtors to achieve competitive financing terms and raise the capital needed to make certain payments at emergence.  *See* A1774 (Stay Decision); Herlihy Decl. ¶ 20.

### ii.    A Stay Could Lead To A Loss Of Backstop Commitments

Beyond imperiling the essential financing facilities, a stay would threaten to prevent the Debtors from implementing the approximately $5.4 billion in new capital offerings that will be issued to enable the Debtors' emergence from Chapter 11 before the expiration of the Backstop Agreements that provide the necessary backstopping of the offerings.  *See* A1775 (Stay Decision); Herlihy Decl. ¶¶ 16-19. The Debtors negotiated an extension of the Backstop Agreements through October

31, 2022, with the option to obtain a further extension through November 30, 2022, at a cost of $73 million. *See* A1775 (Stay Decision); Herlihy Decl. ¶ 18. A stay would significantly increase the risk that the commitments in the Backstop Agreements would need to be extended, at least until November 30, at a cost of $73 million. *See* A1775 (Stay Decision); Herlihy Decl. ¶ 18.

Moreover, if the stay were to remain effective past November 30, the Debtors stand to lose their backstop commitments entirely. A1775 (Stay Decision). The TLA Claimholders glibly dismiss this threat by telling the Court it should assume that the Backstop Parties will agree to renegotiate these agreements. *See* Br. at 15. But as the Bankruptcy Court rightly observed, the backstop commitments were the result "of months of hard bargaining to obtain the best terms possible for the Debtors." A1775 (Stay Decision). There is no guarantee that the Backstop Parties would be willing to negotiate a new backstop agreement, particularly given the current uncertainties in the credit markets and the Debtors' operating environment. *See id.*; Herlihy Decl. ¶¶ 18-19. Even if the Backstop Parties were willing to renegotiate, they likely would not agree to as favorable terms in light of the prevailing market challenges. *See* A1776 (Stay Decision); Herlihy Decl. ¶¶ 18-19.

In total, as outlined above, a stay would place at risk approximately $10.238 billion in new investments that are necessary to the Plan and the Debtors' successful

14

emergence from Chapter 11, resulting in massive harm to the Debtors and to their creditors.  *See* Herlihy Decl. ¶¶ 21-24.[6]

## C.  The TLA Claimholders Cannot Establish A Substantial Possibility Of Success On Appeal

The TLA Claimholders cannot satisfy their burden of demonstrating that they have a substantial possibility of success on appeal.  *See In re Calpine Corp.*, 2008 WL 207841 at *4.  The arguments they seek to present are barred at the threshold because they were not presented below.  And even if these new claims could be considered, they would fail because they are contrary to a "monolithic mountain of authority."  *In re Ultra Petroleum Corp.*, 943 F.3d 758, 760, 763, 766 (5th Cir. 2019).  Seeking to lighten their burden of demonstrating success on the merits, the TLA Claimholders newly argue that "they are entitled to PPI regardless of TLA's solvency."  Br. at 17.  But as the Bankruptcy Court rightly found, because "the TLA Claimholders did not contend in their Plan objection that unsecured creditors were entitled to contract-rate PPI to become unimpaired as a matter of law[]" but instead

---

[6]     The TLA Claimholders argue that the Debtors could choose to defuse the TLA Claimholders' demand for a stay by agreeing that they could pay the TLA Claimholders nearly $150 million in PPI without altering the Plan and accordingly that their appeal will never become equitably moot.  Br. at 12-13.  But as the Bankruptcy Court has found, "[t]he Debtors have demonstrated that if they are required to pay PPI to the TLA Claimholders, they will be required, among other things, to attempt to formulate, negotiate and execute a new restructuring support agreement, a new set of backstop agreements, a new set of financing agreements, and a new plan, and then seek Court approval of the new agreements and plan and obtain voting approval by the various constituents of the Debtors' estates."  A1787 (Stay Decision).  Moreover, the argument that a debtor must either waive equitable mootness or accept a stay is inherently untenable and, if accepted, would lead to a stay in essentially every bankruptcy appeal.

"they contended that TLA was solvent and the solvent debtor exception operated through section 1124(1) of the Bankruptcy Code… there is no basis for an appellate court to consider whether the TLA [Claimholders] must be paid PPI to be rendered unimpaired outside of the context of TLA's solvency . . . ."   A1790-A1823 ("<u>Certification Decision</u>").

It is a "well-established general rule that an appellate court will not consider an issue raised for the first time on appeal." *In re Nortel Networks Corp. Secs. Litig.*, 539 F.3d 129, 132 (2d Cir. 2008).  In order to present an argument on appeal, an appellant must have "raise[d] it ***adequately*** in the bankruptcy court," or else they will have "deprived the bankruptcy court of the opportunity to address it in the first instance." *In re Worldcom, Inc.*, No. 07 Civ. 3408 DLC, 2007 WL 2682882, at *8 (S.D.N.Y. Sept. 14, 2007) (Cote, J.) (emphasis supplied); *see also In re TerreStar Corp.*, No. 13 Civ. 562 (GBD), 2013 WL 4477037, at *7 (S.D.N.Y. Aug. 16, 2013) ("By not raising these specific issues, [appellant] did not afford the Bankruptcy Judge the opportunity to focus his attention on [these issues] prior to his ruling . . . ."); *Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001) (An issue that is "adverted to in a perfunctory manner, unaccompanied by some effort at developed

argumentation," is not adequately presented to a court for decision and therefore is waived.); *Stanbury v. Mukasey*, 271 F. App'x 14, 15 (2d Cir. 2008) (same).[7]

"Appellants cannot 'change [their] strategy on appeal'" such that the bankruptcy court will have viewed their objection under one lens and the appellate court under another. *In re Markus*, 620 B.R. 31, 36 (S.D.N.Y.2020) (quoting *In re Campbell*, 539 B.R. 66, 74 (S.D.N.Y. 2015) ("Appellant, having chosen before the bankruptcy court to rely on [a] theory . . . is not free to change that strategy on appeal.") (alteration in original); *cf. United States v. Harrell*, 268 F.3d 141, 146 (2d Cir. 2001) (noting, in a criminal case, that appellant cannot pursue a different theory on appeal than below, discussing *United States v. Griffiths*, 47 F.3d 74 (2d Cir. 1995) (waiver applied where party referred to a theory but then "proceeded to argue a different theory")).

The TLA Claimholders seek to evade the waiver finding by contending that the Bankruptcy Court incorrectly relied on *Stanbury v. Mukasey* and *Tolbert v.*

---

[7]     The Bankruptcy Court charitably described the TLA Claimholders' making a passing reference at the very end of the confirmation hearing to unsecured creditors being impaired if not paid PPI, A1803-A1804 (Certification Decision), but in fact there was no clear articulation of such an argument even then.  The TLA Claimholders briefly referred to comments by Judge Drain in *Empire Generating* before conceding that he reversed his position in *In re 53 Stanhope LLC*, acknowledging that a creditor is not "impaired" under section 1124 by virtue of its claim being subject to the "Bankruptcy Code's own limitations on claim allowance, including limitations on the allowance of postpetition interest."  625 B.R. 573, 579-80 (Bankr. S.D.N.Y. 2021).  As the Bankruptcy Court found, such a "perfunctory" remark did not adequately present an argument for decision, especially given that the thrust of the Objection relied on the solvent debtor exception, and accordingly the Bankruptcy Court did not address the argument.  A1803-A1804, A1810-1811 (Certification Decision).

*Queens* in holding that an issue is waived if raised only in a "perfunctory manner." Br. at 17. They maintain that the "perfunctory" standard applies only in an appellate court and they cite as purported support *Buccellati Holding Italia Spa v. Laura Buccellati LLC*, No. 11 Civ. 7268 (PGG), 2014 WL 1325748 (S.D.N.Y. Mar. 17, 2014).

The argument is meritless. An argument is not adequately presented in any court if, in the words of *Tolbert*, it is merely "adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation." 242 F.3d at 75. The TLA Claimholders' contention that a perfunctory reference is insufficient in appellate courts, but sufficient in other courts, makes no sense. Not surprisingly, *Buccellati* does not support that theory. It merely noted that *Tolbert,* as an appellate court decision, referred to the adequate presentation standard in that context. 2014 WL 1325748 at *4. At the same time, it acknowledged that "[district] courts in this district have relied on *Tolbert* in rejecting similarly deficient claims." *Id.* And it declined to find waiver not because the *Tolbert* standard did not apply but because, in contrast to the facts of *Tolbert*, the issue in question had not been presented in a merely perfunctory manner and so was not waived under the *Tolbert* standard. *Id.*

In acknowledging that district courts apply the *Tolbert* standard, *Bucellati* cited this Court's decision in *United States v. All Right, Title and Int. in Prop., Appurtenances, and Improvements Known as 479 Tamarind Drive, Hallendale, Fla.,*

18

No. 98 Civ. 2279 (DLC), 2012 WL 3886698, (S.D.N.Y. Sept. 7, 2012) (J. Cote).  As Your Honor stated: "It is well settled that 'issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'  *Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001)."  2012 WL 3886698, at *3 (finding claim was waived because not adequately presented).  The TLA Claimholders' attempt to escape waiver by contending this standard does not apply to them is baseless.[8]

Moreover, beyond the fact that the position the TLA Claimholders now seek to adopt on appeal – that even insolvent debtors must pay PPI to unsecured creditors or else deem them impaired – was not adequately presented below, the various arguments that they offer as purported support for this position were manifestly not presented below – and in many instances are contrary to what they did assert below. As is clear from the precedents above, a party cannot obtain reversal of a decision below based on arguments it never presented to that court.

---

[8]     Still further, the Second Circuit has consistently found perfunctory arguments waived because they were not raised adequately in courts below.  *See, e.g.*, *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 124 n. 29 (2d Cir. 2005) (emphasizing that a party cannot "shift[] his position appeal" and that a sentence addressing argument in district court was insufficient to preserve claim on appeal); *Caiola v. Citibank, N.A.*, 295 F.3d 312, 328 (2d Cir. 2002) (argument raised in a footnote in a brief to the district court insufficient to preserve the issue for appellate review); *Paese v. Hartford Life and Acc. Ins. Co.*, 449 F.3d 435, 446 n. 3 (2d Cir. 2006).  The TLA Claimholders' cite to *Natural Defense Res. Council v. EPA*, Br. at 17, is unavailing because the appellant there clearly did raise the issue in question below.  19 F.4th 177, 183 n. 2 (2d Cir. 2021).

Even if they were not barred, the TLA Claimholders' new arguments are meritless. To begin, contrary to their argument below that "to unimpair an unsecured creditor of a **solvent** debtor, a plan must provide for the payment of PPI to the creditor." A109 ("<u>Objection</u>") ¶ 25 (emphasis supplied). They now contend that section 1124(1) requires that all debtors, even insolvent ones, pay PPI or deem their creditors impaired. But section 1124(1) addresses whether a "plan" creates an impairment, and the ban on PPI is set mandated by section 502(b) of the Code. When a Code provision such as section 502(b)(2) disallows recovery of certain amounts, "the monolithic mountain of authority hold[s] the Code – not the reorganization plan – defines and limits the claim in these circumstances" and therefore creditors cannot claim to be "'impaired' by a plan that paid them everything allowed by the Bankruptcy Code." *In re Ultra Petroleum Corp.*, 943 F.3d at 760, 763, 766 (collecting cases); *see* Appellees' Br. at 25-26 (discussing case law).[9]

The TLA Claimholders attempt to support their new argument by asserting that Congress's repeal of Section 1124(3) in the wake of the *New Valley* decision was not addressed to the solvent debtor exception but instead was intended to establish a general rule applicable to **all** debtors, including insolvent ones. Br. at 20-

---

[9]     The TLA Claimholders point to the Fifth Circuit's acceptance of certification of this issue as purportedly reflecting that it is an open question, but in fact the Fifth Circuit accepted certification in order to reject and reverse the Bankruptcy Court's endorsement of the same argument that the TLA Claimholders are presenting here, because it was contrary to "the monolithic mountain of authority." *Ultra*, 943 F.3d at 760, 763, 766.

21.   But below, they asserted just the opposite: that Congress repealed section 1124(3) in order to "reinforce[] the survival of the solvent debtor exception[.]" A113-A114 (Objection) ¶ 31.  Even if their new argument were not barred, it would fail.  Just as the TLA Claimholders acknowledged, the repeal of section 1124(3) did not serve to require all debtors to pay PPI in contradiction to section 502(b)(2)'s disallowance of PPI but instead was addressed to the solvent debtor exception.  *See* Appellees' Br. at 28-30.

Oddly, the TLA Claimholders try to support their argument by pointing to remarks by Judge Drain in *Empire Generating* about section 1124(1) and the repeal of section 1124(3).  Br. at 21.  But they fail to acknowledge (though they are aware) that Judge Drain reversed his position in *In re 53 Stanhope LLC*, concluding that a creditor is not "impaired" under section 1124 by virtue of its claim being subjected to the "Bankruptcy Code's own limitations on claim allowance, including limitations on the allowance of postpetition interest."  625 B.R. at 579-80; *see* A1803, A1811 (Certification Decision).[10]

Next, the TLA Claimholders argue that the Bankruptcy Court erred in assigning to them the burden to demonstrate that TLA is solvent and that it applied

---

[10]      The TLA Claimholders also refer to *In re Oneida Ltd.*, 351 B.R. 95 (Bankr. S.D.N.Y. 2009) and *Amster Yard Assocs.*, 214 B.R. 122 (Bankr. S.D.N.Y. 1997), but neither held that an insolvent debtor must pay PPI to unsecured creditors.  *See also* A1811-A1814 (Certification Decision) (explaining that *Oneida* is "factually distinguishable and grounded in inapposite case law").

an incorrect valuation standard for assessing solvency.  Br. at 22.  They are wrong on both counts.  *See* Appellees' Br. at 41-42, 48-49; A1334-A1335, A1342 (Confirmation Decision).  But even if they were not wrong, they still would lose because the Bankruptcy Court found that the Debtors affirmatively demonstrated that TLA is insolvent and that the TLA Claimholders' proffered evidence, even apart from not addressing the right valuation standard, was unreliable, did not reflect TLA's current financial condition, and disregarded the full amount of TLA's liabilities.  *See* Appellees' Br. at 42-48; A1342-A1352 (Confirmation Decision).

Finally, the TLA Claimholders would not succeed in their argument regarding the rate of interest that creditors can receive pursuant to the solvent debtor exception when they establish that a debtor is solvent – an issue that need not be addressed because they cannot establish that TLA is solvent or that they have a right to PPI. Br. at 22.  The Bankruptcy Court correctly determined that, if the TLA Claimholders had established a right to PPI by establishing that TLA is solvent, the rate would be the federal judgment rate that is determined under 28 U.S.C. § 1961 rather than the contractual and default rates that the TLA Claimholders propose.  A1355-A1366 (Confirmation Decision).  As noted, the TLA Claimholders' only argument as to the rate was embedded in their solvent debtor theory:  They asserted that the solvent debtor exception should be placed in section 1124(1) and that, if the solvent exception applied because TLA is solvent, they could seek PPI at the contract rate.

22

A114-A121 (Objection) ¶¶ 33-44.  But the Bankruptcy Court concluded, as have other courts, that "the solvent debtor exception survived [the enactment of the Code] through section 1129(a)(7), not section 1124(1)."  A1352-A1353 (Confirmation Decision).  Because section 1129(a)(7) in turn refers to section 726(a)(5), the rate of PPI in solvent debtor cases is the "legal rate" – *i.e.*, the federal judgment rate. A1330-1333; A1352-1366 (Confirmation Decision).   The Bankruptcy Court's decision was well-reasoned and grounded in the applicable statutory sections and case law. *See id.*

### D.   A Stay Would Be Contrary To The Public Interest

The TLA Claimholders cannot demonstrate that a stay pending appeal would serve the public interest.  To the contrary, as the Bankruptcy Court rightly found, a stay would harm the public interest because it "will delay and potentially derail the Debtors' emergence from Chapter 11, which in turn could jeopardize the Debtors' businesses, cause a loss of jobs, and weaken the airline industry more generally. That is plainly not in the public interest."  A1781 (Stay Decision).[11]

---

[11]     The Bankruptcy Court properly rejected the TLA Claimholders' argument that the "public interest in correcting legal errors in the bankruptcy court outweighs the interest in the efficient administration of the estate."  Br. at 24 (citing *CWCapital Asset Mgmt., LLC v. Burcam Cap. II, LLC*, 2013 WL 3288092, *9 (E.D.N.C. June 28, 2013)).  The movant in *CWCapital* had a strong likelihood of success on appeal and was the debtors' "only major creditor," but here the TLA Claimholders have no likelihood of success and are a small group among the "vast majority" of creditors that "support the expedient administration of the Plan." *Id.*

## II.   If a Stay Is Imposed, a Bond Should Be Required to Protect the Debtors Against the Massive Harm that a Stay Would Cause

If a stay were to be issued (and none should be), the TLA Claimholders would need to post a bond in an amount sufficient to protect the Debtors against the massive harm that a stay likely would cause.  See Fed. R. Bankr. P. 8007(c).  A "party seeking a stay without bond has the burden of providing specific reasons why the court should depart from the standard requirement of granting a stay only after posting of a supersedeas bond."  *Adelphia II*, 361 B.R. at 350; *In re DJK Residential, LLC*, No. 08–10375, 2008 WL 650389, at *2 (S.D.N.Y. Mar. 7, 2008) (same).  The TLA Claimholders cannot possibly justify such a departure from the norm, given the severe harm a stay would cause.  The purpose of the bond is "to indemnify the party prevailing in the original action against loss caused by an unsuccessful attempt to reverse the holding of the bankruptcy court."  *See In re Motors Liquidation Co.*, 539 B.R. 676, 686 (Bankr. S.D.N.Y. 2015); *see also* Br. at 24-25.  The bond should be set "at or near the full amount of potential harm to the non-moving parties." *Adelphia II*, 361 B.R. at 368; *see also* 10 Collier on Bankruptcy ¶ 8007.09[1] (16th ed. 2022) (bond should be set "in a sum sufficient to protect the rights of the party who prevailed in the bankruptcy court[]"); *In re DJK Residential*, 2008 WL 650389, at *5 (same).[12]

---

[12]     In the relatively rare circumstances where a stay pending appeal has been granted in complex Chapter 11 cases such as this one, courts have found sizable bonds appropriate.  *See, e.g.*,

Here, as detailed in the Herlihy Declaration, the magnitude of the harm that a stay would threaten to cause to the Debtors is enormous.   A1302-A1435 (Confirmation Decision).   The entry of a stay would place at substantial risk approximately $10.238 billion in new investments that form the basis of the Plan and the Debtors' successful emergence from Chapter 11, including the Backstop Agreements, the DTE/DIP Facilities, and other critically important financing facilities. *See* Herlihy Decl. ¶¶ 6-24.  There is no guarantee that these arrangements could be extended, modified or replaced.  The inability to implement the Plan and consummate these arrangements would cause massive harm to the Debtors and place their successful emergence in jeopardy, with corresponding destruction in value and reduction of recoveries for all creditors and stakeholders. *See id.*  A bond that is commensurate with the full amount of the threatened harm to the non-moving parties would need to be set in an amount of approximately $10.238 billion.

## CONCLUSION

The Debtors respectfully request that the Court deny the TLA Claimholders' motion for a stay pending appeal.  If a stay were to be issued, the bond should be set in an amount commensurate with the likely harm as set forth above.

---

*In re Trib. Co.*, 477 B.R. 465, 483 (Bankr. D. Del. 20212) ($1.5 billion); *Adelphia II*, 361 B.R. at 368 ($1.3 billion); *see also In re Gen. Motors Corp.*, 409 B.R. at 34 (denying stay, but finding that "a bond would have to be posted in an amount no less than $7.4 billion" if the stay had been issued); *In re Calpine Corp.*, 2008 WL 207841, at *7 (denying stay, but finding that "a $900 million bond would be a reasonable, justifiable measure of protection" if a stay had been issued).

Dated: August 12, 2022
New York, New York

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By: */s/ David H. Herrington*

Jeffrey A. Rosenthal
Lisa M. Schweitzer
David H. Herrington
Abena A. Mainoo
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Attorneys for Appellees LATAM Airlines Group S.A.,*
et al.