22-1940
*In re LATAM Airlines Group S.A.*

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2022

(Argued: October 12, 2022          Decided: December 14, 2022)

Docket No. 22-1940

_____

IN RE: LATAM AIRLINES GROUP S.A.,

*Debtor.*
_____

TLA CLAIMHOLDERS GROUP,

*Appellant,*

v.

LATAM AIRLINES GROUP S.A.,

*Debtor-Appellee,*

PARENT AD HOC CLAIMANT GROUP, BANCO DEL ESTADO DE CHILE, OFFICIAL
COMMITTEE OF UNSECURED CREDITORS, AD HOC GROUP OF LATAM
BONDHOLDERS,

*Intervenors-Appellees.*
_____

Before:

LEVAL, CHIN, and LEE, *Circuit Judges.*

Appeal from an order of the United States District Court for the Southern District of New York (Denise L. Cote, *Judge*), affirming an order of the United States Bankruptcy Court for the Southern District of New York (James L. Garrity, Jr., *Bankruptcy Judge*) that confirmed LATAM Airlines Group S.A.'s plan of reorganization. Appellants, who hold unsecured claims against an affiliate of the debtor, contend that they are entitled to post-petition interest on their claims by reason of 11 U.S.C. § 1124(1), or a longstanding equitable rule: the "solvent-debtor exception." We reject their arguments and **AFFIRM**.

MATTHEW D. MCGILL (Jonathan C. Bond, David W. Casazza, Gibson, Dunn & Crutcher LLP, Washington, D.C.; Daniel A. Fliman, Christopher M. Guhin, Emily L. Kuznick, John F. Iaffaldano, Paul Hastings LLP, New York, N.Y., *on the brief*), Gibson, Dunn & Crutcher LLP, Washington, D.C., *for Appellant TLA Claimholders Group*.

DAVID H. HERRINGTON (Jeffrey A. Rosenthal, Lisa M. Schweitzer, *on the brief*), Cleary Gottlieb Steen & Hamilton LLP, New York, N.Y, *for Debtor-Appellee*.

DAVID E. BLABEY, JR. (Rachael L. Ringer, Kenneth H. Eckstein, *on the brief*), Kramer Levin Naftalis & Frankel LLP, New York, N.Y., *for Intervenor-Appellee Parent Ad Hoc Claimant Group*.

G. ERIC BRUNSTAD, JR. (Allan S. Brilliant, David A. Herman, *on the brief*), Dechert LLP, New York, N.Y., *for Intervenor-Appellee Official Committee of Unsecured Creditors*.

2

1    Pedro A. Jimenez, Paul Hastings LLP,
2    New York, N.Y., *for Intervenor-Appellee*
3    *Banco del Estado de Chile*.
4
5    Joshua D. Weedman, White & Case LLP,
6    New York, N.Y., *for Intervenor-Appellee*
7    *Ad Hoc Group of LATAM Bondholders*.
8
9    LEVAL, *Circuit Judge*:

10    The TLA Claimholders, who assert unsecured claims against Tam

11    Linhas Aéreas S.A. ("TLA"), an affiliate of LATAM Airlines Group S.A.

12    ("LATAM"), a large South American airline holding company, appeal

13    from an August 31, 2022 order of the United States District Court for the

14    Southern District of New York (Denise L. Cote, *Judge*), affirming a June

15    18, 2022 order of the United States Bankruptcy Court for the Southern

16    District of New York (James L. Garrity, Jr., *Bankruptcy Judge*), confirming

17    LATAM's reorganization plan.

18    The plan of reorganization provides that the Appellants' claims

19    will be paid in full, except for any post-petition interest. The Bankruptcy

20    Court determined that such treatment rendered the claims unimpaired

21    under Section 1124(1) of the Bankruptcy Code, because Section 502(b)(2)

3

1    of the Code provides that "unmatured interest" may be excluded from a

2    claim. 11 U.S.C. §§ 502(b)(2), 1124(1). It also determined that the affiliate,

3    TLA, was insolvent, so that the solvent-debtor exception—an equitable

4    doctrine permitting the payment of post-petition interest by a solvent

5    debtor in limited circumstances—did not apply.

6          On appeal, the TLA Claimholders contend that, unless they

7    receive post-petition interest, their claims are "impaired" under Section

8    1124(1). They also argue that TLA is solvent and that its solvency makes

9    the solvent debtor exception applicable. They further contend that the

10    Bankruptcy Court's test for assessing solvency was legally flawed.

11          We hold that (1) a claim is not impaired under 11 U.S.C. § 1124(1)

12    when it is altered by operation of the Bankruptcy Code, and (2) the

13    Bankruptcy Court did not err in its assessment of TLA's solvency.

14    Accordingly, we **AFFIRM**.

15                        **BACKGROUND**

16          LATAM is a holding company, which owns numerous South

17    American airlines. TLA, a Brazilian airline, is a subsidiary of LATAM.

1  On May 26, 2020, LATAM and several of its affiliates filed for

2  Chapter 11 bankruptcy protection in the U.S. Bankruptcy Court for the

3  Southern District of New York. On July 9, 2020, TLA filed its own

4  Chapter 11 voluntary petition. Pursuant to Fed. R. Bankr. P. 1015(b), the

5  Bankruptcy Court procedurally consolidated LATAM's case with those

6  of its affiliates, including TLA. We refer to LATAM, TLA, and the other

7  affiliated businesses as the Debtors.

8  The Debtors proposed a plan of reorganization in late 2021 (the

9  "Plan"). The Plan depends on raising $5.442 billion through a new

10  equity offering in Chile (the "Chilean Offering"). To ensure that

11  sufficient funds are raised through the Chilean Offering, several large

12  claimholders and a group of LATAM's largest shareholders have

13  committed to purchase up to $5.4 billion of shares.

14  Consistent with 11 U.S.C. § 1123, the Plan divided claims into

15  different classes and designated each class as impaired or unimpaired.

16  Class 6 contains all general unsecured claims against LATAM's

17  affiliates, with limited exceptions not relevant here. The Plan designates

1     this class as unimpaired. Unless members of Class 6 consent to other

2     treatment, they will receive the full "allowed" value of their claim, *i.e.*,

3     the amount recoverable under the Bankruptcy Code, or whatever other

4     treatment is necessary to render the claims unimpaired. S. App'x at 96.

5         The TLA Claimholders assert unsecured claims against TLA,

6     based on several debt instruments governed by Brazilian law. It is

7     undisputed that TLA defaulted on these instruments, and that in the

8     absence of any bankruptcy proceeding, the Claimholders would be

9     entitled to substantial interest. Under the Plan, the Claimholders are

10    classified as members of Class 6 and receive the full allowed amount of

11    their claims: about $300 million. The Plan does not provide for a further

12    $150 million of post-petition interest.

13        The Claimholders objected to confirmation, arguing that they

14    could not be classified as unimpaired if they did not receive such post-

15    petition interest. In support of this position, they cited the text of Section

16    1124(1) and the solvent-debtor exception. To demonstrate that TLA was

17    solvent, the Claimholders submitted two analyses. The first, the

1    "Waterfall Analysis," used figures submitted by the Debtors in support

2    of a settlement made as part of the bankruptcy proceedings (the

3    "Settlement Figures").[1] The Settlement Figures estimated LATAM's

4    going-concern value, assuming that the Plan was confirmed and

5    LATAM received a capital infusion through the Chilean Offering. These

6    figures estimated the consolidated value of the debtors to be $14 billion,

7    with about $3.446 billion of that value attributable to TLA. The

8    Settlement Figures also identified about $1.080 billion worth of liabilities

9    as associated with TLA, although other estimates proffered by the

10   Debtors showed higher amounts of liabilities. The TLA Claimholders'

11   expert took the Settlement Figures and subtracted TLA's share of the

12   estimated liabilities from its share of the estimated overall value,

13   yielding a surplus of $2.336 billion.

---

[1] The settlement pertains to the treatment of Class 4 claims, which are based on LATAM's 2024 and 2026 bonds. Class 4 claimholders will receive, in cash, the full allowed amount of their claim. The Debtors proffered the Settlement Figures to show that, with the infusion of funds from the Chilean Offering, LATAM would be able to pay the Class 4 claims and continue as a going concern.

1    The Claimholders' second analysis, the "Discounted Cash Flow

2    Analysis," assessed TLA's value as a going concern based on the present

3    value of its future cash flow. Both the Discounted Cash Flow Analysis

4    and the Waterfall Analysis supported the view that TLA was solvent.

5    The Debtors opposed the objection and submitted two additional

6    analyses of TLA's solvency. The first, the "Liquidation Analysis,"

7    compared the amount that TLA would obtain through sales of its assets

8    against the amount of its liabilities. This analysis estimated the amount

9    that could be obtained through quick, foreclosure style-sales, as well as

10   through sales occurring over an eighteen-month period. The second, the

11   "Balance Sheet Test," compared the book value of TLA's assets against

12   the book value of its liabilities. Both analyses submitted by the Debtors

13   indicated that TLA was insolvent.

14   The Debtors also criticized the Claimholders' methodology,

15   arguing that it was improper to use the Settlement Figures in this

16   context. They also argued that both analyses understated TLA's

17   liabilities by a significant amount.

1    The Bankruptcy Court agreed with the Debtors, rejected the

2   Claimholders' objection, and confirmed the Plan. *See generally In re*

3   *LATAM Airlines Grp. S.A.*, No. 20-11254 (JLG), 2022 WL 2206829 (Bankr.

4   S.D.N.Y. June 18, 2022), *as amended*, 2022 WL 2541298 (Bankr. S.D.N.Y.

5   July 7, 2022) ("*LATAM I*").

6    First, the Bankruptcy Court held that Section 1124(1) did not speak

7   to post-petition interest and thus did not supersede the limitation on

8   post-petition interest contained in Section 502(b)(2). Second, it

9   determined that TLA was insolvent, so that the solvent-debtor exception

10  did not apply. Specifically, the Bankruptcy Court found that the

11  analyses submitted by the Debtors were credible, supported by

12  evidence, and consistent with the statutory definition of "insolvent," *i.e.*,

13  that "the sum of such entity's debts is greater than all of such entity's

14  property, at a fair valuation." 11 U.S.C. § 101(32)(A).

15   As to the Waterfall Analysis and the Discounted Cash Flow

16  Analysis, the Bankruptcy Court found that neither comported with

17  Section 101(32). As to the Waterfall Analysis, the Bankruptcy Court

1    agreed with the Debtors that it significantly understated TLA's

2    liabilities. The Bankruptcy Court concluded that when the corrected

3    figure was used, the Waterfall Analysis also demonstrated that TLA was

4    insolvent. As to the Discounted Cash Flow Analysis, the Bankruptcy

5    Court determined that it was too speculative to support a finding of

6    solvency.

7         The District Court affirmed. *In re LATAM Airlines Grp. S.A.*, 643

8    B.R. 741 (S.D.N.Y. 2022) ("*LATAM II*"). The TLA Claimholders then

9    appealed to this Court.

10                        **STANDARD OF REVIEW**

11        "In an appeal from a district court's review of a decision of a

12   bankruptcy court, we conduct an independent and plenary review of

13   the bankruptcy court's decision, accepting the bankruptcy court's

14   findings of fact unless they are clearly erroneous and reviewing its

15   conclusions of law de novo." *In re Teligent, Inc.*, 640 F.3d 53, 57 (2d Cir.

16   2011).

17

# DISCUSSION

## A. Applicable Law

### (i) The Rule Against Post-Petition Interest and the Solvent-Debtor Exception

Before the Bankruptcy Code was enacted in 1978, the Supreme Court recognized a "general rule" in bankruptcy: "interest on the debtors' obligations ceases to accrue at the beginning of proceedings." *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 163 (1946). The Court also recognized that English courts had developed an exception to this rule: "if the alleged 'bankrupt' proved solvent, creditors received post-bankruptcy interest before any surplus reverted to the debtor." *City of New York v. Saper*, 336 U.S. 328, 330 n.7 (1949) (collecting English authorities). Like other circuit courts, we applied this "solvent-debtor" exception in cases arising under pre-Code bankruptcy laws. *See, e.g.*, *Ruskin v. Griffiths*, 269 F.2d 827, 831 (2d Cir. 1959); *see also Debentureholders Protective Comm. of Cont'l Inv. Corp. v. Cont'l Inv. Corp.*, 679 F.2d 264, 269 (1st Cir. 1982); *In re Beverly Hills Bancorp*, 752 F.2d 1334, 1339 (9th Cir. 1984).

11

1    Under the Bankruptcy Code, the rule against post-petition interest

2    is codified at 11 U.S.C. § 502(b)(2). *See United Sav. Ass'n of Texas v.*

3    *Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 372-73 (1988). Section

4    502 defines what portions of a claim may be "allowed," *i.e.*, recoverable

5    in bankruptcy. 11 U.S.C. § 502(a). It contains several specific limitations,

6    including that an allowed claim cannot include "unmatured interest." 11

7    U.S.C. § 502(b)(2).

8    We have not yet addressed whether the solvent-debtor exception

9    survived the enactment of the Code. The Fifth and Ninth Circuits have

10   recently concluded that it did. *See In re Ultra Petroleum Corp.*, 51 F.4th

11   138, 156 (5th Cir. 2022) ("*Ultra Petroleum II*"); *In re PG&E Corp.*, 46 F.4th

12   1047, 1061 (9th Cir. 2022).

13   **(ii)    Impairment Under Chapter 11**

14   "A Chapter 11 bankruptcy is implemented according to a 'plan,'

15   typically proposed by the debtor, which divides claims against the

16   debtor into separate 'classes' and specifies the treatment each class will

17   receive." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639,

1  641 (2012) (citing 11 U.S.C. § 1123). The plan must designate each class

2  as impaired or not impaired. *See* 11 U.S.C. §§ 1123(a)(2)–(3). Classes with

3  "impaired" claims may vote to accept or reject the plan. *See* 11 U.S.C. §§

4  1126, 1129(a)(8). If a class of impaired creditors dissents, the debtor must

5  resort to the "cramdown" process for the plan to be confirmed. *See Bank*

6  *of America Nat'l Tr. and Sav. Ass'n v. 203 North LaSalle St. P'ship*, 526 U.S.

7  434, 441 (1999). An unimpaired class is "conclusively presumed to have

8  accepted the plan" and thus gets no vote. 11 U.S.C. § 1126(f).

9      Section 1124 of the Bankruptcy Code determines when a claim is

10  impaired. It provides that:

11      [A] class of claims or interests is impaired under a plan unless,
12      with respect to each claim or interest of such class, the plan—
13          (1) leaves unaltered the legal, equitable, and contractual
14          rights to which such claim or interest entitles the holder of
15          such claim or interest; or
16          (2) notwithstanding any contractual provision or applicable
17          law that entitles the holder of such claim or interest to
18          demand or receive accelerated payment of such claim or
19          interest after the occurrence of a default—
20              (A) cures any such default that occurred before or after
21              the commencement of the case under this title, other
22              than a default of a kind specified in section 365(b)(2) of
23              this title or of a kind that section 365(b)(2) expressly
24              does not require to be cured;

1                          (B) reinstates the maturity of such claim or interest as

2                          such maturity existed before such default;

3                          (C) compensates the holder of such claim or interest

4                          for any damages incurred as a result of any reasonable

5                          reliance by such holder on such contractual provision

6                          or such applicable law;

7                          (D) if such claim or such interest arises from any

8                          failure to perform a nonmonetary obligation, other

9                          than a default arising from failure to operate a

10                          nonresidential real property lease subject to section

11                          365(b)(1)(A), compensates the holder of such claim or

12                          such interest (other than the debtor or an insider) for

13                          any actual pecuniary loss incurred by such holder as a

14                          result of such failure; and

15                          (E) does not otherwise alter the legal, equitable, or

16                          contractual rights to which such claim or interest

17                          entitles the holder of such claim or interest.

18

19   11 U.S.C. § 1124.

20   **B.**     **Application**

21           **(i)**        **Whether Section 1124(1) Requires the Payment of Post-**

22                        **Petition Interest to Render a Claim Unimpaired**

23

1    The TLA Claimholders first argue that to be unimpaired under

2  Section 1124(1) of the Bankruptcy Code, a creditor must receive post-

3  petition interest on its claim, regardless of the debtor's solvency.[2]

4    We have stated that Section 1124(1) "define[s] impairment in the

5  broadest possible terms," so that "any change in legal, equitable or

6  contractual rights creates impairment." *In re Taddeo*, 685 F.2d 24, 28 (2d

7  Cir. 1982). Although other circuits agree that Section 1124(1) sweeps

8  broadly,[3] the Third, Fifth, and Ninth Circuits have noted a significant

9  caveat: Because Section 1124(1) refers to impairment imposed by a

10  "plan," these circuits have held it inapplicable to modifications which

11  occur by operation of the Code. "In other words, a creditor's claim

---

[2] The District Court held that this argument had not been raised in the Bankruptcy Court and was therefore forfeited. Based on our review of the transcript of the confirmation hearing and the TLA Claimholders' demonstrative slides, we find that the argument was raised before the Bankruptcy Court. In any event, we may exercise our discretion to consider the issue on appeal. *See In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 133 (2d Cir. 2008) ("[O]ur waiver doctrine is entirely prudential.").

[3] *See, e.g., In re PPI Enters. (U.S.), Inc.*, 324 F.3d 197, 202 (3d Cir. 2003) ("If the debtor's Chapter 11 reorganization plan does not leave the creditor's rights entirely 'unaltered,' the creditor's claim will be labeled as impaired under § 1124(1) of the Bankruptcy Code."); *In re L&J Anaheim Assocs.*, 995 F.2d 940, 942 (9th Cir. 1993) (adopting *Taddeo*'s formulation).

15

1     outside of bankruptcy is not the relevant barometer for impairment;

2     [courts] must examine whether the plan itself is a source of limitation on

3     a creditor's legal, equitable, or contractual rights." *PPI Enters.*, 324 F.3d

4     at 204. *See also In re Ultra Petroleum Corp.*, 943 F.3d 758, 763 (5th Cir.

5     2019) ("*Ultra Petroleum I*") ("The plain text of § 1124(1) requires that '*the*

6     *plan*' do the altering. We therefore hold a creditor is impaired under

7     § 1124(1) only if 'the plan' itself alters a claimant's 'legal, equitable, [or]

8     contractual rights.'" (alteration in original)); *PG&E*, 46 F.4th at 1063 n.11

9     ("[A]n alteration of pre-bankruptcy rights that occurs by operation of

10    the Code does not result in impairment.").

11        We find these authorities persuasive. We therefore join the Third,

12    Fifth, and Ninth Circuits and hold that a claim is impaired under

13    Section 1124(1) only when the plan of reorganization, rather than the

14    Code, alters the creditor's legal, equitable, or contractual rights.[4]

---

[4] The TLA Claimholders argue that we should instead follow *In re Monclova Care Center, Inc.*, 59 F. App'x 660, 664 (6th Cir. 2003), where the Sixth Circuit determined that the Internal Revenue Service's ("IRS") claim against a debtor would be impaired under Section 1124(1) unless the IRS received post-petition interest. We do not regard *Monclova* as persuasive authority for two

1    Under this interpretation of Section 1124(1), Appellants' claims are

2    not impaired simply because they did not receive post-petition interest.

3    Although they had a contractual right to such interest, "this contractual

4    right, as applied to postpetition debts, was superseded by the Code—

5    specifically, by § 502(b)(2)'s prohibition on the inclusion of 'unmatured

6    interest' as part of a claim." *PG&E*, 46 F.4th at 1063 (citing *Ultra*

7    *Petroleum I*, 943 F.3d at 763); *see also PPI Enters.*, 324 F.3d at 205

8    ("Because the Bankruptcy Code, not the Plan, is the only source of

9    limitation on those rights here, [the creditor's] claim is not impaired

10   under § 1124(1)."). This determination does not necessarily mean that

---

reasons. First, unlike the disputed interest here, the IRS's right to interest in *Monclova* is conferred by federal statute. *Id.* at 663 (citing 26 U.S.C. §§ 6601(a), (e), 6621, 6622). Second, in reaching its conclusion that the IRS is owed post-petition interest, the Sixth Circuit treated the dispute as concerning the language of a bankruptcy plan, rather than the Code. *Id.* at 663-64. Although the definitions given in the plan tracked those in the Code, the Sixth Circuit did not appear to treat the dispute as an issue of law subject to de novo review, and instead stated that it gave "full deference" to the bankruptcy court's "reasonabl[e]" interpretation of the plan in favor of the IRS. *Id.* at 661, 662, 664. We are thus uncertain whether the Sixth Circuit definitively adopted an interpretation of the Code contrary to the one held by the Third, Fifth, and Ninth Circuits, and which we adopt today. For these reasons, we do not rely on *Monclova*.

Appellants' claims are unimpaired; we must still determine whether

they have any "equitable" right to post-petition interest under the

solvent-debtor exception, which Section 1124(1) would protect. *See*

*PG&E*, 46 F.4th at 1064; *Ultra Petroleum I*, 943 F.3d at 765-66. However,

we reject the argument that post-petition interest must be paid

regardless of solvency.

The TLA Claimholders raise three further objections to this

conclusion. We find each unpersuasive.

*First*, they argue that because Section 1124(1) refers to "claims"

rather than "allowed claims," Section 502(b)(2)'s limitation on post-

petition interest does not apply. We agree with the Fifth Circuit that the

"broader statutory context" undermines this argument. *Ultra Petroleum*

*I*, 943 F.3d at 764. Section 1124(1) does not state that the "claims"

themselves will be left unaltered; instead, it protects "the legal,

equitable, and contractual *rights* to which such claim or interest entitles

the holder of such claim or interest." 11 U.S.C. § 1124(1) (emphasis

added). Thus, "we judge impairment after considering everything that

18

defines the scope of the right or entitlement," including the Bankruptcy

Code. *Ultra Petroleum I*, 943 F.3d at 764. The Third Circuit agrees that the

language of Section 1124(1) "does not address a creditor's claim 'under

nonbankruptcy law,'" and that its use of the present-tense suggests a

creditor's rights must be ascertained with regard to applicable

statutes[.]" *PPI*, 324 F.3d at 204 (quotation marks omitted).

   *Second*, the TLA Claimholders point to Section 1124(2), the "cure"

provision. This subsection applies where the creditor has a right to

"demand or receive accelerated payment . . . after the occurrence of a

default." 11 U.S.C. § 1124(2). It permits the debtor to treat the defaulted

claim as unimpaired without providing that accelerated payment, so

long as other conditions are satisfied: the creditor must cure the default,

reinstate the maturity of the claim, and compensate the creditor for

damages resulting from reliance on the prospect of receiving accelerated

payment. *See* 11 U.S.C. §§ 1124(2)(A)–(C). The Claimholders correctly

note that courts considering Section 1124(2) have required debtors to

pay post-petition interest to render a claim unimpaired. However, each

19

case identified by the Claimholders reasoned that the right to post-

petition interest in a Section 1124(2) case follows from 11 U.S.C. §

1123(d), which provides how much must be paid to cure a default.[5]

Unlike Section 1124(1), which, as discussed above, refers to all

applicable law, including the Code, Section 1123(d) provides that the

amount necessary to cure a default shall be determined by "applicable

nonbankruptcy law." Because Section 1124(1) does not refer to cure and

reinstatement, we find no guidance in these authorities considering the

interaction of Sections 1124(2) and 1123(d).

   *Third*, the TLA Claimholders make an argument from statutory

history. Prior to 1994, Section 1124(3) permitted a debtor to render a

---

[5] *See, e.g.*, *In re Depietto*, No. 20-CV-8043 (KMK), 2021 WL 3287416, at *6 (S.D.N.Y. Aug. 2, 2021) ("A number of courts, including several within the Second Circuit, have concluded that § 1123(d) may require the debtor to pay a default interest rate in order to cure a default."); *In re New Inv., Inc.*, 840 F.3d 1137, 1142 (9th Cir. 2016) ("The parties bargained for a higher interest rate on the note in the event of default, and Pacifica is entitled to the benefit of that bargain under the terms of § 1123(d)."); *In re Moshe*, 567 B.R. 438, 444 (Bankr. E.D.N.Y. 2017) ("Courts interpreting Section 1123(d) have held that the underlying loan agreement and state law determine whether a debtor must cure using the default rate of interest in a Chapter 11 plan."); *In re Gen. Growth Properties, Inc.*, 451 B.R. 323, 327 (Bankr. S.D.N.Y. 2011) (holding that § 1123(d) compelled the payment of default interest at the contractual rate).

1   claim "unimpaired" by paying the allowed amount of a claim in cash.

2   *See* 11 U.S.C. § 1124(3) (1992). It is not disputed that this subsection

3   would have also permitted the Debtors to treat the claims of TLA

4   Claimholders as unimpaired without post-petition interest. The

5   Claimholders thus argue that, for the repeal of Section 1124(3) to have

6   had any meaning, Section 1124(1) cannot be read to authorize treating

7   claims as unimpaired when excluding post-petition interest.

8       We are not convinced that the 1994 repeal can be given such

9   sweeping effect. The Supreme Court "has been reluctant to accept

10  arguments that would interpret the Code, however vague the particular

11  language under consideration might be, to effect a major change in pre-

12  Code practice that is not the subject of at least some discussion in the

13  legislative history." *Dewsnup v. Timm*, 502 U.S. 410, 419 (1992). While the

14  TLA Claimholders' proposed interpretation would nullify the

15  longstanding rule barring post-petition interest, the legislative history

16  regarding the 1994 repeal demonstrates more modest intentions. That

17  history shows that Congress acted in response to *In re New Valley Corp.*,

21

1   168 B.R. 73 (Bankr. D.N.J. 1994). *See* H.R. Rep. No. 103-835, § 214 at 47–

2   48 (1994); *see also PG&E*, 46 F.4th at 1060, 1062 (discussing legislative

3   history). In *New Valley*, a solvent debtor argued that it need not pay

4   post-petition interest to unsecured creditors to render them unimpaired,

5   relying on Sections 502(b)(2) and 1124(3). *See* 168 B.R. at 75-76. The

6   bankruptcy court agreed, ruling that "a plain reading of the pertinent

7   Bankruptcy Code sections demonstrates that in a Chapter 11 context

8   solvency alone is an insufficient basis to require payment of postpetition

9   interest to unsecured creditors." *Id.* at 77. The House Report explained

10  that the repeal of Section 1124(3) was meant to prohibit this outcome,

11  describing *New Valley* as an "unfair result." H.R. Rep. No. 103-835, § 214

12  at 48.

13      Based on this legislative history, the Fifth Circuit has held that, in

14  repealing Section 1124(3), Congress meant only to ensure that solvent

15  debtors pay post-petition interest on their claims. *See Ultra Petroleum I*,

16  943 F.3d at 764-65. The Third and Ninth Circuits have likewise described

17  Section 1124(3)'s repeal as targeted at the "anomalous result" created by

1    the *New Valley* decision. *PPI Enters.*, 324 F.3d at 206-07; *see PG&E*, 46

2    F.4th at 1060 (emphasizing that the *New Valley* repeal applies to

3    "creditors of a solvent debtor"). We agree with this interpretation.

4          The TLA Claimholders argue that these decisions are wrong, and

5    that we should instead follow the approach taken by several bankruptcy

6    courts. *See In re Seasons Apartments, Ltd. P'ship*, 215 B.R. 953, 960 (Bankr.

7    W.D. La. 1997); *In re Atlanta-Stewart Partners*, 193 B.R. 79, 81–82 (Bankr.

8    N.D. Ga. 1996). These courts have reasoned that, even though Congress

9    may have been spurred to action by the *New Valley* decision, the repeal

10   of Section 1124(3) applies to all debtors. They base this conclusion on

11   Section 1124's purported failure to distinguish between solvent and

12   insolvent debtors. *See Seasons Apartments*, 215 B.R. at 960; *Atlanta-*

13   *Stewart*, 193 B.R. at 82.

14         We are not persuaded. Although Section 1124(1) does not

15   expressly refer to solvency, it does protect a creditor's "equitable

16   rights." That includes whatever survives of the solvent-debtor

17   exception. *See PG&E*, 46 F.4th at 1060 ("While, as discussed, no Code

23

1   provision legally entitles supposedly unimpaired creditors to

2   postpetition interest, pre-Code practice conclusively establishes

3   creditors' equitable entitlement to contractual postpetition interest when

4   a debtor is solvent, subject to any other countervailing equities."). So

5   interpreted, Section 1124(1) does distinguish between solvent and

6   insolvent debtors. The textual hurdle identified by the *Seasons*

7   *Apartments* and *Atlanta-Stewart* courts thus does not foreclose our

8   interpretation. We therefore do not believe that the repeal of Section

9   1124(3) carries the weight the TLA Claimholders ascribe to it.

10  **(ii)    Whether the Solvent-Debtor Exception Was Satisfied**

11          The Claimholders also raise two legal objections to the Bankruptcy

12  Court's solvency analysis.[6] First, they argue that the solvent-debtor

13  exception arises from the absolute priority rule, a doctrine which forbids

14  a debtor's equity holders from recovering value from the estate before

15  all creditors are paid. *See In re DBSD N. Am., Inc.*, 634 F.3d 79, 94 (2d Cir.

---

[6] Although the Claimholders raised limited factual objections to the solvency analysis before the District Court, *see LATAM II*, 643 B.R. at 752, they have not done so on this appeal.

24

2011). Thus, the solvent-debtor exception is triggered—and creditors

must receive post-petition interest—whenever a plan will return value

to equity.

Second, the Claimholders argue that the Bankruptcy Court should

have looked to a discounted cash-flow analysis to assess solvency. They

primarily rely on *Consolidated Rock Products Company v. Du Bois*, 312 U.S.

510, 520 (1941), in which the Supreme Court held that a plan of

reorganization could not be confirmed under the 1898 Bankruptcy Act.[7]

The barriers to confirmation included the lower court's failure "to value

the whole enterprise by a capitalization of prospective earnings." *Id.* at

525. The Court further explained that "[f]indings as to the earning

capacity of an enterprise are essential to a determination of the

feasibility as well as the fairness of a plan of reorganization." *Id.*

---

[7] The TLA Claimholders also argue that *Associates Commercial Corporation v. Rash*, 520 U.S. 953 (1997), required the Bankruptcy Court to look to TLA's value as a going concern. But *Rash* does not provide a general standard for valuation: it interpreted specific statutory language in 11 U.S.C. § 506(a). *See Rash*, 520 U.S. at 961–62 (holding that Section 506(a)'s second sentence "expressly addresses how 'value shall be determined'" in the context of secured claims). Because that provision of the Code does not apply here, neither does *Rash*'s interpretation of that provision.

1       Although raised as a separate objection, the *Consolidated Rock*

2   argument also follows from the absolute priority rule. The reason a

3   prospective earnings analysis was "essential," as Justice Douglas

4   explained, was to ensure that "indefensible participation of junior

5   securities in plans of reorganization" did not result. *Id.* at 525-26; *see also*

6   John D. Ayer, *Rethinking Absolute Priority After Ahlers*, 87 Mich. L. Rev.

7   963, 975–76 (1989). Thus, to the extent the Claimholders argue that

8   *Consolidated Rock* requires a prospective earnings analysis in this context,

9   such a requirement likewise follows from the common-law absolute

10  priority rule. *See* Appellant's Br. at 65; Reply Br. at 21. We therefore

11  consider these objections together.

12      As we have explained, the Code's treatment of absolute priority

13  "is so different from the prior Bankruptcy Act that the old practice

14  simply cannot be imported *in toto* into practice under the new Code." *In*

15  *re Coltex Loop Cent. Three Partners, L.P.*, 138 F.3d 39, 43 (2d Cir. 1998);

16  *accord 203 North Lasalle*, 526 U.S. at 448 ("[T]he Code does not codify any

17  authoritative pre-Code version of the absolute priority rule.").

1    Accordingly, even assuming the TLA Claimholders correctly describe

2    the solvent-debtor exception's relationship to the common-law absolute

3    priority rule,[8] we cannot assume that the Code guarantees the same

4    result.

5         Under the Code, the absolute priority rule comes into effect only

6    when a class of impaired creditors votes to reject a plan, and the debtor

7    resorts to the "cramdown" procedure. *DBSD*, 634 F.3d at 105. For

8    unsecured creditors such as the TLA Claimholders, the absolute priority

9    rule is codified at Section 1129(b)(2)(B). The plan must satisfy one of two

10   conditions:

11        (i) the plan provides that each holder of a claim of such class
12            receive or retain on account of such claim property of a value, as

---

[8] In support of their position, the TLA Claimholders primarily rely on *PG&E* and *Ultra Petroleum II*. Although both cases stated that the solvent-debtor exception has roots in the absolute priority rule, neither addressed the proper standard for determining solvency. There was no need to do so, as each debtor's solvency was obvious and consequently undisputed. *See PG&E*, 46 F.4th at 1051 ("...PG&E was, and has remained, solvent. Its assets at the time of the bankruptcy filing exceeded its known liabilities by nearly $20 billion."); *Ultra Petroleum II*, 51 F.4th at 143 ("During the bankruptcy proceedings, the same volatile commodity prices that hurled Ultra into insolvency propelled the debtors back into solvency. Indeed, Ultra became 'massively solvent.'"). We therefore do not understand either court's discussion of history to bear on the proper test for solvency.

1       of the effective date of the plan, equal to the allowed amount of
2       such claim; or
3       (ii) the holder of any claim or interest that is junior to the claims of
4       such class will not receive or retain under the plan on account of
5       such junior claim or interest any property . . . .
6
7    11 U.S.C. §§ 1129(b)(2)(B)(i)–(ii).
8
9            Under the statute, unsecured creditors such as the Claimholders—

10   who will be paid the full allowed amount of their claim—cannot insist

11   on compliance with the absolute priority rule. Because such a plan

12   satisfies Section 1129(b)(2)(B)(i), there is no need for it to satisfy Section

13   1129(b)(2)(B)(ii). *Cf. Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 201

14   n.1 (1988).

15          The Claimholders' understanding of the solvent-debtor exception

16   is not consistent with this statutory scheme. Under their interpretation,

17   they are effectively entitled to insist on compliance with the absolute

18   priority rule, unless they are paid more than what they could recover

19   under full compliance with the rule as codified.[9] Appellant's Br. at 40;

_____

[9] The Claimholders mention in passing that a plan cannot be crammed down
if it does not comply with the best-interest-of-creditors test, 11 U.S.C.
§ 1129(a)(7), which requires impaired, dissenting creditors to receive as much

28

1    Ad Hoc Claimant Brief at 14. We therefore do not believe that the

2    absolute priority rule provides the relevant test for solvency. We

3    accordingly reject the argument that the Bankruptcy Court was

4    required, as a matter of law, to apply the solvent debtor exception under

5    these circumstances. We likewise reject the contention that the

6    Bankruptcy Court was required to credit the Discounted Cash Flow

7    Analysis because of *Consolidated Rock*'s gloss on the absolute priority

8    rule.

9    　　　The Claimholders do not identify any other rule of law which

10    would require the Bankruptcy Court to rule that the solvent-debtor

11    exception applied. We have held that bankruptcy courts have "broad

12    discretion when considering evidence to support a finding of

---

as they would have in a Chapter 7 liquidation. Appellant's Br. 7. We do not
understand them to argue that the Plan would have failed this test. Section
1129(a)(7) "essentially requires every plan proponent to perform a liquidation
analysis of the estate," which "will often be proved through the testimony of
auctioneers or other liquidators as to what the assets will yield under more or
less 'firesale' conditions." 7 Collier on Bankruptcy ¶ 1129.02[7][b][iii] (16th ed.
2022); *see also Toibb v. Radloff*, 501 U.S. 157, 164 (1991) (describing this process
as assuming "an immediate liquidation of the debtor's assets"). Given the
analyses proffered by the Debtors, we have no basis to assume that the
Claimholders would be better off in a Chapter 7 liquidation.

insolvency." *In re Roblin Indus., Inc.*, 78 F.3d 30, 35 (2d Cir. 1996). The

district court did not abuse that discretion in determining that the

Debtors' analyses and the corrected Waterfall Analysis were more

probative on the question of TLA's solvency than the Discounted Cash

Flow Analysis. We accordingly affirm the Bankruptcy Court's finding

that TLA was insolvent.[10]

## CONCLUSION

We have considered the TLA Claimholders' remaining arguments

and determined that they are without merit. In sum, we hold that: 1) a

claim is not "impaired" under 11 U.S.C. § 1124(1) unless the plan, rather

than other provisions of the Bankruptcy Code, alters the claim, and 2)

the Bankruptcy Court did not err in its assessment of TLA's solvency.

We therefore **AFFIRM**.

---

[10] Under these circumstances, it is unnecessary to consider whether the Bankruptcy Court correctly put the burden on the Claimholders to prove TLA's insolvency. The Debtors did provide affirmative evidence of TLA's insolvency, which the Bankruptcy Court determined to be reliable.